UNITED STATES DISTRICT COURT

for the

Northern District of Georgia

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL – 7 2014

JAMES N. HATTEN, CLERK
By:
J. Brannon    Deputy Clerk

Jemal Ahmed,

      plaintiff

   v.

Elias Kifle,

      Defendant

|

|

|

|

|

|

Civil Action No.

1:12-cv-2697

---

## MOTION TO RECONSIDER THE MAGISTRATE JUDGE'S DECISION TO DENY MY REQUEST FOR HEARING

I, Elias Kifle, a pro se, hereby submit the following motion to reconsider the Magistrate Judge's decisions, which are based on a series of factual errors and misperceptions.

1. The magistrate judge's order states: **"It appears that Defendant Kifle, proceeding pro se, has filed a motion requesting a hearing before the Court in response to Plaintiff's motion to compel."**

That is not correct. My motion for a hearing is NOT in response to the Plaintiff's motion to compel. My motion for hearing is for the Plaintiff's "first set of interrogatories." The Plaintiff's representatives, DLA Piper, rushed to file a motion to compel when I filed a motion for hearing as a scheme to squeeze extra money at

the rate of $600 - $800 per hour.  The information the Plaintiff and DLA Piper are seeking from me will expose the lives of my associates and witnesses to extreme danger. As I explained in my previous documents, already some reporters in Ethiopia have been thrown in jail suspected of communicating with me. (See the attached articles by Reuters titled: "*Ethiopia slaps prison terms on three journalists.*" and by CPJ titled: "*Ethiopia: Life sentence for blogger, prison for journalists*" that states: "*... government prosecutors presented as evidence intercepted emails and phone calls between the journalists, as well as more than 25 Ethiopian Review articles on the activities of opposition groups, CPJ research shows.*")

The Plaintiff's representatives, DLA Piper, could have waited to hear the court's decision on my motion for hearing, instead of rushing to file a motion to compel.

2. The magistrate judge's order states: **"In support of his motion to compel, Plaintiff argues that Defendant Kifle has failed "to respond to properly propounded discovery continu[ing] a pattern of dilatory conduct that began at the outset of this litigation."**

The facts prove otherwise. I have been more than cooperative, sometimes going out of my way. For example, due to my frequent travels, it would have been impossible for the Plaintiff to serve me with the court papers without spending hundreds of hours trying to locate me. Instead, I had informed the private investigator who was hired by the Plaintiff and DLA Piper to serve me with court papers to call me on the phone and meet me at a convenient location for both of us. The Plaintiff has been

able to save not only time, but also thousands of dollars as a result of my cooperation. Even as I exhibited such good-faith cooperation, DLA Piper continued to engage in hostile actions against me, such as having the highly paid private investigators (who work for the Dr. Phil Show, among other clients) to follow me around town, park their cars outside my family's residence, deflate my car's tire, and going so far as following my mother and brother to a supermarket in an apparent intimidation tactic.

It is unfair and unjust for the Magistrate Judge to ignore my side of the story and go only by what the Plaintiff and DLA Piper are falsely alleging. Unlike the Plaintiff, who lives in Ethiopia and has tons of looted money at his disposal, I cannot afford to hire any attorney, let alone the likes of DLA Piper. I am swamped with my elderly parents' medical bills and I am barely able to survive as an exiled journalist. And due to the nature of my work and the difficult conditions under which I am working, I do not have the luxury of responding to DLA Piper's flood of requests and motions in a short period of time. This is the third lawsuits DLA Piper has filed against me on behalf of members of the brutal dictatorship in Ethiopia as part of their campaign of harassment. I have made myself available via mail forwarding services, express mail such as DHL, and email.

When I received the Plaintiff's "first set of interrogatories," I submitted a motion for hearing as soon as the conditions I am facing allowed me and after I have communicated with my associates in Ethiopia. I am making a sincere effort to make myself available and respond to the Plaintiff's requests in a timely manner. However, the Plaintiff's and DLA Piper's intention, as it has become abundantly

3

clear, is to obstruct me and my associates from doing our job of exposing the dictatorship in Ethiopia. On top of filing frivolous lawsuits, they have been harassing web hosting companies, satellite TV providers, and radio stations to remove our content.

3. The Magistrate Judge's order states: **"... it is undisputed that Defendant Kifle has completely failed to make timely responses to Plaintiff's interrogatories or produce any documents responsive to his RFPs."**

This is a gross misrepresentation of the fact. When I received the Plaintiff's interrogatories, as a lay person with a very limited knowledge of the legal procedures, I took time to study the document, conduct research, and discuss the matter with my associates in Ethiopia who would be exposed to danger if the information requested by DLA Piper fall in the hands of the Ethiopian regime's secret police. It is based on the grave concern that I have that I filed a motion for hearing.

Justice will be served by the Court having a fair and balanced view of the case. This lawsuit involves a Plaintiff who resides in a different continent 10,000 miles away, an exiled dissident (me) who and whose family are being persecuted by the Plaintiff's political party, witnesses who are being tortured and languishing in malaria-infested jails in Ethiopia, and DLA Piper, a company of over-paid lawyers who provide political, public relations, and "legal" services to some of the most vile, murderous dictators around the world. The complexity of the case, and the extreme dangers facing those who are on my side, call for extreme caution,

4

thorough understanding, and extra care, which are all lacking in the Magistrate Judge's Order.

The Plaintiff claims injury to his reputation, even though he has made himself a public figure by openly and publicly supporting the brutal dictatorship in Ethiopia, a regime that the U.S. Department of State is accusing of engaging in massive human rights violations. My associates in Ethiopia and I, on the other hand, are facing imminent danger if the Court doesn't care to address our concern. It is out of such grave concern that I requested a hearing.

It should also be noted here that every electronic communication I make exposes me and my associates in Ethiopia to the Ethiopian regime's aggressive electronic surveillance. The Ethiopian regime uses a spyware named Finfisher that takes control of the targeted person's computer and access all the data. Even if DLA Piper will not share with Plaintiff Ahmed the identity of my witnesses, I am concerned that DLA Piper's own computers might have been infected by Finfisher via the documents that are being exchanged between them. The Plaintiff works hand in glove with the Ethiopian regime's brutal secret police. They can easily plant the spyware in his digital files that he exchanges with DLA Piper. Finfisher is hidden in image, doc, and pdf files. Anyone who opens a file sent from Ethiopia is exposed to this dangerous spyware. I use separate computers when I open emails from DLA Piper, and I am also forced to use disposable email accounts, proxy IPs, and temporary phone numbers to protect myself and my associates. (See the attached articles by Voice of America titled: "*Ethiopia Accused of Using Spyware Against Citizens Living Abroad*" and by The Washington Post titled: "*Foreign regimes use*

5

*spyware against journalists, even in U.S."* )

4. The Magistrate Judge's Order states: **"Defendant Kifle did not file timely objections to Plaintiff's discovery requests, and he has therefore waived any objections to Plaintiff's requests."**

My motion for a hearing was intended to discuss my concern. I was planning to file an objection or respond to the discovery requests based on the outcome of the hearing that I requested. It was not necessary for the Plaintiff to file a motion to compel, while my motion for hearing is being considered. Even though I have practically no knowledge of legal technicalities and procedures, I believe that I have the right to be heard, and my constitutionally protected free speech, as well as the right to due process trump deadlines and technicalities. The Plaintiff should not have more rights than me and more advantage over me just because he is able to hire one of the most expensive law firms in the world with his ill-gotten wealth.

5. The Magistrate Judge's Order states: **"... from a review of the interrogatories and document requests, it does not appear that the discovery sought is overreaching or irrelevant to Plaintiff's claims or Defendant's defenses."**

That is the most surprising and appalling conclusions in the Magistrate Judge's order. Here is one of the Plaintiff's questions: **"Identify each person with material knowledge of any fact or event relating to the allegations in the Complaint or any defenses to those allegations, and describe each person's knowledge."**

The Magistrate Judge seemed to have totally dismissed the concern I have expressed for the safety of "each person with material knowledge of any fact or event relating to the allegations in the Complaint or any defenses to those allegations." The purpose of my motion for hearing is to discuss with the Court how I can protect my sources from imminent danger. How can the Magistrate Judge in good conscience say that identifying my witnesses, who will face torture and death, is not "overreaching"? What is more overreaching than exposing people to torture and death over a civil suit?

6. The Magistrate Judge's Order states: **"... because the Court has sufficient information to make its determination with regard to Plaintiff's motion to compel..."**

The Magistrate Judge did not even hear my side of the argument. As I stated previously, the Plaintiff's motion to compel was not necessary because I have filed a motion for hearing to discuss my concerns with the Court. I would respond to the Plaintiff's interrogatories one way or another based on the outcome of the hearing. Refusing to hear my concern for the safety of my sources and witnesses would cause terrible injury to them and to my constitutionally protected right of free speech, as well as my right to due process.

Unlike well-financed websites and blogs, it would be impossible for exiled journalists and bloggers like me to exercise our freedom of speech if we are forced to defend ourselves against an onslaught of lawsuits by dictators, looters, mass

murderers and gangsters in third world countries who hire powerful legal firms such as DLA Piper. (See the attached article by Newsweek titled: "*When lobbyists work for authoritarian nations*" that highlights some of DLA Piper's lies:

> "*In a memo sent to congressional offices, DLA Piper, representing Ethiopia, argued, "The terms 'political prisoners' and 'prisoners of conscience' are undefined and mischaracterize the situation in Ethiopia," and should be removed from a bill that condemned the Ethiopian regime for detaining opposition activists.*"

As shown in the attached Newsweek article, DLA Piper lawyers go so far as to deny that there are political prisoners in Ethiopia, a fact that is well-documented by the U.S. Government, as well as all credible international human rights organizations.

DLA Piper attorneys claim that they spent 7 hours and 55 minutes to prepare the motion to compel. (See the attached Plaintiff's Exhibit A, Fees and Expenses: Plaintiff's Motion to Compel) If it takes this much time for the most expensive law firm in the U.S. to prepare a simple motion, I hope the Court would understand how much effort it takes for me as a lay person defending myself to respond to a flood of papers from DLA Piper while at the same time trying to make a living. It took me two weeks just to prepare this Motion to Reconsider. Even under the best of circumstances, defending oneself in a lawsuit is a daunting task, but in my case, I have to communicate with my sources and associates in Ethiopia under extremely dangerous conditions where our phone conversations and emails are

8

underservailance by the dictatorship in Ethiopia. (See the attached article titled: "*Ethiopia's borderless cyberespionage.*" The article states:

> "*Ethiopian expats, including those living in the United States, have become targets of Addis Ababa's global espionage.*
>
> *The state-run Ethio Telecom is the sole provider of phone and Internet services in Ethiopia. The Chinese telecom equipment and systems company ZTE is helping Ethiopia modernize its telecommunications infrastructure. The Ethiopian government uses a Chinese-developed telecom system to monitor and control the communications of its citizens and to silence dissenters both in Ethiopia and abroad. Security officials have unlimited access to the phone records of everyone in the country who owns a phone. During abusive interrogations, security officials often play back recorded phone calls to people in their custody. Those calling or receiving calls from foreign numbers are particularly at risk of reprisals by a government keen to punish those it considers a threat.*"

On top of danger I am facing from illegal surveillance and spywares, there are times when I am not able to communicate with my associates in Ethiopia for over two weeks because of phone, internet, and electricity outages. Ethiopia is the 2nd poorest country in the world with barely functioning infrastructure. Less than 10 percent of homes in Ethiopia have electricity. To complicate matters even more, some of my eyewitnesses are in Ethiopian jail. Every thing I say and do in relation to this case will expose them to even more severe danger.

9

At the hearing I am requesting, I will be able to inform the Court how my witnesses are being subjected to torture and other forms of abuses and how the Court can help me protect them. If the Plaintiff knows the identity of my sources, it is as good as the giving them away to the blood thirsty Ethiopian secret police.

I, therefore, respectfully ask the court to vacate the Magistrate Judge's entire order and grant me a hearing to discuss the grave concern I have for my sources, my witnesses, my family and myself.

Respectfully submitted,

Elias Kifle, Defendant pro se

Email: eliaskifle@gmail.com
July 1, 2014

UNITED STATES DISTRICT COURT
for the
Northern District of Georgia

Jemal Ahmed,                                    |       Civil Action No.
      plaintiff                                 |       1:12-cv-2697
    v.                                          |
Elias Kifle,                                    |
      Defendant                               |

---

## NOTICE OF SERVICE

I, Defendant in the above named case, hereby certify that on 2 July 2014, a true and correct copy of the attached was served upon the Plaintiff's attorney by email as follows:

Email: anthony.lehman@dlapiper.com

Respectfully submitted,

Elias Kifle, Defendant pro se
6412 Brandon Ave, #252
Springfield VA 22150 USA
Email: eliaskifle@gmail.com

2 July 2014

 **Voice of America**

*February 20, 2014*

# Ethiopia Accused of Using Spyware Against Citizens Living Abroad

*by Peter Heinlein*

Several Ethiopians living abroad are accusing their home government of using sophisticated computer spyware to hack into their computers and monitor their private communications. One Washington area man has filed a federal suit against the Ethiopian government, and another has filed a complaint with British police.

The Ethiopian native, who is a U.S. citizen, charges that agents used a program called FinSpy to monitor his emails, Skype calls and his web browsing history. A suit filed in Federal District Court in Washington Tuesday asks that Ethiopia be named as being behind the cyber-attacks and pay damages of $10,000.

The suit includes an affidavit asking that the plaintiff's name be kept secret.

Attorney Richard Martinez of the law firm Robins, Kaplan, Miller and Cirese helped to prepare the suit. Martinez told VOA the unusual request for anonymity was made because the individual fears that he and family members still in Ethiopia could be in danger if he is identified.

"We have petitioned the court to proceed anonymously because this individual is very active within the Ethiopian diaspora community and we think the action taken by the Ethiopian government against him illustrates exactly the attention they've placed on him and the danger that exists for him," said Martinez.

The suit is the latest in a series of cyber spying accusations against the Addis Ababa government. In another case, an Ethiopian refugee in London is asking British police to investigate evidence that FinSpy software known as "FinFisher" was used to hack his computer.

Tadesse Kersmo, who identified himself as a member of the executive committee of the Ethiopian opposition group Ginbot 7, filed a complaint Monday asking for a probe of Gamma Group, a Britain-based company that produces the FinFisher software.

Kersmo told a news conference he became suspicious after files from his computer began appearing on the Internet, and found evidence it had been infected with FinSpy.

Much of the evidence linking Ethiopia to cyberspying has been developed by a Canadian organization called Citizen Lab. Bill Marczak, a researcher for Citizen Lab, told VOA that investigators first linked Ethiopia to cyber spyware nearly a year ago.

"Ethiopia first came across our radar at Citizen Lab in March/April 2013, when we were doing a global study looking at the proliferation of FinFisher, the commercial espionage software which is sold exclusively to governments by a German company called FinFisher GMBH. This technology is spyware that can be installed on a targeted computer giving governments operating it full access to a computer so they can make files, record passwords and keystrokes, and even turn on the computer's webcam and microphone," said Marczak.

Marczak said Citizen Lab's investigation has also led it to an Italian firm called Hacking Team, which has been labeled by the press freedom group Reporters Without Borders on a list of what are called

"Corporate Enemies." A Citizen Lab report released this month suggests that Hacking Team software has been used to spy on U.S.-based journalists from Ethiopia.

Ethiopian foreign ministry spokesman Dina Mufti told VOA his government does not engage in computer hacking.

"There is freedom of speech, everyone is entitled to his opinion, and that is something that is at the core of our rules and procedures. There is freedom of expression, and the hacking business is not our business. As for the allegation that the journalists are coming up with, I cannot say anything now," said Mufti.

Marczak said companies like Hacking Team and FinSpy offer confidentiality to their clients, leaving cyber detectives the difficult task of sorting out who is spying on who.

However, he maintained that it is clear someone is spying on journalists of Ethiopian origin and others identified with the country's opposition, and despite its denial, the government is the most likely suspect.

"This is part of a pattern we've seen whenever we've exposed activists or journalists being targeted… The government is always the first to deny it and say 'Oh we didn't do that. It could have been anyone, we have no reason to use these products.' The fact is, the Ethiopian government does have reason to be using these products. There's a very strong and robust diaspora movement in Ethiopia, and the government is blind and clueless in the movement so they're desperately looking for informants, eyes and ears in the movement, and to unmask people's contacts and infiltrate these social networks," said Marczak.

Marczak also said evidence has been found linking software supplied by Hacking Team and FinSpy to more than a dozen countries, including Ethiopia, Sudan, Saudi Arabia, Azerbaijan, Uzbekistan and Bahrain.

A Hacking Team policy statement posted on the Internet said the company understands the potential for abuse of the surveillance technologies they produce, and takes precautions to limit that potential. The lengthy statement said Hacking Team has established an outside panel of technical experts and legal advisers to review potential sales. The company does not sell its products to any country blacklisted by the United States, the European Union, the United Nations or NATO. Ethiopia is not named on those blacklists.

*http://www.voanews.com/content/ethiopia-accused-of-using-spyware-against-citizens-living-abroad/1855312.html*

 **HUMAN RIGHTS WATCH**

http://www.hrw.org

## Ethiopia's borderless cyberespionage [1]

by
 Felix Horne
Published in: Al Jazeera [2]
April 7, 2014

I met Abdi (not his real name), a 32-year-old primary school teacher from Ethiopia's Oromia region, last July while in Nairobi. Abdi had been arrested a year earlier in his hometown for organizing a protest against local government corruption. He was already under the eye of Ethiopian security officials because he refused to provide information on the activities of his students to local authorities.

Over the course of two weeks in detention, Abdi was repeatedly beaten and accused of belonging to the Oromo Liberation Front (OLF), which originated in nationalist movements fighting for increased autonomy in the 1960s. The Ethiopian government considers the OLF a terrorist organization and uses the threat of an armed struggle to justify repression of ordinary Oromos, who constitute Ethiopia's largest ethnic group.

The harassment continued after Abdi was released. Eventually, like thousands of other Ethiopians, he felt compelled to flee to Kenya, leaving behind his wife and two children. After some time in Kenya he called home and spoke to his wife, who told him that security officials had been harassing her since he left. That was the last time he spoke to her.

Abdi later learned from neighbors that security officials came to their house hours after his call, demanding to know who was calling her from Kenya and accusing her of being in contact with rebel operatives there. He no longer calls Ethiopia and does not know the whereabouts of his family.

Abdi's story is not unique. In the last two decades, tens of thousands of Ethiopians have fled their country because of government repression or limited economic opportunities. Most of these migrants, especially those living in neighboring African countries, fear that if they communicate with their families back home, their calls will be traced and their relatives will face repercussions. As new research by Human Rights Watch [3]shows, their fears are well founded. The fear that permeates the lives of many inside Ethiopia has been successfully exported to other countries.

Ethiopian expats, including those living in the United States, have become targets of Addis Ababa's global espionage.

The state-run Ethio Telecom is the sole provider of phone and Internet services in Ethiopia. The Chinese telecom equipment and systems company ZTE is helping Ethiopia modernize its telecommunications infrastructure. The Ethiopian government uses a Chinese-developed telecom system to monitor and control the communications of its citizens and to silence dissenters both in Ethiopia and abroad. Security officials have unlimited access to the phone records of everyone in the country who owns a phone. During abusive interrogations, security officials often play back recorded phone calls to people in their custody. Those calling or receiving calls from foreign numbers are particularly at risk of reprisals by a government keen to punish those it considers a threat.

But Ethiopia goes even further to monitor dissenting voices outside its borders. The government has acquired and is using commercially available European-made spyware — namely the U.K.- and Germany-based Gamma International's FinFisher and the Italy-based Hacking Team's Remote Control System — to monitor dissenters in other countries, effectively extending its surveillance capabilities far beyond its borders. These tools provide security and intelligence agencies with full access to files and activity on an infected target's computer. They can log keystrokes and passwords and switch on a device's webcam and microphone, turning a computer anywhere in the world into a listening device. Ethiopian expats, including those living in the United States, the United Kingdom, Norway and Switzerland, have become targets of this global espionage.

In late 2012, security officials detained the wife of Yohannes Alemu, a Norwegian citizen and member of a banned opposition group, as she was visiting family in Addis Ababa. They questioned her about her husband's political connections. Then the security officials demanded information from Yohannes via phone and email about his opposition party colleagues. He refused; after 20 days his wife was finally released and returned to Norway.

But the incident did not end there.

One of the emails he received contained an attachment infected with FinFisher spyware. Once he had downloaded this spyware, the Ethiopian security agencies had unfettered access to all the information on his computer.

While people around the world are right to be shocked by former National Security Agency contractor Edward Snowden's revelations of mass surveillance by the U.S. government, they should also be concerned that repressive governments such as Ethiopia's are purchasing and using advanced technologies to target independent voices beyond their borders. The export and use of these European-made commercial products remains virtually unregulated. This is particularly worrying given that evidence exists that similar technologies may be in the hands of authoritarian regimes throughout the world.

These technologies enable repressive governments to monitor dissenting voices in other countries —

even in countries where privacy rights are stronger and legal protections are in place to limit state-sponsored surveillance.

The United States, European Union and other donors that together provide an estimated $4 billion in annual aid to Ethiopia should take concerted steps to stop this abuse. They should support global efforts to regulate the export and use of such technologies to governments with poor human rights records. African governments should also speak out and make it clear to Ethiopia that it is an infringement on basic rights to use these technologies to spy on citizens outside of Ethiopia's borders — people who are all too often seeking protection from repression back home.

*Felix Horne is an Africa researcher at Human Rights Watch and co-author of a new report, "'They Know Everything We Do': Telecom and Internet Surveillance in Ethiopia [4]."*

**Source URL:** http://www.hrw.org/news/2014/04/07/ethiopias-borderless-cyberespionage

**Links:**

[1] http://www.hrw.org/news/2014/04/07/ethiopias-borderless-cyberespionage

[2] http://america.aljazeera.com/opinions/2014/4/ethiopia-s-borderlesscyberespionage.html

[3] http://www.hrw.org/sites/default/files/reports/ethiopia0314_ForUpload_0.pdf

[4] http://www.hrw.org/reports/2014/03/25/they-know-everything-we-do

© Copyright 2014, Human Rights Watch

# The Washington Post

Back to previous page

# Foreign regimes use spyware against journalists, even in U.S.

## By Craig Timberg, Published: February 12

Mesay Mekonnen was at his desk, at a news service based in Northern Virginia, when gibberish suddenly exploded across his computer screen one day in December. A sophisticated cyberattack was underway.

But this wasn't the Chinese army or the Russian mafia at work.

Instead, a nonprofit research lab has fingered government hackers in a much less technically advanced nation, Ethiopia, as the likely culprits, saying they apparently used commercial spyware, essentially bought off the shelf. This burgeoning industry is making surveillance capabilities that once were the exclusive province of the most elite spy agencies, such as National Security Agency, available to governments worldwide.

The targets of such attacks often are political activists, human rights workers and journalists, who have learned that the Internet allows authoritarian governments to surveil and intimidate them even after they have fled to supposed safety.

That includes the United States, where laws prohibit unauthorized hacking but rarely succeed in stopping intrusions. The trade in spyware itself is almost entirely unregulated, to the great frustration of critics.

"We're finding this in repressive countries, and we're finding that it's being abused," said Bill Marczak, a research fellow for Citizen Lab at the University of Toronto's Munk School of Global Affairs, which released a report Wednesday. "This spyware has proliferated around the world . . . without any debate."

Citizen Lab says the spyware used against Mekonnen and one other Ethiopian journalist appears to have been made by Hacking Team, an Italian company with a regional sales office in Annapolis. Its products are capable of stealing documents from hard drives, snooping on video chats, reading e-mails, snatching contact lists, and remotely flipping on cameras and microphones so that they can quietly spy on a computer's unwitting user.

Some of the targets of recent cyberattacks are U.S. citizens, say officials at Ethiopian Satellite Television's office in Alexandria, where Mekonnen works. Others have lived in the United States or other Western countries for years.

"To invade the privacy of American citizens and legal residents, violating the sovereignty of the United States and European countries, is mind-boggling," said Neamin Zeleke, managing director for the news service,

which beams reports to Ethiopia, providing a rare alternative to official information sources there.

Citizen Lab researchers say they have found evidence of Hacking Team software, which the company says it sells only to governments, being used in a dozen countries, including Uzbekistan, Kazakhstan, Sudan, Saudi Arabia and Azerbaijan.

The Ethiopian government, commenting through a spokesman at the embassy in Washington, denied using spyware. "The Ethiopian government did not use and has no reason at all to use any spyware or other products provided by Hacking Team or any other vendor inside or outside of Ethiopia," Wahide Baley, head of public policy and communications, said in a statement e-mailed to The Washington Post.

Hacking Team declined to comment on whether Ethiopia was a customer, saying it never publicly confirms or denies whether a country is a client because that information could jeopardize legitimate investigations. The company also said it does not sell its products to countries that have been blacklisted by the United States, the United Nations and some other international groups.

"You've necessarily got a conflict between the issues around law enforcement and the issues around privacy. Reasonable people come down on both sides of that," said Eric Rabe, a U.S.-based senior counsel to Hacking Team. "There is a serious risk if you could not provide the tools that HT provides."

The FBI, which investigates computer crimes, declined to comment on the Citizen Lab report.

### Allegations of abuse

Technology developed in the aftermath of the Sept. 11, 2001, terrorist attacks has provided the foundation for a multibillion-dollar industry with its own annual conferences, where firms based in the most developed countries offer surveillance products to governments that don't yet have the ability to produce their own.

Hacking Team, which Reporters Without Borders has named on its list of "Corporate Enemies" of a free press, touted on its Web site that its "Remote Control System" spyware allows users to "take control of your targets and monitor them regardless of encryption and mobility. It doesn't matter if you are after an Android phone or a Windows computer: you can monitor all the devices."

Hacking Team software has been used against <u>Mamfakinch</u>, an award-winning Moroccan news organization, and <u>Ahmed Mansoor</u>, a human rights activist in the United Arab Emirates who was imprisoned after signing an online political petition, Citizen Lab reported. Another research group, Arsenal Consulting, has said <u>Hacking Team software</u> was used against an American woman who was critical of a secretive Turkish organization that is building schools in the United States.

Such discoveries have sparked calls for international regulation of Hacking Team and other makers of spyware, which typically costs in the hundreds of thousands of dollars, according to experts.

By selling spyware, "they are participating in human rights violations," said <u>Eva Galperin</u>, who tracks spyware use for the Electronic Frontier Foundation, a civil liberties group based in San Francisco. "By dictator standards, this is pretty cheap. This is pocket change."

Rabe, the Hacking Team official, said that the company does not itself deploy spyware against targets and that, when it learns of allegations of human rights abuses by its customers, it investigates those cases and sometimes withdraws licenses. He declined to describe any such cases or name the countries involved.

Ethiopian Satellite Television, typically known by the acronym ESAT, started in 2010 and operates on donations from members of the expatriate community. The news service mainly employs journalists who left Ethiopia in the face of government harassment, torture or criminal charges. Though avowedly independent, ESAT is viewed as close to Ethiopia's opposition forces, which have few other ways of reaching potential supporters.

Despite the nation's close relationship with the U.S. government — especially in dealing with unrest and Islamist extremism in neighboring Somalia — the State Department has repeatedly detailed human rights abuses by the Ethiopian government against political activists and journalists. There has been little improvement, observers say, since the 2012 death of the nation's longtime ruler, Meles Zenawi.

"The media environment in Ethiopia is one of the most repressive in Africa," said Felix Horne, a researcher for Human Rights Watch. "There are frequent cases of people who have spoken to journalists being arrested. There's very little in the way of free flow of information in the country. The repressive anti-terrorism law is used to stifle dissent. There are a number of journalists in prison for long terms for doing nothing but practicing what journalists do."

**Taking the bait**

Mekonnen was wary as soon as he received a document, through a Skype chat with a person he did not know, on Dec. 20. But the file bore the familiar icon of a Microsoft Word file and carried a name, in Ethiopia's Amharic language, suggesting that it was a text about the ambitions of a well-known political group there. The sender even used the ESAT logo as his profile image, suggesting the communication was from a friend, or at least a fan.

When the screen filled with a chaotic series of characters, Mekonnen knew he had been fooled — in hacker jargon, he had taken "the bait" — yet it wasn't clear what exactly was happening to his computer, or why.

That same day, an ESAT employee in Belgium also had received mysterious documents over Skype chats. Noticing that the files were of an unusual type, he chose not to open them on his work computer. Instead, the ESAT employee uploaded one of the files to a Web site, VirusTotal, that scans suspicious software for signs of their origins and capabilities.

That Web site also has a system to alert researchers when certain types of malicious software are discovered. Marczak, the Citizen Lab researcher, who had been tracking the spread of spyware from Hacking Team and other manufacturers, soon got an e-mail from VirusTotal reporting that a suspicious file had been found, carrying telltale coding.

Marczak, a doctoral student in computer science at the University of California at Berkeley, had worked with members of the Ethiopian community before, during an attempted hacking incident last April. When he received the alert from VirusTotal, he got in touch with ESAT's offices in Alexandria and began looking for signs of Hacking Team software on the news service's computers. He was eventually joined in the detective work by three other researchers affiliated with Citizen Lab, Claudio Guarnieri, Morgan Marquis-Boire and John Scott-Railton. They did not detect an active version of the spyware on Mekonnen's computer, suggesting it had failed to activate properly or was removed by the hackers who deployed it. But when Citizen Lab analyzed the file itself — still embedded in Mekonnen's Skype account — its coding tracked closely to other Hacking Team spyware, Marczak said.

The Citizen Lab team found that the spyware was designed to connect to a remote server that used an encryption certificate issued by a group listed as "HT srl," an apparent reference to Hacking Team. The

certificate also mentioned "RCS," which fits the acronym for the company's "Remote Control System" spyware.

The researchers discovered a similar encryption certificate used by a server whose IP address was registered to Giancarlo Russo, who is Hacking Team's chief operating officer. The phone number and mailing address associated with that server's IP address matched the company's headquarters in Milan, Citizen Lab said.

The evidence of Ethiopia's involvement was less definitive — as is common when analysts attempt to learn the origin of a cyberattack — though the Citizen Lab researchers express little doubt about who was behind the attack. The document that Mekonnen downloaded, they noted, had a title in Amharic that referred to Ethiopian politics, making clear that the attackers had deep knowledge of that country.

In addition, few governments have enough interest in Ethiopian politics to deploy a sophisticated spyware attack against journalists covering the country, Marczak said. "I can't really think of any other government that would like to spy on ESAT."

The biggest fear among journalists is that spies have accessed sensitive contact lists on ESAT computers, which could help the government track their sources back in Ethiopia.

"This is a really great danger for them," Mekonnen said.

The latest from Craig Timberg: New surveillance technology can track everyone in an area for several hours at a time Blimplike surveillance craft set to deploy over Maryland heighten privacy concerns FBI's search for 'Mo,' suspect in bomb threats, highlights use of malware for surveillance

**Sponsored Links**


**You Will Turn Off Your TV**
TV is on its way out. And that means a $2.2T industry is up for grabs.
The Motley Fool www.fool.com


**Benefits of Buying Penny Stocks**
Georgia 3 reasons why we think this stock will explode from $0.50 to $6.00
www.invests.com


**Cloud Phone Service**
You have a smart phone in your pocket. Get a smart phone on your desk.
www.nextiva.com

                                        **Buy a link here**

© The Washington Post Company

# Newsweek

## When Lobbyists Work for Authoritarian Nations

By Joshua Kurlantzick | 7/26/10 at 7:36 AM

Once the province of a few fringe players operating on the margins of Washington, lobbying for foreign countries has become big business for the most prestigious firms in D.C. According to data from the Department of Justice, the number of registrants—forms submitted by people registered to represent foreign countries—grew from about 1,800 in the first half of 2005 to 1,900 in the first half of 2009, the most recent data available. Human-rights activists say there has been a steeper rise, particularly in terms of dollars spent, among some of the most brutal regimes on earth, including several sanctioned by the U.S. for their human-rights abuses.

The Republic of the Congo spent $1.5 million on lobbying and PR firms and other representation in the first half of 2009 alone, according to reports compiled by the Justice Department. Angola, one of the most corrupt nations in the world, spent more than $3 million in that period. Teodoro Nguema Obiang, the brutal dictator of African petrostate Equatorial Guinea, who took power more than three decades ago in a coup, has hired the law firm of former Bill Clinton aide Lanny Davis to lobby on his behalf, for the annual sum of $1 million. (Davis says the arrangement is contingent on Obiang's progress on human-rights issues.) Chris Walker, of the NGO Freedom House, says this is all a reflection of the fact that "authoritarian regimes recognize there is a greater payoff in participating in and influencing the decision-making process, rather than sitting it out."

In the past, foreign lobbying by rogues in Washington was a relatively small game. Nazi agents lobbying in Washington before World War II had tainted the whole enterprise, a stain that would take decades to erase. Though allies like Japan or Britain could find representation, the task of shilling for the nastiest governments fell to those like Edward von Kloberg III. Wearing a cape and calling himself "Baron," a made-up honor, he represented Saddam Hussein and Nicolae Ceausescu, among others. Many developing nations, including China, meanwhile, had little idea how to win influence in Washington through lobbying. China has built a lobby since its harsh experience in 2005, when Congress, playing upon a strong anti-China sentiment among constituents, scuttled an attempt by China National Offshore Oil Corp. to purchase American petroleum firm Unocal. Now even new regimes waste no time finding their men in Washington. After seizing power in a coup last summer, and facing immediate criticism from

the Obama administration, Honduras's new military rulers quickly spent at least $400,000 to hire powerful American firms to lobby for them.

*Try Newsweek Print + Digital for only $1.25 per week*

One result is that lobbying has become less transparent. U.S. law requires lobbyists to disclose all contracts with foreign clients, but the reality is that filings about foreign clients offer little information, and some lobbyists simply don't file. "I was so careful to document every phone call, every meeting, and then I found that some other people, they don't file at all," says one lobbyist who works extensively with foreign clients. "Does anything happen to them? Not really." Since the mid-1960s, in fact, the U.S. government has never successfully prosecuted anyone for violating the disclosure rules.

The rise in foreign lobbying may have also compromised the policymaking of current and future U.S. government officials. With little oversight, lobbyists can represent the most repressive regimes and then turn around and work in government. According to John Newhouse, author of a forthcoming book on the influence of foreign lobbies on American policies, one of John McCain's senior foreign-policy advisers during his 2008 campaign, Randy Scheunemann, simultaneously worked for McCain and as a paid adviser to the government of Georgia, which had been accused of human-rights violations. Despite McCain's reputation as a leading champion of human rights, Scheunemann largely escaped questions about whether his lobbying might have affected his foreign-policy advice to the powerful senator. Similarly, while at Cassidy & Associates, lobbyist Amos Hochstein oversaw the Equatorial Guinea account, which required him to argue the merits of one of the most repressive regimes on earth. Still, after leaving Cassidy, Hochstein landed a prominent job on the (ill-fated) 2008 presidential campaign of Connecticut Sen. Chris Dodd, a politician also known for his longstanding human-rights advocacy. Now Hochstein says he helped "move the ball forward on human rights" in the country.

Lobbying can turn down the pressure on authoritarian regimes. After years of intense lobbying, Equatorial Guinea's Obiang managed to transform his image in Washington from a venal autocrat into a solid American ally and buddy of U.S. business. In 2006 he strode out of a meeting at Foggy Bottom with Secretary of State Condoleezza Rice, who declared him "a good friend." Last year Obiang met with Obama for a public photo op, which is coveted by foreign leaders. Similarly, according to several congressional staffers, the authoritarian regime in Kazakhstan won support for its chairmanship of the Organization for Security and Co-operation in Europe by hiring lobbyists to help quiet congressional critics of Kazakhstan's human-rights record. Ethiopia's lobbying, meanwhile, has helped to defuse charges that the government has turned increasingly authoritarian. In a memo sent to congressional offices,

DLA Piper, representing Ethiopia, argued, "The terms 'political prisoners' and 'prisoners of conscience' are undefined and mischaracterize the situation in Ethiopia," and should be removed from a bill that condemned the Ethiopian regime for detaining opposition activists.

All this has taken a toll. Many democratic countries retain lobbyists in Washington to handle issues like trade disputes or intellectual-property challenges. But in those free countries, human-rights activists or opponents of the government could hire their own lobbyists in Washington and make their cases to the American government. Not so in the world's most repressive countries. Though there are rare exceptions, like the Tibetan government in exile, most human-rights activists in authoritarian countries cannot make the close connections in Washington, or come up with the funds needed to match the lobbying of leaders like Obiang. The result: while thugs get heard in Washington, the voices of their opponents remain silent.

*With R. M. Schneiderman in New York. Kurlantzick is a fellow at the Council on Foreign Relations.*

*Community Guidelines*



http://cpj.org/x/47dd

ALERTS | ETHIOPIA

# Ethiopia: Life sentence for blogger, prison for journalists



From left: Woubshet, Reeyot, Kifle.

New York, January 26, 2012--A U.S.-based journalist convicted on politicized terrorism charges in Ethiopia was sentenced to life in prison in absentia today, while two other Ethiopian journalists received heavy prison sentences in connection with their coverage of banned opposition groups, according to news reports.

Elias Kifle, exiled Ethiopian editor of the Washington-based opposition website *Ethiopian Review*, was handed a life sentence in absentia today, which followed a 2007 life sentence given to him also in absentia on charges of treason for his coverage of the government's brutal repression of 2005 post-election protests, CPJ research shows. A court in the capital, Addis Ababa, sentenced Reeyot Alemu, a columnist with the independent weekly *Feteh*, and Woubshet Taye, deputy editor of the now-defunct weekly *Awramba Times*, to 14 years in prison and 33,000 birrs (US$1,500), news reports said.

"The life sentence for Elias Kifle and the prison sentences for Reeyot Alemu and Woubshet Taye are based on their writings about political dissent. This verdict has little to do with justice," said CPJ Africa Advocacy Coordinator Mohamed Keita. "We condemn this politicized prosecution designed to cow critical voices into silence and call on the Supreme Court to reverse all the convictions."

The three journalists were charged in September with lending support to an underground network of banned opposition groups, which has been criminalized under the country's 2009 antiterrorism law. Alemu and Taye were arrested in June and held for weeks on government accusations of plotting to sabotage telephone and electricity lines before they were charged. In the trial, government prosecutors presented as evidence intercepted emails and phone calls between the journalists, as well as more than 25 *Ethiopian Review* articles on the activities of opposition groups, CPJ research shows.

Eskinder Nega, another Ethiopian blogger, has been imprisoned since September and could be sentenced to death if convicted of similar politicized terrorism charges in connection with his coverage of banned opposition groups.

*EDITOR'S NOTE: The headline and text of the alert was changed to reflect that the U.S.-based blogger was given a life sentence, not the death penalty.*

Web site content © CPJ. All rights reserved. Articles
may be reproduced only with permission.

» Print

This copy is for your personal, non-commercial use only.

# Ethiopia slaps prison terms on three journalists

Thu, Jan 26 2012

By Aaron Maasho

ADDIS ABABA (Reuters) - Ethiopia sentenced two Ethiopian journalists to 14 years in jail and an exiled blogger to life imprisonment on Thursday on charges of conspiring with rebel groups against the government, the second case in a month targeting the media.

In December, two Swedish journalists were sentenced to 11 years in jail for entering the country illegally and aiding a rebel group, prompting anger among rights groups and concern over media freedom in the east African country.

Woubishet Taye and Reyot Alemu were found guilty last week of conspiring to participate in terrorist acts and laundering money from rebel groups and Ethiopian arch-foe Eritrea. The pair had been arrested in July.

"I didn't expect this sentencing, she didn't commit terrorist crimes," said Reyot's lawyer, Mola Zegeye, adding that the two will appeal the sentence.

U.S.-based Elias Kifle, whose pro-opposition website www.EthiopianReview.com often criticises the government, was tried in absentia and sentenced to life on similar charges.

Addis Ababa has been accused by watchdogs of clamping down on its media under the guise of national security, a charge the government denies.

Critics point to an anti-terrorism law passed after several blasts in 2009 and stating that anyone caught publishing information that could induce readers into acts of terrorism could be jailed for between 10 to 20 years.

More than 10 journalists have been charged under the law, according to the Committee to Protect Journalists. The group also says Ethiopia is close to replacing Eritrea as the African country with the highest number of journalists behind bars.

The Ethiopian government denies targeting journalists because of their reporting or political affiliations.

Woubshet and Reyot were found to have links to Ginbot 7, one of five groups the government has banned as terrorist organisations. Ethiopia accuses Eritrea of backing these groups.

Terrorism charges have not been limited to journalists - more than 150 opposition politicians and supporters have been detained since last year, according to rights watchdogs.

In Thursday's ruling, an opposition party official and another opposition-linked individual were sentenced to 17 and 19 years, respectively.

Woubshet, an editor for the now-defunct Awramba Times, and Reyot, of the Feteh newspaper, were also fined $2,100 (1,336.98 pound) each. Eskinder Nega, another opposition blogger, faces the death penalty and will appear in court in March on terrorism-linked charges.

(Editing by Yara Bayoumy and Alessandra Rizzo)

© Thomson Reuters 2012. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only.

# EXHIBIT A

| Matter | Date | Name | Title | Hours | Amount | Description |
|---|---|---|---|---|---|---|
| 361808-000030 | 03/19/14 | Anthony D. Lehman | Counsel | 0.40 | $264.00 | Work on responses to outstanding motions and protective order |
| 361808-000030 | 03/24/14 | Anthony D. Lehman | Counsel | 1.40 | $924.00 | Work on reply memo in support of motion to compel; correspond with Mr. Kifle regarding discovery |
| 361808-000030 | 03/25/14 | Anthony D. Lehman | Counsel | 0.80 | $528.00 | Review, revise, and finalize reply on motion to compel. |
| 361808-000030 | 03/25/14 | Mark E. Grantham | Partner | 0.70 | $598.00 | Review and revise draft brief and discuss same with Mr. Lehman. |
| 361808-000030 | 03/26/14 | Anthony D. Lehman | Counsel | 1.1 | $726.00 | Revise and finalize reply brief in support of Motion to Compel; email filed pleadings to Mr. Elias Kifle |
| 361808-000030 | 03/11/14 | | | | $    75.00 | Westlaw Charges |
| 361808-000030 | 03/12/14 | | | | $    92.00 | Westlaw Charges |
| 361808-000030 | 03/13/14 | | | | $    18.00 | Westlaw Charges |

**TOTAL:**    $ 5,264.00

*Ahmed v. Kifle*
### Case No. 1:12-CV-2697-JEC-ECS
### Fees and Expenses:  Plaintiff's Motion to Compel

| Matter | Date | Name | Title | Hours | Amount | Description |
|---|---|---|---|---|---|---|
| 361808-000030 | 03/06/14 | Anthony D. Lehman | Counsel | 0.40 | $264.00 | Reviewing discovery requests and begin drafting motion to compel |
| 361808-000030 | 03/10/14 | Anthony D. Lehman | Counsel | 0.80 | $528.00 | Email correspondence with Mr. Kifle regarding discovery requests; legal research and draft motion to compel |
| 361808-000030 | 03/14/14 | Mark E. Grantham | Partner | 0.30 | $257.00 | Revisions to memo, motions to compel, and order prior to filing |
| 361808-000030 | 03/17/14 | Anthony D. Lehman | Counsel | 1.10 | $726.00 | Revise and finalize pleadings in motion to compel and correspond by email with Mr. Kifle regarding same. |
| 361808-000030 | 03/19/14 | Anthony D. Lehman | Counsel | 0.40 | $264.00 | Review and analysis of Mr. Kifle's responses to emails and intent to engage in discovery processes in case |