IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN  DISTRICT OF GEORGIA
ATLANTA DIVISION

JEMAL AHMED,                    )
                               )
          PLAINTIFF,           )
                               ) NO. 1:12-CV-2697-SCJ
          V.                   ) ATLANTA, GEORGIA
                               )
ELIAS KIFLE AND ETHIOPIAN      ) JANUARY 29, 2015
REVIEW, INC.,                  )
                               )
          DEFENDANTS.          )
_____)

                    - - -

                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE STEVE C. JONES
          UNITED STATES DISTRICT JUDGE

                    - - -

APPEARANCES OF COUNSEL:

     FOR THE PLAINTIFF:        MARY ELIZABETH GATELY
                               ANTHONY D. LEHMAN

     FOR THE DEFENDANTS:       PRO SE

                    DAVID A. RITCHIE
                OFFICIAL COURT REPORTER
                  75 SPRING ST., S.W.
                ATLANTA, GEORGIA  30303
                    (404) 215-1516

                UNITED STATES DISTRICT COURT

                                        INDEX
                                                                    PAGE
JEMAL AHMED

        DIRECT BY MS. GATELY                                          8
        CROSS BY MR. KIFLE                                           37

CRAIG KRONENBERGER

        DIRECT BY MR. LEHMAN                                         79
        CROSS BY MR. KIFLE                                           95

ELIAS KIFLE

        DIRECT BY MR. KIFLE                                         103
        CROSS BY MS. GATELY                                         110

UNITED STATES DISTRICT COURT

(ATLANTA, FULTON COUNTY, GEORGIA, JANUARY 29, 2015, IN OPEN COURT)

THE CLERK:  THE COURT CALLS THE MATTER OF JEMAL AHMED, PLAINTIFF V. ELIAS KIFLE AND ETHIOPIAN REVIEW, INC., DEFENDANTS, CIVIL ACTION NUMBER 1:12-CV-2697.

THE COURT:  OKAY.  GOOD AFTERNOON.

PLAINTIFF'S COUNSEL, WILL YOU ALL INTRODUCE YOURSELF FOR THE RECORD?

MS. GATELY:  GOOD AFTERNOON.  MY NAME IS MARY GATELY WITH THE LAW FIRM OF DLA PIPER.  MY COLLEAGUE, TONY LEHMAN.

THE COURT:  GOOD AFTERNOON, MR. LEHMAN.

MR. LEHMAN:  WITH THE COHAN LAW GROUP.

THE COURT:  YES, SIR.

MS. GATELY:  YOUR HONOR, I ALSO HAVE THE PLAINTIFF HERE, MR. JEMAL AHMED.

THE COURT:  GOOD AFTERNOON, MR. AHMED.

MS. GATELY:  AND I HAVE A COLLEAGUE FROM WASHINGTON, D.C. WITH ME, MR. GEORGE SALEM.

THE COURT:  GOOD AFTERNOON, SIR.

MR. SALEM:  GOOD AFTERNOON.

THE COURT:  AND, MR. KIFLE, ARE YOU GOING TO BE REPRESENTING YOURSELF TODAY?

MR. KIFLE:  YES, SIR.

THE COURT:  OKAY.  LET ME JUST POINT OUT SOMETHING TO YOU HERE THAT I HAVE TO POINT OUT FOR THE RECORD.

THE LAWYERS ON THE OTHER SIDE ARE TRAINED LAWYERS, HIGHLY SKILLED ATTORNEYS.  THEY HAVE DONE THIS PROBABLY A NUMBER OF TIMES BEFORE.

I AM SURE YOU ARE A HIGHLY INTELLIGENT PERSON, BUT YOU ARE GOING UP AGAINST PEOPLE THAT DO THIS.  I AM NOT ALLOWED TO GIVE YOU ANY HELP OR ADVISE YOU.  I HAVE TO HOLD YOU TO THE SAME RULES OF EVIDENCE AND PROCEDURE THAT I HOLD THEM TO AS WELL.

DO YOU UNDERSTAND?

MR. KIFLE:  I WOULD JUST LIKE TO HAVE THE SAME, THE SAME TIME AND EQUAL OPPORTUNITY TO PRESENT MY CASE.  THAT'S ALL I NEED.

THE COURT:  WELL, I AM GOING TO GET TO THAT.

MR. KIFLE:  SO FAR I HAVEN'T BEEN, SIR, AND I HAVE -- MANY OF MY MOTIONS HAVE BEEN JUST SET ASIDE AND --

THE COURT:  LET'S DEAL WITH ONE THING AT A TIME.

YOU UNDERSTAND ABOUT THE PROCEDURE, HOW WE ARE GOING TO DEAL WITH THIS AS FAR AS PRESENTATION.  YOU KNOW, WHAT I CAN TELL YOU I WILL TELL YOU, BUT AS FAR AS WHAT YOU ARE BEING HELD RESPONSIBLE FOR, YOU ARE GOING TO BE HELD RESPONSIBLE FOR THE SAME RULES OF EVIDENCE AND PROCEDURE AS THE ATTORNEYS FOR THE PLAINTIFF.

YOU UNDERSTAND THAT, RIGHT?

MR. KIFLE:  YES, SIR.

THE COURT:  NOW, AS FAR AS TIME, I AM GIVING YOU ALL

UNITED STATES DISTRICT COURT

TWO HOURS.  WE ARE STARTING AT 2:30 OR WE ARE STARTING AT 2:35, SO AT 4:35, YOU KNOW, AN HOUR EACH.

WHAT I DON'T NEED TO TALK ABOUT, I CAN TELL YOU ALL EXACTLY WHAT I NEED TO TALK ABOUT.  THERE ARE A NUMBER OF MOTIONS.  THE ONLY ORAL ARGUMENT THAT I WANT TO HEAR THIS AFTERNOON AND THE ONLY EVIDENCE I WANT TO HEAR ABOUT IS THE DEFAULT JUDGMENT REGARDING MR. KIFLE AND DAMAGES, DAMAGES AND THE DAMAGES REGARDING MR. KIFLE, THE DEFAULT JUDGMENT REGARDING ETHIOPIAN REVIEW AND ANY DAMAGES THAT MIGHT APPLY TO THAT AND THE DAMAGES REGARDING MR. KIFLE.  THE OTHER MOTIONS I WILL DEAL WITH FROM THE BRIEFS.

ONE MORE TIME.  ALL I WANT TO DEAL WITH THIS AFTERNOON AND ALL I WILL DEAL WITH THIS AFTERNOON IS THE DEFAULT, THE MOTION FOR ENTRY OF A DEFAULT JUDGMENT AGAINST THE ETHIOPIAN REVIEW AND ANY DAMAGES THAT MIGHT APPLY IF I GRANT THAT DEFAULT JUDGMENT AND THEN DAMAGES REGARDING THE DEFENDANT, MR. KIFLE.  ALL THE OTHER MOTIONS OUT THERE I WILL RULE BASED ON THE BRIEFS.

ANY QUESTIONS ABOUT THAT FROM THE PLAINTIFFS?

MS. GATELY:  NO, YOUR HONOR.

THE COURT:  ANY QUESTIONS ABOUT THAT, SIR?

MR. KIFLE:  YES, SIR, I HAVE A QUESTION.

THE COURT:  ALL RIGHT.

MR. KIFLE:  ON THE ORDER YOU ENTERED ON DECEMBER 18TH, I SEE THAT YOU ARE WILLING TO CONSIDER MY MOTIONS, IT

SAYS IN THE ORDER, AND I WAS PREPARED, I AM PREPARED TO COME TO DISCUSS THOSE, INCLUDING --

THE COURT:  I DON'T NEED ORAL ARGUMENT OR EVIDENCE ON THOSE MOTIONS.  I WILL RULE ON THOSE MOTIONS BASED ON THE BRIEFS AND THE RESPONSE THAT HAS BEEN FILED, BRIEFS AND THE RESPONSE THAT HAS BEEN FILED ON THOSE.  I DON'T NEED ANY ARGUMENT OR EVIDENCE ON THOSE.  I HAVE ALL I NEED FROM THE BRIEFS ON THOSE.  ALL I WANT TO HEAR THIS AFTERNOON AND ALL I WILL HEAR IS THE MOTION FOR DEFAULT JUDGMENT AGAINST ETHIOPIAN REVIEW AND ANY DAMAGES THAT MIGHT APPLY AND ANY DAMAGES REGARDING YOU IN YOUR PERSONAL CAPACITY.

WITH THAT STATED, NOW, I DON'T TRY TO TELL ANYBODY WHAT TO DO, BUT I UNDERSTAND THERE ARE SOME PEOPLE HERE FROM ETHIOPIA.  YOU MIGHT WANT TO CALL THEM FIRST.

MS. GATELY:  THANK YOU, YOUR HONOR.

WE ARE READY TO PROCEED WITH OUR FIRST WITNESS.  WE ARE GOING TO CALL THE PLAINTIFF, MR. JEMAL AHMED.

MR. KIFLE:  I HAVE A QUESTION.

THE COURT:  YES, SIR.

MR. KIFLE:  BASED ON MY MOTIONS ABOUT DISQUALIFYING DLA PIPER, DO I PRESENT THINGS NOW OR AS THEY PRESENT THEM?

THE COURT:  THEY WILL BE REPRESENTING THE PLAINTIFFS AND I WILL RULE ON YOUR MOTION WHETHER OR NOT TO DISQUALIFY THEM AT THE APPROPRIATE TIME.  AND YOU WILL PROBABLY BE GETTING AN ORDER, BOTH SIDES WILL GET AN ORDER ON THAT, IF NOT MONDAY,

TUESDAY.  MAYBE EVEN EARLIER.

MS. GATELY:  MAY I PROCEED, YOUR HONOR?

THE COURT:  YOU MAY PROCEED.

MS. GATELY:  YOUR HONOR, THE PLAINTIFFS CALL JEMAL AHMED AS THEIR FIRST WITNESS.

THE COURT:  MR. AHMED, COME ON UP, SIR.

MR. KIFLE, IF YOU WILL MOVE TO THE MIDDLE OF THE TABLE SO YOU CAN BE CLOSER TO THE MIKE SO THE COURT REPORTER CAN PICK UP EVERYTHING YOU ARE SAYING.

- - -

JEMAL AHMED,

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

- - -

THE CLERK:  THANK YOU.

IF YOU'LL HAVE A SEAT, PLEASE.

MS. GATELY:  YOUR HONOR, AS A PRELIMINARY MATTER, I HAVE BINDERS OF THE EXHIBITS THAT I WOULD LIKE TO USE WITH THE WITNESS.

THE COURT:  YOU MAY.

MS. GATELY:  AND I HAVE A COPY FOR YOU, A COPY FOR THE DEFENDANT AND A COPY FOR THE WITNESS.

THE COURT:  THANK YOU, MS. GATELY.

MS. GATELY:  MAY I APPROACH, YOUR HONOR?

THE COURT:  YES, MA'AM.

THANK YOU.

DIRECT EXAMINATION

BY MS. GATELY:

Q.    MR. AHMED, COULD YOU PLEASE STATE YOUR NAME AND YOUR ADDRESS, PLEASE, SIR?

A.    MY NAME IS JEMAL AHMED ABDU.  I LIVE IN ETHIOPIA.  MY ADDRESS IS 90 BUILDING, 15TH FLOOR, ADDIS ABABA.

Q.    MR. AHMED, WERE YOU BORN IN ETHIOPIA?

A.    YES, MA'AM.

Q.    DID THERE COME A TIME WHEN YOU MOVED TO THE UNITED STATES?

A.    YES, IN 1993.

Q.    AND WHERE DID YOU MOVE WHEN YOU CAME TO THE UNITED STATES?

A.    TO GEORGIA, ATLANTA.

Q.    AND WHY DID YOU COME TO ATLANTA, GEORGIA, AT THAT TIME?

A.    I WAS HOPING TO PURSUE A HIGHER EDUCATION.

Q.    AND BY HIGHER EDUCATION DO YOU MEAN COLLEGE?

A.    YES, MA'AM.

Q.    AND HAD YOU INTENDED TO STAY IN THE UNITED STATES FOR YOUR ENTIRE COLLEGE?

A.    YES, MA'AM.

Q.    AND WAS YOUR EDUCATION CUT SHORT?

A.    YES, MA'AM.

Q.    AND WHY WAS THAT?

A.    A FAMILY PROBLEM.  MY FATHER DIED.  NOBODY WAS ABLE TO SUPPORT MY FAMILY, SO I WAS CALLED UP BY MY MOTHER TO HELP

SUPPORT THE FAMILY.

Q.   AND HOW BIG OF A FAMILY DO YOU HAVE, SIR?

A.   WE ARE 12 BROTHERS AND SISTERS AND A MOTHER.

Q.   SO INCLUDING YOU THERE'S 12?

A.   YEAH, WE ARE.

Q.   AND DID YOU RETURN TO ETHIOPIA THEN?

A.   YES, MA'AM.

Q.   AND WHEN WAS THAT?

A.   JULY 1994.

Q.   AND DO YOU STILL HAVE FAMILY IN THE ATLANTA AREA?

A.   YES, MA'AM.

Q.   AND HOW MANY FAMILY STILL LIVE IN THE ATLANTA AREA?
SIBLINGS.

A.   THREE SISTERS AND THREE BROTHERS.

Q.   AND IS YOUR MOTHER, DOES SHE SPEND TIME IN THE UNITED
STATES?

A.   YES.

Q.   IN THE ATLANTA AREA?

A.   YES, MA'AM.

Q.   AND DOES SHE HAVE PERMANENT RESIDENCY STATUS?

A.   YES, MA'AM.

Q.   AND DO YOUR SIBLINGS THAT LIVE IN THE UNITED STATES, DO
THEY LIVE IN THE ATLANTA AREA AS WELL?

A.   YES, MA'AM.

Q.   AND DO YOU TRAVEL TO ATLANTA FROM TIME TO TIME?

A.   YES, MA'AM.

Q.   HOW OFTEN?

A.   TWO OR THREE TIMES A YEAR.

Q.   AND WHEN WAS THE LAST TIME YOU WERE HERE?  DID YOU JUST COME FROM ETHIOPIA YESTERDAY?

A.   NO.  I CAME FOR THIS COURT HEARING YESTERDAY.

Q.   OKAY.  FROM ETHIOPIA?

A.   YES, MA'AM.

Q.   AND WHEN WAS THE LAST TIME YOU WERE IN ATLANTA BEFORE THAT?

A.   FOR THE NEW YEAR HOLIDAY.  I WAS VISITING MY FAMILY HERE.

Q.   AND DID YOU HAVE A PERSONAL REASON ALSO AT THE BEGINNING OF JANUARY FOR BEING IN ATLANTA?

A.   YES.  MY WIFE WAS DELIVERING AND I WAS BLESSED WITH A BABY GIRL.

Q.   AND DO YOU LIVE IN ETHIOPIA FULL TIME?

A.   YES, MA'AM.

Q.   NOW, AFTER MOVING BACK TO ETHIOPIA AFTER YOUR FATHER DIED, WHAT DID YOU DO?

A.   I STARTED LOOKING AFTER MY FATHER'S SHOP.  I STARTED DEALING WITH AUTO SPARE PARTS.

Q.   AND DID YOU ALSO START YOUR OWN COMPANY EVENTUALLY?

A.   EVENTUALLY I FOUNDED A COMPANY CALLED AHFA PRIVATE LIMITED COMPANY.

Q.   AND WHAT DID THAT COMPANY DO?

A.    IT WAS TRADING COOKING OIL WE USED TO IMPORT FROM MALAYSIA TO ETHIOPIA, THEN BUILT UP OUR BUSINESS AND TRANSFORMED IT INTO FOOD PROCESSING, MANUFACTURING.

Q.    AND DID THERE COME A TIME WHEN YOU STARTED TO DO BUSINESS WITH SHEIK MOHAMMED HUSSEIN AL AMOUDI?

A.    YES.

Q.    AND APPROXIMATELY WHEN THAT WAS?

A.    IT WAS IN 2008.

Q.    AND IS SHEIK AL AMOUDI YOUR BUSINESS PARTNER?

A.    YES.  WE SET UP A COMPANY CALLED HORIZON PLANTATIONS.

Q.    AND CAN YOU EXPLAIN FOR THE COURT WHAT TYPE OF BUSINESS HORIZON PLANTATIONS IS INVOLVED IN?

A.    IT'S AGRICULTURE AND AGRO-INDUSTRY.

Q.    AND SPECIFICALLY WHAT FORM OF AGRICULTURE?  WHAT ARE ITS PARTS?

A.    WE GROW COFFEE, SPICE, VEGETABLES, FRUITS AND WE EXPORT AND CATER TO THE LOCAL MARKET.

Q.    AND WHAT IS THE NAME OF THE BUSINESS THAT DEALS WITH COFFEE?

A.    WE HAVE DIFFERENT COFFEE FARMS WITH DIFFERENT ENTITIES CALLED BEBEKA COFFEE ESTATE SHARE COMPANY, LIMMU COFFEE ENTERPRISE.

Q.    SO IF I UNDERSTAND YOU RIGHT, YOU HAVE TWO BUSINESSES THAT DEAL WITH COFFEE.  ONE IS CALLED BEBEKA AND ONE IS CALLED LIMMU?

A.    LIMMU.

Q.    LIMMU.  AND IS THE COFFEE THAT YOU GROW, IS THAT FOR EXPORT OUTSIDE OF ETHIOPIA OR FOR THE LOCAL MARKET?

A.    YES, FOR EXPORT, MOSTLY TO THE EUROPEAN UNION AND TO THE UNITED STATES OF AMERICA.

Q.    AND YOU MENTIONED THAT YOU ALSO ARE ENGAGED IN GROWING, I THINK YOU SAID, FRUITS AND VEGETABLES?

A.    YES, MA'AM.

Q.    AND IS THAT FOR THE LOCAL MARKET OR FOR EXPORT?

A.    FOR THE LOCAL MARKET.

Q.    AND DO YOU ALSO GROW SPICES?

A.    YES, MA'AM.

Q.    AND IS THAT FOR THE LOCAL MARKET OR THE EXPORT?

A.    BOTH.

Q.    AND APPROXIMATELY HOW MANY PEOPLE DO YOU EMPLOY IN ETHIOPIA?  OR HORIZON, I SHOULD SAY.

A.    SINCE OUR OPERATION IS HIGHLY LABOR-INTENSIVE, WE HAVE 30,000 PEOPLE EMPLOYED BY US AND WE HAVE TO GET THEIR HOUSING AND THEIR FAMILIES SO WE HAVE 150,000 PEOPLE LIVING IN OUR FARMS.

Q.    YOU MENTIONED THE COFFEE THAT YOU EXPORT.  WHAT IS THE QUALITY OF THE COFFEE?  IS IT SORT OF THE MODERATE RANGE OR SPECIALTY COFFEE?

A.    WE HAVE BOTH CONVENTIONAL, 35 CONVENTIONAL AND SPECIALTY COFFEE, AND WE CATER IN BOTH MARKETS.

Q.   NOW, I WANT TO TURN YOUR ATTENTION TO ETHIOPIAN REVIEW.

WERE YOU AWARE OF THE ETHIOPIANREVIEW.COM PRIOR TO 2012?

A.   YES, MA'AM.

Q.   AND I WANT TO TURN YOUR ATTENTION NOW TO EXHIBIT 1 IN YOUR BINDER AND IT'S A COPY OF A MARCH 29TH, 2012 ARTICLE THAT WAS WRITTEN BY MR. KIFLE AND PUBLISHED ON ETHIOPIANREVIEW.COM.  CAN YOU READ THE TITLE FOR THE COURT?

A.   "AL AMOUDI'S HUMAN TRAFFICKER IN ETHIOPIA IDENTIFIED."

Q.   NOW, SIR, HOW DID YOU BECOME AWARE THAT THIS ARTICLE WAS PUBLISHED?

A.   A LOCAL NEWSPAPER EDITOR IN CHIEF CALLED ME AND INFORMED ME AND HE SENT ME THE LINK VIA EMAIL.

Q.   AND WHAT WAS YOUR REACTION TO BEING NOTIFIED BY A MEMBER OF THE MEDIA THAT AN ARTICLE LIKE THIS HAD BEEN WRITTEN?

A.   I WAS SHOCKED VERY MUCH.

Q.   AND DID OTHER PEOPLE CONTACT YOU ABOUT THE PUBLICATION OF THE ARTICLE?

A.   YES, MA'AM.

Q.   CAN YOU GIVE THE COURT SOME SENSE OF THE SIZE OF THE NUMBER OF PEOPLE THAT CONTACTED YOU?

A.   A LOT OF PEOPLE.  MOST FROM ETHIOPIA AND FRIENDS AND FAMILY.  RELATIVES FROM THIS COUNTRY AS WELL.

Q.   WHEN YOU SAY "THIS COUNTRY," YOU MEAN THE UNITED STATES?

A.   THE UNITED STATES OF AMERICA.

Q.   AND THEN DID YOU GO AHEAD AND READ THE ARTICLE?

A.   YES, MA'AM, I DID READ IT.

Q.   AND DID YOU ALSO READ THE COMMENTS THAT WERE ALSO PUBLISHED RELATED TO THE ARTICLE?

A.   YES, MA'AM.

     MS. GATELY:  YOUR HONOR, I WOULD OFFER EXHIBIT 1 INTO EVIDENCE.

     THE COURT:  ANY OBJECTIONS, SIR?

     MR. KIFLE:  NO OBJECTION.

     THE COURT:  ADMITTED WITHOUT OBJECTION.

     MS. GATELY:  THANK YOU.

                    - - -

BY MS. GATELY:

Q.   NOW, CAN YOU JUST SORT OF GIVE THE COURT A SENSE OF WHAT THIS ARTICLE SAYS ABOUT YOU?

A.   THIS ARTICLE ACCUSED ME OF HUMAN TRAFFICKING, WHICH IS A HORRENDOUS CRIME, PARTICULARLY IN ETHIOPIA.  WE HAVE A LOT OF ETHIOPIANS SUFFERED UNDER HUMAN TRAFFICKING AND I WAS ACCUSED OF THAT CRIME.  AND NOT ONLY ME, ANYONE WHO KNOWS ME WAS SHOCKED BECAUSE OF IT.

Q.   THE PICTURE THAT IS USED IN THE ARTICLE IN THIS, WHERE DID THAT COME FROM?

A.   IT MUST HAVE COME FROM MY FACEBOOK.

Q.   NOW, YOU JUST TESTIFIED THAT YOU READ SOME OF THE COMMENTS THAT WERE PUBLISHED ALONG WITH THIS ARTICLE.  I WANT TO REFER

YOUR ATTENTION NOW TO SOME OF THOSE COMMENTS.

FIRST OF ALL, CAN YOU TELL THE COURT HOW MANY PAGES OF COMMENTS ARE REFLECTED IN EXHIBIT 1?

A.   31 PAGES.

Q.   AND CAN YOU GIVE THE COURT YOUR REACTION TO GENERALLY WHAT YOU THOUGHT WHEN YOU READ THESE COMMENTS?

A.   SINCE MOST OF THE COMMENTS ARE VERY MUCH NEGATIVE, I UNDERSTAND THE PEOPLE WHO MADE THAT NEGATIVE COMMENT BECAUSE, AS I TRIED TO ELABORATE EARLIER, HUMAN TRAFFICKING IS A VERY -- THE WORST CRIME YOU CAN COME ACROSS IN ETHIOPIA AND ALL THE COMMENTS WERE NEGATIVE.  AND THE ACCUSATION THAT WAS FABRICATED, BECAUSE OF THAT IT ANGERS ME.  IT ALSO SCARED ME, BECAUSE SOME OF THE PEOPLE MADE A THREAT NOT ONLY AGAINST ME BUT ALSO AGAINST MY FAMILY.

Q.   I WANT TO NOW REFER YOUR ATTENTION TO PAGE SEVEN OF 31 ON EXHIBIT 1, AT THE TOP OF THE PAGE ON PAGE SEVEN, AND I AM GOING TO REFER YOU TO THE PART THAT SAYS:  GET WITH THE TIME, MAN. AL AMOUDI AND JEMAL ARE USING TODAY'S GLOBALIZATION TO PROFIT AND IT HAS NOTHING TO DO WITH DEVELOPMENT.  IN ORDER TO GET THEIR BUSINESS PROFIT, THEY HAVE TO HIRE PEOPLE, BUT WHATEVER THEY DO IT'S ALL ABOUT THEMSELVES.

FROM READING THIS COMMENT AND ACTUALLY FROM READING THE OTHER COMMENTS THAT YOU DID, IS IT YOUR UNDERSTANDING THAT THE PEOPLE WHO POSTED THESE COMMENTS THOUGHT YOU HAD DONE WHAT WAS PUBLISHED IN THAT ARTICLE?

A.   YES, MA'AM.  IF YOU SEE THE FIRST LINE IN THAT COMMENT, IT SAYS:  "ARE YOU REALLY PROUD OF HUMAN TRAFFICKING IN ETHIOPIA?" THAT MEANS HE BELIEVED, THE GUY WHO COMMENTED BELIEVED THAT I WAS INVOLVED IN THAT CRIME.

Q.   AND DID THE OTHER COMMENTS TO YOUR KNOWLEDGE HAVE THAT SAME SORT OF PREMISE, ACCEPTING THAT YOU HAD DONE WHAT WAS PUBLISHED IN EXHIBIT 1?

A.   MOSTLY, YES.

Q.   THIS COMMENT ALSO SUGGESTS THAT YOU WERE ENGAGED IN THIS FOR A PROFIT; IS THAT RIGHT?

A.   YES, MA'AM.

Q.   NOW, I WANT TO REFER YOUR ATTENTION TO COMMENT 18 ON PAGE 13.  DOWN TOWARDS THE BOTTOM SOMEBODY NAMED TESSO REPLIES AND IT SAYS:  "JEMAL AND TIGREANS SEND THEIR SISTERS, COUSINS AND RELATIVES TO ATLANTA AND EXPORT POOR ETHIOPIAN GIRLS TO ARAB COUNTRIES AS INDENTURED SERVANTS.  YOU SUBHUMAN CRIMINALS WILL PAY FOR THIS ONE WAY OR ANOTHER, SOONER OR LATER.  I GUARANTEE YOU THAT.  JUST LEARN FROM QADDAFI AND FAMILY."

DO YOU SEE THAT, SIR?

A.   YES, MA'AM.

Q.   NOW, THIS POSTING CHARACTERIZES WHAT YOU HAVE DONE -- YOU AS A CRIMINAL, DOESN'T IT?

A.   YES, MA'AM, AND ALSO THEY KNOW THAT I HAVE MY SISTERS AND COUSINS LIVING IN ATLANTA AND THEY ARE MAKING A THREAT.

Q.   NOW, YOU MENTIONED THAT HUMAN TRAFFICKING IS THE WORST

UNITED STATES DISTRICT COURT

SORT OF CRIME. IS IT ILLEGAL TO HUMAN TRAFFICK IN ETHIOPIA?

A. I THINK HUMAN TRAFFICKING IS ILLEGAL EVERYWHERE IN THE WORLD, BUT IN ETHIOPIA A LOT OF PEOPLE HAVE BEEN TRAFFICKED BY CRIMINAL HUMAN TRAFFICKERS AND IT'S A BIG ISSUE IN ETHIOPIA.

Q. NOW, THIS ALSO HAS A THREAT IN IT. SPECIFICALLY THE LANGUAGE SAYS: ONE WAY OR THE OTHER, YOU'LL PAY FOR THIS.

A. YES. IT'S A DIRECT THREAT.

Q. AND HOW DID THAT MAKE YOU FEEL?

A. ANGRY AND SCARED.

Q. AND WERE THERE OTHER COMMENTS SIMILAR TO THIS THROUGHOUT THESE 31 PAGES?

A. MOST OF THEM ARE SIMILAR.

Q. NOW I WANT TO REFER YOUR ATTENTION BACK TO PAGE TWO OF EXHIBIT 1 IN COMMENT ONE, THE LAST PARAGRAPH OF COMMENT ONE, WHERE IT SAYS: THE OTHER DAY I WATCHED A CLIP OF POOR ETHIOPIAN GIRL ON YOUTUBE WHILE SHE WAS DRAGGED BY MAD ARAB MEN IN LEBANON. AS A RESULT OF THIS HUMILIATING STATE, SHE TOOK HER OWN PRECIOUS LIFE. I WAS SICK AND FELT PAIN DEEP IN MY STOMACH. BY THE WAY, MY THOUGHT AND CONDOLENCE GOES TO THE VICTIM'S FAMILY.

DO YOU KNOW WHAT THAT IS A REFERENCE TO, SIR?

A. YES. THERE WAS AN ETHIOPIAN MAID ABUSED BY HER EMPLOYERS AND SOMEHOW IT WAS BEING RECORDED AND THE VIDEO WAS ON THE NET AND IT ANGERS EVERY ETHIOPIAN.

Q. AND IT WAS PUT ON YOUTUBE, WASN'T IT?

A.   YES.

Q.   AND THE MAID WAS LIVING IN WHICH COUNTRY?

A.   LEBANON.

Q.   AND WAS THIS AT OR AROUND THE SAME TIME THAT THIS ARTICLE WAS PUBLISHED?

A.   YES, MA'AM.

Q.   AND IN YOUR MIND DOES MR. KIFLE'S ARTICLE ABOUT YOU SUGGEST A LINK BETWEEN YOU AND THIS POOR WOMAN?

A.   DEFINITELY.

Q.   WHY DO YOU THINK THAT?

A.   BECAUSE HE FABRICATED AND ACCUSED ME OF HUMAN TRAFFICKING AND MOST PROBABLY THIS GIRL WAS TRAFFICKED TO LEBANON.

Q.   AND IN FACT PEOPLE WHO COMMENTED TO THE ARTICLE ACTUALLY MADE THAT LINK THEMSELVES, DIDN'T THEY?

A.   YES, MA'AM.

Q.   AND TO YOUR KNOWLEDGE IS THIS ARTICLE STILL ON THE ETHIOPIAN WEBSITE TODAY?

A.   YES, MA'AM.

Q.   NOW, I WANT ALSO TO REFER ON EXHIBIT 1 TO COMMENT 41, WHICH IS ON PAGE 21 OF 31.

        MR. KIFLE:  WHICH EXHIBIT?

        MS. GATELY:  EXHIBIT 1.

BY MS. GATELY:

Q.   DO YOU HAVE THAT, SIR?

A.   YES, MA'AM.

UNITED STATES DISTRICT COURT

Q.   AT THE BOTTOM OF THAT PAGE COMMENT 41 SAYS:  "JEMAL AHMED SAYS."  DO YOU SEE THAT?

A.   YES, MA'AM.

Q.   AND DID YOU WRITE THAT COMMENT?

A.   YES, MA'AM.

Q.   AND IT SAYS IT WAS POSTED ON MARCH 30TH; IS THAT RIGHT?

A.   YES.

Q.   AND CAN YOU EXPLAIN WHY YOU POSTED THIS COMMENT?

A.   I TRIED TO EXPLAIN TO THE ACCUSER AND TO THE READERS WHAT I DO FOR A LIVING AND HOPING THAT HE WOULD REMOVE THIS FABRICATED ARTICLE.

Q.   AND DID YOU SAY THAT YOU WERE NOT INVOLVED IN HUMAN TRAFFICKING?

A.   YES, MA'AM.

Q.   AT THE BOTTOM OF YOUR COMMENT ON PAGE 22 YOU SAY:  "I WILL MAKE SURE THAT I GET JUSTICE FOR THE DEFAMATION YOU INCURRED ME."

     DO YOU SEE THAT?

A.   YES, MA'AM.

Q.   AND HOW IS IT THAT YOU HAVE GONE ABOUT TRYING TO GET JUSTICE FOR THIS PUBLICATION?

A.   BY HAVING EXPERTS TO PURSUE A LEGAL COURSE.

Q.   NOW, DID MR. KIFLE TAKE YOUR COMMENT AND ALSO POST IT AS A SEPARATE ENTRY ON HIS WEBSITE?

A.   YES, MA'AM.

Q.   I WANT TO REFER TO EXHIBIT 4, PLEASE.

          DO YOU HAVE EXHIBIT 4 IN FRONT OF YOU?

A.   YES, MA'AM.

Q.   AND THIS IS AN ARTICLE THAT WAS PUBLISHED MARCH 30TH AND IT SAYS:  "JEMAL RESPONDS TO HUMAN TRAFFICKINGS, LAND GRABBING ACCUSATIONS"?

A.   YES, MA'AM.

Q.   AND IS THAT THE SEPARATE PUBLICATION OF COMMENT 41 THAT WE SAW IN EXHIBIT 1?

A.   YES, MA'AM.  IT WAS REPUBLISHED.

          MS. GATELY:  YOUR HONOR, I OFFER EXHIBIT 4 INTO EVIDENCE.

          THE COURT:  ANY OBJECTION?

          MR. KIFLE:  NO, NO OBJECTIONS.

          THE COURT:  ADMITTED WITHOUT OBJECTION.

          MS. GATELY:  THANK YOU.

BY MS. GATELY:

Q.   AND CAN YOU INDICATE FOR THE COURT, DID PEOPLE COMMENT ON THIS PUBLICATION AS WELL?

A.   YES.

Q.   AND CAN YOU INDICATE FOR THE COURT HOW MANY PAGES OF COMMENTS APPEAR FOR THIS PUBLICATION?

A.   46 PAGES.

Q.   AND AT THE TIME, AT OR AROUND THE TIME, DID YOU READ THE COMMENTS AS WELL?

UNITED STATES DISTRICT COURT

A.    YES.

Q.    AND WERE THEY SIMILAR TO THE ONES THAT WE ALREADY HAVE DISCUSSED?

A.    YES, MA'AM.

Q.    WITH RESPECT TO EXHIBIT 1?

A.    THEY ARE THE SAME.

Q.    NOW, VIA COUNSEL, MR. AHMED, DID YOU ASK THAT MR. KIFLE REMOVE THIS ARTICLE AND APOLOGIZE FOR IT?

A.    YES, MA'AM.

Q.    I WANT YOU TO TURN TO EXHIBIT 5 IN YOUR BINDER, PLEASE. THAT'S AN APRIL 4TH, 2012 LETTER FROM YOUR COUNSEL - THAT'S ME - TO MR. KIFLE, ISN'T IT?

A.    YES, MA'AM.

          MS. GATELY:  YOUR HONOR, I WOULD MOVE EXHIBIT 5 INTO EVIDENCE.

          THE COURT:  MR. KIFLE, ANY OBJECTIONS?

          MR. KIFLE:  NO OBJECTION.

          THE COURT:  PLAINTIFF'S 5 IS ADMITTED WITHOUT OBJECTION.

          MS. GATELY:  THANK YOU.

BY MS. GATELY:

Q.    NOW, DID MR. KIFLE EVER REMOVE THE ARTICLE IN RESPONSE TO MY LETTER?

A.    NO, MA'AM.

Q.    AND IF YOU LOOK ON PAGE TWO OF MY LETTER YOU WILL SEE THAT

I ASKED THAT IT BE REMOVED AND THAT HE CEASE FROM MAKING THESE FALSE AND DEFAMATORY STATEMENTS; IS THAT RIGHT?

A.    YES, MA'AM.

Q.    AND THAT HE PUBLISH AN APOLOGY AS WELL, CORRECT?

A.    YES.

Q.    AND TO YOUR KNOWLEDGE DID HE EVER DO ANY OF THOSE THINGS?

A.    NO, MA'AM.

Q.    NOW, DID MR. KIFLE ALSO PUBLISH MY LETTER ON HIS ETHIOPIAN REVIEW WEBSITE AS WELL?

A.    YES, MA'AM.

Q.    I DIRECT YOUR ATTENTION TO EXHIBIT 6, PLEASE, AND THE TITLE OF THIS, IT'S AN APRIL 4TH POSTING AND IT'S "AL AMOUDI'S LAWYER THREATENS TO FILE ANOTHER LAWSUIT."

DO YOU SEE THAT?

A.    YES, MA'AM.

Q.    AND DID YOU REVIEW THAT AT OR AROUND THE TIME THAT IT WAS PUBLISHED?

A.    YES, MA'AM.

MS. GATELY:  YOUR HONOR, I WOULD OFFER EXHIBIT 6 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. KIFLE:  NO, SIR.

THE COURT:  ADMITTED WITHOUT OBJECTION.

BY MS. GATELY:

Q.    NOW, MR. KIFLE ACTUALLY PUBLISHES A PORTION OF MY LETTER,

DOESN'T HE?

A.   YES, MA'AM.

Q.   AND IF YOU TURN TO PAGE TWO OF EXHIBIT 6, HE INCLUDES A PDF, RIGHT?

A.   YES.

Q.   AND APRIL 4TH IS THE DATE OF THE LETTER THAT I SENT ON EXHIBIT 5, IS IT NOT?

A.   YES, MA'AM.

Q.   SO ON THE SAME DAY THAT I SENT THE LETTER TO HIM HE ALSO PUBLISHED IT, RIGHT?

A.   YES, MA'AM.

Q.   AND DID HE ALSO INCLUDE A RESPONSE TO DLA PIPER IN THAT?

A.   YES, MA'AM.

Q.   AND COULD YOU PLEASE READ THE RESPONSE ON PAGE TWO OF EXHIBIT 6 TO THE COURT?

A.   "DEAR MARY E. GATELY, WHERE ARE YOU GOING TO SUE ME THIS TIME?  IN TIMBUKTU?"

Q.   AND CONTINUE, PLEASE.  I SEE IT HAS SOME WEB --

A.   "SINCERELY, ELIAS KIFLE."

Q.   WELL, IT SAYS:  "BRING IT ON PLEASE."  DO YOU SEE THAT?

A.   YES, MA'AM.  I'M SORRY.  IT SAYS -- AFTER HE PUBLISHED THE LINK, THEN IT SAYS:  "BRING IT ON PLEASE."

Q.   SINCERELY?

A.   "SINCERELY, ELIAS KIFLE."

Q.   AND HOW MANY PAGES OF COMMENTS WERE FILED WITH RESPECT TO

THIS PUBLICATION?

A.    I KNOW --

Q.    DOWN AT THE BOTTOM ON THE LEFT-HAND SIDE YOU CAN SEE THE PAGE COUNT.

A.    YES.  35 PAGES.

Q.    AND ARE THE COMMENTS THAT YOU FIND AS A RESULT OF THIS PUBLICATION SIMILAR TO THE KIND THAT WE SAW WITH RESPECT TO EXHIBIT 1?

A.    YES, MA'AM.

Q.    INCLUDING NEGATIVE AND THREATENING COMMENTS?

A.    MOSTLY NEGATIVE.

Q.    NOW, EVENTUALLY YOU DID FILE A LAWSUIT AGAINST MR. KIFLE?

A.    YES, MA'AM.

Q.    AT ANY TIME HAS MR. KIFLE TAKEN DOWN THIS OFFENDING MARCH 29TH PUBLICATION?

A.    NOT AT ALL.

Q.    NOW I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 7, PLEASE, AND THIS IS AN ARTICLE PUBLISHED BY MR. KIFLE ON AUGUST 9TH, 2012.

        DO YOU SEE THAT?

A.    YES, MA'AM.

Q.    AND IT'S TITLED "AL AMOUDI'S CHIEF HUMAN TRAFFICKER FILES LAWSUIT AGAINST ETHIOPIAN REVIEW."

A.    YES, MA'AM.

Q.    AND WHO IS THE REFERENCE TO AL AMOUDI'S CHIEF HUMAN

TRAFFICKER?

A.   IT WAS REFERRING TO ME, I BELIEVE.

Q.   AND HOW DO YOU HAVE THAT UNDERSTANDING?

A.   BECAUSE IN THE INITIAL ACCUSATION OF HIS TITLE IT SAYS AL AMOUDI'S CHIEF HUMAN TRAFFICKER IDENTIFIED, HIM MENTIONING MY NAME AND MY PICTURE.

Q.   YOU ARE REFERRING TO EXHIBIT 1, ARE YOU NOT?

A.   YES.

         MS. GATELY:  YOUR HONOR, I WOULD OFFER EXHIBIT 7 INTO EVIDENCE.

         THE COURT:  ANY OBJECTION?

         MR. KIFLE:  NO, SIR.

         THE COURT:  SEVEN IS ADMITTED WITHOUT OBJECTION.

BY MS. GATELY:

Q.   NOW, MR. AHMED, CAN YOU TELL THE COURT HOW MANY PAGES OF COMMENTS WERE FILED WITH RESPECT TO THIS PUBLICATION?

A.   20.

Q.   NOW, MR. AHMED, DID THERE COME A TIME WHEN MR. KIFLE REPUBLISHED THE MARCH 29TH ARTICLE?

A.   YES.

Q.   I AM GOING TO DIRECT YOUR ATTENTION TO EXHIBIT 8.  THE TITLE OF THIS IS "AL AMOUDI'S HUMAN TRAFFICKER IN ETHIOPIA IDENTIFIED (UPDATE)"?

A.   YES, MA'AM.

Q.   AND THE DATE OF THAT IS OCTOBER 18TH, 2012; IS THAT RIGHT?

A.   YES, MA'AM.

Q.   AND IS THIS IDENTICAL, AT LEAST THE PART THAT STARTS AT THE BOTTOM OF EXHIBIT 8 WHERE IT SAYS "AL AMOUDI'S HUMAN TRAFFICKER IN ETHIOPIA IDENTIFIED, BY ELIAS KIFLE," IS THAT IDENTICAL TO WHAT WE SAW IN EXHIBIT 1?

A.   YES, MA'AM.

MS. GATELY:  YOUR HONOR, I WOULD OFFER EXHIBIT 8 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. KIFLE:  NO, SIR.

THE COURT:  ADMITTED WITHOUT OBJECTION.

BY MS. GATELY:

Q.   AND I DIRECT YOUR ATTENTION TO EXHIBIT 9.  EXHIBIT 9 IS A COPY OF THE ARTICLE BUT IT ALSO HAS THE COMMENTS ATTACHED TO IT.

A.   YES.

Q.   AND AT OR AROUND THE TIME THAT THIS WAS PUBLISHED DID YOU ALSO TAKE A LOOK AT THE COMMENTS THAT WERE PUBLISHED WITH RESPECT TO THAT ARTICLE?

A.   YES, MA'AM.

MS. GATELY:  AND, YOUR HONOR, I'D ADMIT EXHIBIT 9 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. KIFLE:  NO, SIR.

THE COURT:  ADMITTED WITHOUT OBJECTION.

UNITED STATES DISTRICT COURT

BY MS. GATELY:

Q.    CAN YOU TELL THE COURT HOW MANY PAGES OF COMMENTS WERE FILED WITH RESPECT TO THIS?

A.    19.

Q.    AND DID IT HAVE SIMILAR KINDS OF NEGATIVE COMMENTS AS WHAT WE SAW IN EXHIBIT 1?

A.    YES, MA'AM.

Q.    NOW, ARE YOU AWARE OF WHETHER THE MARCH 29TH AND OCTOBER 18TH ARTICLES FROM 2012 HAVE BEEN USED BY OTHER PEOPLE ON THE INTERNET?

A.    YES, MA'AM.

Q.    I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 10 NOW, PLEASE.

ARE YOU AWARE OF THE BILISUMMAA TV VIDEOS?

A.    YES, MA'AM.

Q.    AND THESE ARE SCREEN CAPTURES FROM VIDEOS THAT WERE PUBLISHED BY BILISUMMAA TV ON YOUTUBE, ARE THEY NOT?

A.    YES, MA'AM.

MS. GATELY:  YOUR HONOR, I WOULD OFFER EXHIBIT 10 INTO EVIDENCE.

THE COURT:  ANY OBJECTION?

MR. KIFLE:  NO, SIR.

THE COURT:  MS. GATELY, BEFORE YOU ASK THE NEXT QUESTION.

MS. GATELY:  YES, SIR.

THE COURT:  AND EXCUSE MY INTERRUPTION, BUT EXPLAIN

TO ME BILISUMMAA TV.  IS THIS LIKE WHAT, SOMETHING -- BILISUMMAA.  WHAT IS IT LIKE?  WHAT IS IT, A TALK-TYPE TELEVISION THING?  WHAT IS IT?

MS. GATELY:  WELL, I CAN EXPLAIN IT TO YOU THROUGH HIS TESTIMONY.

THE COURT:  OKAY.

MS. GATELY:  THE FIRST COUPLE OF VIDEOS ARE JUST MUSIC PLAYING WITH THIS FLASHING UP ON THE SCREEN.  AND THEN THE NEXT COUPLE WHERE YOU SEE SORT OF A PERSON WHO HAS GOT A MICROPHONE IN FRONT OF THEM?

THE COURT:  YES.

MS. GATELY:  THAT IS MORE LIKE THAT PERSON SPEAKING AND TELLING ABOUT IT AND ASKING THE QUESTIONS, IS HE A HUMAN TRAFFICKER AND THAT SORT OF THING.  I ACTUALLY BROUGHT A DISK WHICH I COULD PLAY IF THE COURT WOULD -- THEY WOULDN'T LET ME BRING MY COMPUTER IN, THOUGH, BUT I DO HAVE THAT.

THE COURT:  YOU MIGHT ENTER IT INTO EVIDENCE.  THE COURT MAY WANT TO HEAR IT ON ITS OWN.

MS. GATELY:  ALL RIGHT.  I WILL MARK THIS AS EXHIBIT 13 AND I HAVE -- I HAVE THE TAG.  I WILL MARK THAT, YOUR HONOR, AT THE CONCLUSION AND HAND THAT UP.

THE COURT:  OKAY.  ALL RIGHT.

THE CLERK:  I HAVE STICKERS.

MS. GATELY:  OH, THANK YOU.

LET ME MARK THAT AS EXHIBIT 13.

UNITED STATES DISTRICT COURT

THE CLERK:  OKAY.

THE COURT:  MR. KIFLE, HAVE YOU -- WELL, SHE HASN'T OFFERED IT.

MS. GATELY:  YOUR HONOR, I WOULD LIKE TO OFFER EXHIBIT 13 INTO EVIDENCE.  IT'S THE ACTUAL VIDEOS THAT I'VE GOT THE SCREEN CAPTURES FOR IN EXHIBIT 10.

THE COURT:  ANY OBJECTIONS?

MR. KIFLE:  NO, SIR.

THE COURT:  IT'S ADMITTED WITHOUT OBJECTION.

AND WHAT WE'LL DO, THE COURT WILL NOT PLAY IT NOW. THE COURT MAY ENTER ORDERS ON SOME OF THIS TODAY, BUT THE COURT WILL LISTEN TO THAT BEFORE WE ENTER THE FINAL ORDERS.

MS. GATELY:  PERHAPS I COULD HAND IT UP TO THE CLERK, YOUR HONOR?

THE COURT:  YES, YES.

BY MS. GATELY:

Q.   NOW, MR. AHMED, TURN YOUR ATTENTION TO THE FIRST PAGE OF EXHIBIT 10.

CAN YOU TELL THE COURT THE DATE THAT THIS PARTICULAR VIDEO WAS PUBLISHED?

A.   MARCH 31ST.

Q.   AND THE ARTICLE IN EXHIBIT 1, THAT WAS FIRST PUBLISHED BY MR. KIFLE ON MARCH 29TH, WASN'T IT?

A.   YES, MA'AM.

Q.   NOW, IN THIS AT THE UPPER RIGHT-HAND CORNER, THE FIRST

UNITED STATES DISTRICT COURT

PAGE OF EXHIBIT 10, THERE IS A REFERENCE TO ALEM DECHASA.  DO YOU SEE THAT?

A.   YES, MA'AM.

Q.   AND IS THAT THE NAME OF THE ETHIOPIAN MAID THAT TOOK HER OWN LIFE IN LEBANON THAT YOU SPOKE ABOUT EARLIER?

A.   YES, MA'AM.

Q.   AND SO THIS VIDEO MAKES THAT SAME CONNECTION TO YOU AS WELL, THIS LINKAGE BETWEEN THAT INCIDENT AND THIS?

A.   YES, MA'AM.

Q.   AND ALSO ON PAGE ONE CAN YOU SEE THE NUMBER OF SUBSCRIBERS TO THIS BILISUMMAA TV?

A.   413.

Q.   THAT'S THE NUMBER OF VIEWS BUT OVER TO THE LEFT-HAND SIDE --

A.   2,778.

Q.   2,700 --

A.   -- 778.

Q.   NOW, IF YOU NOTICE IN THE TEXT OF THIS BILISUMMAA TV SCREEN CAPTURE, YOU WILL SEE THAT THE SAME KINDS OF ACCUSATIONS THAT WERE MADE IN EXHIBIT 1 ARE REPEATED IN THIS, ARE THEY NOT?

A.   YES, MA'AM.

Q.   TURNING TO PAGE TWO OF EXHIBIT 10, CAN YOU TELL THE COURT THE DATE OF THIS VIDEO?  WHEN WAS IT PUBLISHED?

A.   APRIL 2.

Q.   APRIL 2, 2012, CORRECT?

UNITED STATES DISTRICT COURT

A.    YES, MA'AM.

Q.    A MATTER OF JUST A FEW DAYS AFTER THE MARCH 29 PUBLICATION, CORRECT?

A.    YES, MA'AM.

Q.    AND THEN TURNING TO THE NEXT SCREEN CAPTURE, DO YOU SEE THE NEXT ONE?  IT'S THE ONE THAT SAYS "THE ETHIOPIAN HUMAN TRAFFICKING CASE GOES TO COURT, JEMAL AHMED VS. ELIAS KIFLE." DO YOU SEE THAT?

A.    YES, MA'AM.

Q.    AND WHAT IS THE DATE OF THAT PUBLICATION?

A.    OCTOBER 20, 2012.

Q.    AND IF WE RETURN TO EXHIBIT NUMBER 8, THE REPUBLICATION OF MR. KIFLE'S ARTICLE ON OCTOBER 18TH, CORRECT?

A.    YES, MA'AM.

Q.    SO JUST TWO DAYS AFTER MR. KIFLE REPUBLISHES THE SAME THING FROM MARCH 29TH YOU HAVE YET ANOTHER VIDEO POP UP?

A.    YES, MA'AM.

Q.    AND THEN IF YOU TURN TO THE NEXT PAGE OF EXHIBIT 10, A VIDEO THAT'S TITLED "AL AMOUDI'S BUSINESS ASSOCIATE JEMAL AHMED: IS JEMAL AHMED HUMAN TRAFFICKER?"

        CAN YOU TELL THE COURT THE DATE OF THAT PUBLICATION?

A.    OCTOBER 24TH.

Q.    2012?

A.    2012.

Q.    SO IN A SPAN OF JUST A FEW DAYS AFTER THAT REPUBLICATION

UNITED STATES DISTRICT COURT

YOU HAVE HAD TWO MORE VIDEOS PUBLISHED, CORRECT?

A.   YES, MA'AM.

Q.   NOW, MR. AHMED, I WANT TO TURN TO THE IMPACT THAT THE PUBLICATION OF THIS ARTICLE HAS HAD ON YOU PERSONALLY AND ON YOUR BUSINESS.

FOR YOUR COFFEE BUSINESS AT HORIZON, HOW DID YOU MARKET YOUR COFFEE BUSINESS PRIOR TO THE PUBLICATION OF THIS ETHIOPIAN REVIEW ARTICLE?

A.   WE USED TO APPROACH CLIENTS.  I USED TO LEAD THAT TEAM AND I WAS APPROACHING CLIENTS OFFERING OUR COFFEES AND TELLING OUR STORIES.

Q.   AND WOULD YOU APPROACH PEOPLE IN THE UNITED STATES AS WELL AS IN EUROPE?

A.   YES, MA'AM.

Q.   AND AS A RESULT OF THE PUBLICATION OF THIS ARTICLE DID YOU HAVE TO CHANGE THE WAY THAT YOU WENT ABOUT YOUR BUSINESS?

A.   YES, MA'AM.

Q.   AND CAN YOU DESCRIBE FOR THE COURT HOW YOU CHANGED IT AND WHY?

A.   BECAUSE WHEN I MET A NEW PERSON WHO WANTS TO BUY MY COFFEE, THE NEXT DAY HE WOULD NATURALLY DO HIS GOOGLE ABOUT ME AND WHAT COMES OUT IS THESE ARTICLES ABOUT ME BEING A HUMAN TRAFFICKER.

Q.   SO HOW DID YOU CHANGE YOUR BUSINESS AS A RESULT OF YOUR FEAR THAT PEOPLE WOULD LOOK AT WHO YOU ARE ON GOOGLE?

A.   I HIRED OTHER PEOPLE, ANOTHER PERSON TO REPRESENT ME ON THE BUSINESS.

Q.   AND SO YOU HAD TO HIRE A SEPARATE PERSON TO DO THE MARKETING FOR YOUR BUSINESS?

A.   YES, MA'AM.

Q.   AND APPROXIMATELY WHEN DID YOU DO THAT?

A.   ALMOST IMMEDIATELY, BECAUSE IN A MATTER OF A FEW DAYS, THESE THINGS HAPPENED.  AND AFTER I MET A COUPLE OF CLIENTS THEY DID NOT COME BACK TO ME AND I FIGURED THAT'S THE MAIN REASON.

Q.   NOW, WHEN THOSE PEOPLE DIDN'T COME BACK TO DO BUSINESS WITH YOU, DID THEY TELL YOU, MR. AHMED, I'M NOT GOING TO DO BUSINESS WITH YOU BECAUSE I SEE YOU ARE A HUMAN TRAFFICKER?

A.   IF A LEGITIMATE BUSINESSMAN FINDS OUT THAT HIS BUSINESS PARTNER IS A CRIMINAL, HE HAS NO REASON TO COME BACK AND TELL HIM THAT HE'S A CRIMINAL.

Q.   SO IT DOESN'T SURPRISE YOU THAT NOBODY CAME BACK AND SAID THAT TO YOU, I GUESS IS WHAT I'M SAYING.

A.   NO, NOT AT ALL.

Q.   NOW, CAN YOU DESCRIBE FOR THE COURT WHAT THE IMPACT OF THIS ARTICLE, THE PUBLICATION OF THIS ARTICLE WAS FOR YOU PERSONALLY?

A.   YES.  I HAVE SIX SISTERS AND FIVE BROTHERS.  I HAVE 120,000 PEOPLE LIVING IN MY FARMS AND I'M ACCUSED OF THIS HORRENDOUS CRIME.  IT IS THE WORST ATTACK ANYONE CAN DO AGAINST

ME AND IT'S MORALLY AFFECTED ME, IT AFFECTED MY BUSINESS, IT AFFECTED MY FAMILY, THIS ARTICLE BEING ONLINE TWO YEARS NOW, AND ANYONE WHO WANTS TO KNOW ABOUT ME LEARNS THIS FABRICATED STORY.

Q.   IN FACT, WITH THE -- MARCH 29TH, 2015, WILL BE COMING UP ON ALMOST THREE YEARS; IS THAT RIGHT?

A.   YES, MA'AM.

Q.   AND NOT ONLY ARE THESE ARTICLES STILL AVAILABLE ON THE ETHIOPIAN REVIEW WEBSITE AND OTHER WEBSITES BUT THEY ALSO HAVE SPREAD TO OTHER SOURCES LIKE WHAT WE SAW IN EXHIBIT 10; IS THAT RIGHT?

A.   YES.  MANY WEBSITES LINKED IT TO IT.

Q.   AND WHAT ARE YOU ASKING THE COURT TO DO TODAY FOR YOU, MR. AHMED?

A.   FIRST AND FOREMOST, JUDGE, THIS FABRICATED, UNFOUNDED STORY, I WANT IT TO BE REMOVED.  I WANT THE COURT TO REMOVE IT, BECAUSE THERE IS NO EVIDENCE SUGGESTING THAT I HAVE BEEN INVOLVED IN SUCH A HORRENDOUS CRIME.  AND I AM A LEGITIMATE BUSINESSMAN AND I AM RESPONSIBLE FOR TENS OF THOUSANDS OF EMPLOYEES AND OUR BUSINESS MEANS A LOT FOR US, BECAUSE OUR BUSINESS IS NOT LIMITED IN ETHIOPIA.  IT IS A GLOBAL BUSINESS. MY NAME MATTERS.

SECOND, THE DAMAGE I INCURRED IN THE LAST ALMOST THREE YEARS IS TOO MUCH TO BEAR AND I WANT TO BE COMPENSATED.

AND THIRD, IN ETHIOPIA AND MOSTLY IN POOR COUNTRIES

ALL OVER THE WORLD A LOT OF PEOPLE HAVE BECOME VICTIMS OF HUMAN TRAFFICKING.  I DON'T THINK WHATEVER MONEY I WAS AWARDED WOULD FIX MY REPUTATION.  MOST OF THE DAMAGE HAS ALREADY BEEN DONE. BUT I WANT TO USE SOME OF THAT AWARD MONEY FOR POOR PEOPLE WHO LOST THEIR LIVES IN THE MIDDLE EAST TO THEIR FAMILY AND I WANT COMPENSATION BECAUSE OF THAT.

MS. GATELY:  THANK YOU, YOUR HONOR.

I HAVE NO FURTHER QUESTIONS AT THIS TIME.

THE COURT:  MR. KIFLE, YOU HAVE A RIGHT TO ASK QUESTIONS OF THIS WITNESS.  NOW, YOU WILL BE GIVEN A CHANCE TO MAKE ANY STATEMENTS YOU WANT TO MAKE AND TESTIFY IF YOU WANT TO, BUT AT THIS TIME I WILL ALLOW YOU TO ASK ANY QUESTIONS YOU WANT TO ASK.

MR. KIFLE:  YES, SIR.  CAN I APPROACH?

THE COURT:  YOU CAN COME TO THE PODIUM, YES, SIR.

MR. KIFLE:  CAN I --

THE COURT:  YOU CAN USE ANY NOTES -- EXCUSE ME.

MR. KIFLE:  I ALREADY GAVE IT TO THEM, SO CAN I GIVE YOU THIS, MY LIST?

THE COURT:  ALL RIGHT.  NOW, LET MS. GATELY LOOK AT IT FIRST BEFORE YOU --

MR. KIFLE:  SHE HAS IT ALREADY.

THE COURT:  ALL RIGHT.  NOW, WHAT IS IT YOU WANT TO GIVE THE COURT?

MR. KIFLE:  IT'S A -- THAT'S A BRIEF, MY BRIEF.

THE COURT:  YOUR BRIEF.

MS. GATELY:  YOUR HONOR, I WOULD NOTE THAT MR. KIFLE HANDED ME A TRIAL BRIEF WHEN HE WALKED INTO COURT TODAY.

THE COURT:  HE WANTS TO OFFER IT, I GUESS, INTO THE EVIDENCE OF THE COURT.

WHAT IS YOUR POSITION, MS. GATELY?

MS. GATELY:  YOUR HONOR, I OBJECT TO THAT.  IT'S NOT EVIDENCE.  IT'S ARGUMENT.

MR. KIFLE:  I RECEIVED THEIR BRIEF YESTERDAY, OR LAST NIGHT, ACTUALLY, WHEN I CHECKED MY EMAIL.

THE COURT:  YES.  IF THIS IS A BRIEF, WHAT YOU NEED TO DO IS FILE IT WITH THE CLERK'S OFFICE.  IT'S NOT -- IT'S AN ARGUMENT.  IT'S NOT EVIDENCE.  BUT IF YOU WANT THE COURT TO BE ABLE TO SEE IT, WHAT YOU NEED TO DO AT THE END OF THIS HEARING TODAY IS FILE IT WITH THE CLERK'S OFFICE AND THEN I WILL GET TO SEE IT.  BUT AS FAR AS THIS PARTICULAR MATTER, I WILL HAVE TO -- NO, I CAN'T TAKE IT AS EVIDENCE IN THIS HEARING, BUT YOU FILE IT WITH THE CLERK'S OFFICE AND I WILL STILL GET TO SEE IT.

MR. KIFLE:  OKAY.

THE COURT:  OKAY.  BUT MAKE SURE YOU FILE IT TODAY, BECAUSE THE COURT IS GOING TO START WORKING ON THIS CASE AS SOON AS IT'S OVER.

MR. KIFLE:  YES, SIR.

THE COURT:  AND LET ME ADD ONE OTHER THING.

YOU WILL GET WHAT WE CALL A CLOSING ARGUMENT, BUT

YOUR CLOSING ARGUMENT HAS TO PERTAIN TO WHAT THE EVIDENCE IS IN THIS MATTER, SO I DON'T KNOW WHAT'S IN THERE, WHAT YOU HAVE THERE.

MR. KIFLE:  YES, SIR.

I HAVE A COUPLE OF -- A FEW QUESTIONS TO THE PLAINTIFF.

THE COURT:  GO AHEAD.

CROSS-EXAMINATION

BY MR. KIFLE:

Q.   OKAY.  DO YOU MIND IF I CALL YOU JEMAL?

THE COURT:  I PREFER YOU TO CALL HIM BY HIS -- I LIKE IN MY COURT TO REMAIN FORMAL, MR. AND MRS.

MR. KIFLE:  OKAY.  MR. AHMED?

THE COURT:  YES.

MR. KIFLE:  OKAY.  MR. AHMED --

THE COURT:  WHEN YOU TESTIFY, YOU WILL GET THE SAME RESPECT.

MR. KIFLE:  YES, SIR.

BY MR. KIFLE:

Q.   MR. AHMED, HAVE WE MET BEFORE?

A.   NO.

Q.   DO YOU KNOW ME?

A.   I'VE HEARD OF YOU.

Q.   DO YOU KNOW MY FAMILY?

A.   I KNOW YOUR SISTER AND YOUR BROTHER.

Q.    TELL ME ABOUT MY SISTER.

A.    YOUR SISTER WAS DATING MY BROTHER SOME 20 YEARS AGO.

Q.    THAT'S NOT TRUE, BUT --

THE COURT:  WELL, DON'T ARGUE.  ASK QUESTIONS.  ASK QUESTIONS.  DON'T ARGUE WITH HIM.

MR. KIFLE:  OKAY.

BY MR. KIFLE:

Q.    CONTINUE.

A.    AND SHE CAME WITH MY BROTHER TO VISIT ETHIOPIA.

Q.    OKAY.

A.    AND SHE BROUGHT HER YOUNG BROTHER NAMED BROOK.

Q.    WHO'S YOUR -- WHAT'S THE NAME OF YOUR BROTHER?

A.    ABDU HAMAN AHMED (PHONETIC).

MS. GATELY:  YOUR HONOR, I AM GOING TO OBJECT.

Q.    (CONTINUING)  WHERE IS HE NOW?

THE COURT:  HOLD ON, HOLD ON.  HOLD ON A SECOND, MR. KIFLE.

MS. GATELY:  YOUR HONOR, I AM GOING TO OBJECT THAT THIS REALLY DOESN'T HAVE ANYTHING TO DO WITH THE REPUTATIONAL HARM OR THE DAMAGES SUFFERED BY MR. AHMED.

THE COURT:  REMEMBER, WE ARE HERE FOR TWO REASONS IN THIS HEARING.  ONE IS THAT THEY ARE ASKING THE COURT TO AWARD DAMAGES AGAINST YOU PERSONALLY AND THERE IS A MOTION TO FIND DEFAULT AGAINST THE ETHIOPIAN REVIEW, AND IF I FIND THE DEFAULT, ENTER A DEFAULT JUDGMENT AND DAMAGES.

UNITED STATES DISTRICT COURT

SO, MS. GATELY, I AM GOING TO ALLOW HIM A LITTLE MORE LEEWAY BECAUSE HE IS PRO SE.

MS. GATELY:  THANK YOU, YOUR HONOR.

THE COURT:  BUT WE NEED TO KEEP IN MIND, KEEP IT TO WHAT WE ARE HERE ABOUT.

MR. KIFLE:  YOUR HONOR, I --

THE COURT:  I AM ASSUMING HIS QUESTIONS ABOUT YOUR SISTER AND THE WITNESS'S BROTHER IS LEADING TOWARDS SOMETHING REGARDING EITHER THE DEFAULT JUDGMENT OR THE DAMAGES.

MR. KIFLE:  YOUR HONOR, I DIDN'T INTERRUPT THEM EVEN THOUGH I COULD, SO --

THE COURT:  WELL, I CAN TELL YOU, I WILL TREAT YOU LIKE A LAWYER.  IF MS. GATELY WANTS TO OBJECT, SHE CAN OBJECT AND I HAVE TO RULE.  YOU COULD OBJECT IF YOU WANTED TO OBJECT, OKAY?

MR. KIFLE:  YES, SIR.

THE COURT:  ALL RIGHT.

MR. KIFLE:  MAY I CONTINUE?

BY MR. KIFLE:

Q.    OKAY.  DO YOU KNOW MY FAMILY, MY PARENTS?

A.    I DON'T KNOW THEM.

Q.    WELL, WHY DO YOU THINK I'M TRYING TO DEFAME YOU?  WHAT'S MY REASON?  IF MY SISTER IS STILL, MY SISTER IS A VERY GOOD FRIEND OF YOUR BROTHER AND MY SISTER IS A VERY GOOD FRIEND OF YOUR FAMILY AND YOUR PARENTS, WHAT'S MY REASON FOR -- TO HARM

YOU OR TO DEFAME YOU?

MS. GATELY:  OBJECTION.

Q.   (CONTINUING)  OR WHAT DO YOU THINK --

THE COURT:  HOLD ON, HOLD ON.  I HAVE AN OBJECTION.

MS. GATELY?

MS. GATELY:  YOUR HONOR, THIS JUST CALLS FOR SPECULATION.  IT'S NOT PERSONAL KNOWLEDGE.

THE COURT:  IT'S KIND OF -- YOU ARE ASKING HIM TO GUESS AT WHY SOMETHING MIGHT BE.

YOU KNOW, MS. GATELY, I AM GOING TO LET HIM ANSWER THAT QUESTION, THOUGH.  I AM GOING TO LET HIM ANSWER THAT QUESTION.

GO AHEAD.

MR. KIFLE:  WELL, THE REASON I AM ASKING --

THE COURT:  NO.  I AM GOING TO ALLOW THAT QUESTION TO BE ANSWERED IF YOU CAN ANSWER IT.

MR. KIFLE:  OKAY.  WHY DO YOU THINK --

THE COURT:  WELL, HE'S GOT THE QUESTION.  IF YOU CAN ANSWER IT, ANSWER IT.

THE WITNESS:  MAYBE BECAUSE MY BUSINESS IS BIG IN ETHIOPIA AND IT INVOLVES A LOT OF PEOPLE, YOU WANT TO DAMAGE MY REPUTATION AND IN TURN DAMAGE THE WHOLE OPERATION WE DO IN ETHIOPIA, BECAUSE IN MOST OF YOUR WEBSITE WHATEVER GOOD NEWS ABOUT ETHIOPIA COMES, YOU DEFAME IT.  AND MAYBE I'M A COLLATERAL DAMAGE, BUT I DON'T KNOW FOR CERTAIN WHAT'S THE

REASON BEHIND.

BY MR. KIFLE:

Q.   SO YOU --

A.   AND YOU MENTIONED THAT SINCE YOUR SISTER IS A GOOD FRIEND OF MY BROTHER.  I DO NOT THINK THAT YOUR SISTER IS A GOOD FRIEND OF MY BROTHER.  I SAID 20 YEARS AGO I HAD SEEN HER WITH MY BROTHER AND I DON'T KNOW IF SHE IS HIS FRIEND OR NOT.

Q.   WELL, WHERE IS YOUR BROTHER RIGHT NOW?

THE COURT:  THAT RIGHT THERE IS KIND OF -- I CAN'T SEE HOW THAT IS LEADING TO WHAT WE ARE HERE ON.  SO IF THERE IS AN OBJECTION, THEN --

MS. GATELY:  YOUR HONOR, I OBJECT TO THIS LINE OF QUESTIONING.  I THINK IT'S JUST VERY FAIR AFIELD.

THE COURT:  YES.  WHERE HIS BROTHER IS AT NOW, I CAN'T SEE HOW THAT IS RELEVANT, SO I WILL SUSTAIN THAT OBJECTION.

BY MR. KIFLE:

Q.   OKAY.  SO HORIZON IS YOUR COMPANY, RIGHT?

A.   YES, SIR.

Q.   AND WHAT OTHER COMPANY DO YOU HAVE?

A.   AS I SAID IN MY FIRST TESTIMONY, I HAVE A COMPANY CALLED AHFA PLC, WHICH PRODUCES FOOD.  IT'S A FOOD PROCESSING PLANT. AND THE SECOND COMPANY I HAVE IS HORIZON PLANTATIONS PLC.

Q.   OKAY.  SO YOUR ARGUMENT IS JUST BECAUSE YOU ARE SUCCESSFUL, I CAME AFTER YOU?

MS. GATELY:  OBJECTION, YOUR HONOR.  THAT'S NOT EVEN A QUESTION.

THE COURT:  THAT IS A LEADING QUESTION.  I WILL ALLOW THAT ONE.

THE WITNESS:  MY ARGUMENT IS I AM WRONGFULLY ACCUSED.

BY MR. KIFLE:

Q.   WELL, I AM ACCUSING YOU BECAUSE YOU ARE SUCCESSFUL?

MS. GATELY:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

THE COURT:  I THINK THAT HE HAS ANSWERED THAT.

THE WITNESS:  I HAVE ALREADY ANSWERED IT.

THE COURT:  HOLD ON.  THAT WAS ASKED AND ANSWERED.  THAT WAS ASKED AND HE ANSWERED THAT.  THAT IS THE SAME QUESTION AGAIN AND HE ANSWERED IT.

SO WHAT IS YOUR NEXT QUESTION?

BY MR. KIFLE:

Q.   OKAY.  WELL, DO YOU KNOW ANY OTHER SUCCESSFUL INDIVIDUAL OR ORGANIZATION I AM ACCUSING OR DEFAMING?

A.   I DON'T TRACK YOU.  I ONLY TALK ABOUT ME, THAT I AM WRONGFULLY ACCUSED.

Q.   OKAY.  YOU SAY THAT HORIZON IS YOUR COMPANY AND IT DOES -- IT GROWS COFFEE AND FRUITS, RIGHT?

A.   AMONG OTHERS.

Q.   HOW MUCH LAND DO YOU HAVE?  WHAT'S THE SIZE OF THE LAND YOU HAVE?

A.   WITHIN HORIZON PLANTATION PLC WE HAVE AROUND 25,000

HECTARES.

Q.    HOW DID YOU OBTAIN THAT LAND?

MS. GATELY:  OBJECTION, YOUR HONOR.  THIS IS VERY FAR AFIELD OF ANYTHING TO DO WITH WHY WE ARE HERE.

THE COURT:  THERE IS AN OBJECTION, MR. KIFLE, THAT THIS IS AN IRRELEVANT QUESTION.

MR. KIFLE:  IT'S CONNECTED TO THE GOVERNMENT, HIS GOVERNMENT, THE GOVERNMENT RELATION TO HIM AND THE CORRUPT METHOD THAT HE OBTAINED THE LAND.

THE COURT:  WELL, BUT --

MR. KIFLE:  AND IT'S CONNECTED TO THE PEOPLE WHO OWN THE LAND WHO HAVE BEEN TRAFFICKED TO SAUDI ARABIA.

THE COURT:  WELL, HERE IS THE SITUATION, THOUGH.  I AM TRYING TO DETERMINE WHETHER OR NOT I SHOULD GRANT A DEFAULT JUDGMENT AGAINST THE ETHIOPIAN REVIEW FOR NOT FILING AN ANSWER.  I AM ALSO TRYING TO DETERMINE -- IT'S ALREADY BEEN DETERMINED BY JUDGE CARNES, AND I INHERITED THIS CASE, THAT THE DEFAULT JUDGMENT ENTERED AGAINST YOU AND DAMAGES, HOW MUCH DAMAGES SHOULD BE APPLIED AGAINST YOU.  SO HOW THIS WITNESS GOT THE LAND, I CAN'T SEE HOW IT IS RELEVANT UNLESS YOU CAN ENLIGHTEN ME.

MR. KIFLE:  CAN I -- CAN I EXPLAIN, SIR?

THE COURT:  YES, YOU CAN TRY TO EXPLAIN IT TO ME.

MR. KIFLE:  OKAY.  HE CLAIMS THAT MY ARTICLE HAS DEFAMED HIM AND IT HAS A NEGATIVE EFFECT ON HIS BUSINESS.  BUT

EVEN AFTER MY ARTICLE WAS PUBLISHED HE WAS BEING REWARDED WITH MORE BUSINESS AND WITH MORE LAND AND --

THE COURT:  WHY DON'T YOU ASK HIM THAT QUESTION?

MR. KIFLE:  WELL, I AM TRYING TO GET TO THAT POINT, SIR.

THE COURT:  LET ME TELL YOU SOMETHING.  SOMETIMES THE BEST WAY TO GET TO A POINT IS A STRAIGHT LINE.  JUST ASK HIM THE QUESTION.  THAT'S A GOOD QUESTION TO ASK HIM.

BY MR. KIFLE:

Q.   OKAY.  YOU SAID MY ARTICLE HAS NEGATIVELY AFFECTED YOU, YOUR BUSINESS.  SINCE MY ARTICLE WAS PUBLISHED HAVE YOU RECEIVED MORE LAND FROM THE GOVERNMENT?

A.   THE GOVERNMENT DOESN'T GIVE ME LAND.  IT'S AS ANY BUSINESS.  SINCE YOU WRONGFULLY ACCUSED ME, I HAVE BOUGHT ENTERPRISES, NOT LAND.  IN ETHIOPIA LAND DOES NOT -- IS NOT SOLD OR BOUGHT.

Q.   YOU HAVE BOUGHT THE LAND?

A.   AS I SAID, IN ETHIOPIA NOBODY BUYS LAND.

Q.   WHERE DID YOU GET THE LAND FROM?

A.   THE FARMS, IF YOU ARE TALKING ABOUT THE FARMS, THE FARMS WERE STATE FARMS AND THE ETHIOPIAN GOVERNMENT FOR THE LAST 20 YEARS --

Q.   BUT YOU --

THE COURT:  WELL, LET HIM FINISH HIS ANSWER.  LET HIM FINISH HIS ANSWER.

A.    (CONTINUING)  -- THE LAST 20 YEARS IS PRIVATIZING

GOVERNMENT ENTERPRISES.  THOSE FARMS ARE PRIVATIZED IN OPEN

TENDER AND I WON THAT OPEN TENDER AND BOUGHT THOSE ENTERPRISES.

Q.    FROM WHOM?

A.    FROM THE ETHIOPIAN GOVERNMENT.

        THE COURT:  LET ME ASK YOU THIS QUESTION:  HAS YOUR
NET WORTH INCREASED SINCE THIS ARTICLE OR HAS YOUR NET WORTH
DECREASED?

        THE WITNESS:  MY NET WORTH INCREASES BECAUSE I WORK.

        THE COURT:  WELL --

        MR. KIFLE:  YOUR NET WORTH --

        THE COURT:  HOLD ON, HOLD ON.

        MR. KIFLE:  HE DID SAY NET WORTH.

        THE COURT:  MR. KIFLE, YOU HAVE TO ALLOW HIM TO
ANSWER THE QUESTION.

        MR. KIFLE:  YES, SIR.

        THE COURT:  YOU CANNOT INTERRUPT.

        MR. KIFLE:  YES, SIR.

        THE COURT:  ALL RIGHT.  GO AHEAD.

        THE WITNESS:  YOUR HONOR, WE WORK HARD WITH MY 30,000
EMPLOYEES.

        THE COURT:  THAT'S NOT MY QUESTION.

        THE WITNESS:  BECAUSE OF THAT MY REVENUE INCREASES.
MY NET REVENUE AS WELL INCREASES.

        THE COURT:  HAS IT INCREASED BECAUSE OF THE EXTRA

LAND YOU HAVE GOTTEN FROM THE GOVERNMENT?

THE WITNESS:  NO, SIR.  THOSE ENTERPRISES, WE HAVE NOT PAID OFF OUR DEBTS YET.

THE COURT:  WHAT IS YOUR NEXT QUESTION?

MR. KIFLE:  OKAY.  LET ME ASK THE SAME QUESTION, BUT --

THE COURT:  WELL, DON'T ASK THE SAME QUESTION AGAIN.

MR. KIFLE:  NOT THE SAME QUESTION BUT WITH ADDITIONAL, SOME ADDITIONAL ANGLES.

BY MR. KIFLE:

Q.   WHEN YOU ACQUIRED THE LAND, YOU SAID WHEN YOU GOT THE -- YOU RECEIVED THE LAND FROM THE GOVERNMENT.  BEFORE YOU RECEIVED THE LAND, BEFORE YOU RECEIVED THE LAND, WHO WAS OCCUPYING THE LAND OR WHO WERE THE OWNERS?

MS. GATELY:  YOUR HONOR, AGAIN, THIS IS LIKE WAY AFIELD OF WHETHER OR NOT MR. AHMED IS DAMAGED.

THE COURT:  YES, WHO WERE THE PRIOR OWNERS IS -- I CAN SEE ABOUT ACQUIRING THE LAND, BUT WHO THE PRIOR OWNERS ARE, I CAN'T SEE WHERE THAT IS RELEVANT.  I ALLOWED YOU TO ASK THE QUESTION ABOUT ACQUIRING THE LAND, BECAUSE I CAN SEE HOW THAT MIGHT GO TOWARD DAMAGES, BUT WHO OWNED IT PREVIOUSLY, I DON'T SEE THAT.

MR. KIFLE:  CAN I EXPLAIN WHY?

THE COURT:  SO NEXT QUESTION.

MR. KIFLE:  CAN I EXPLAIN WHY THAT IS?

THE COURT:  NO, NO.

NEXT QUESTION.

BY MR. KIFLE:

Q.    OKAY.  DO YOU KNOW ABOUT -- DO YOU KNOW H&M, THE SWEDISH FASHION GIANT, H&M?

A.    THE DEPARTMENT STORE YOU ARE TALKING ABOUT?

Q.    YES, YES.

A.    UH-HUH.

Q.    WHAT IS YOUR DEALING WITH H&M?

A.    I DON'T DEAL WITH H&M.

Q.    YOUR PARTNER, AL AMOUDI, DEALS WITH H&M?

A.    I DON'T ANSWER FOR MY PARTNER.

Q.    WELL --

MS. GATELY:  OBJECTION, YOUR HONOR.  AGAIN, WE ARE WAY FAR AFIELD HERE OF WHETHER --

THE COURT:  WELL, HE HAS ALREADY ANSWERED THAT ONE.

MS. GATELY:  I AM GOING TO OBJECT TO THIS LINE OF QUESTIONS, YOUR HONOR.

THE COURT:  AND THAT'S YOUR RIGHT.

MS. GATELY:  THANK YOU.

BY MR. KIFLE:

Q.    OKAY.  AFTER THIS CASE WAS FILED HOW MUCH MORE LAND HAVE YOU RECEIVED?  CAN YOU, CAN YOU BE SPECIFIC?

A.    I SAID, YOUR HONOR, I DID NOT RECEIVE LAND.  WE BOUGHT ENTERPRISES.  ENTERPRISES WAS FUNCTIONING ENTERPRISES WITH

EMPLOYEES, THE LAND, THE ASSETS, THE BUILDINGS WE BOUGHT FROM THE GOVERNMENT, AND WE DID NOT RECEIVE LAND TO DEVELOP.

THE COURT:  YOU BOUGHT IT?

THE WITNESS:  WE BOUGHT IT, THE ENTERPRISES, FARMS, WHICH WERE OPERATIONAL FOR 30, 40 YEARS.

THE COURT:  OKAY.

BY MR. KIFLE:

Q.   HOW MUCH DID YOU PAY FOR THE LAND?

A.   WHICH LAND ARE YOU TALKING ABOUT?  I DID NOT PAY FOR THE LAND.

MS. GATELY:  OBJECTION, YOUR HONOR.

MR. KIFLE:  THE ONE YOU ACQUIRED THAT --

THE COURT:  HOLD ON, HOLD ON, HOLD ON.  I AM GOING TO SUSTAIN THAT OBJECTION.  I MEAN I THINK WE GOT THE LAND THING SORT OF ASKED AND ANSWERED.  LET'S SEE IF WE CAN MOVE ON TO ANOTHER PHASE OF IT.  I THINK I'VE GOT THIS PART DOWN.

MR. KIFLE:  OKAY.  YOUR HONOR, I SUBMITTED EXHIBITS, EXHIBIT NUMBER 3, BEFORE I CAME --

MS. GATELY:  YOUR HONOR --

MR. KIFLE:  -- TO THE CLERK.

THE COURT:  HOLD ON, HOLD ON.

MR. KIFLE:  EXHIBIT 3.

THE COURT:  HOLD ON.

MS. GATELY:  I DON'T HAVE IT.

MR. KIFLE:  YOU ALREADY HAVE IT.

UNITED STATES DISTRICT COURT

THE COURT:  WHERE IS THE EXHIBIT?

MR. KIFLE:  IT'S IN THE -- WITH THE CLERK'S OFFICE. IT WAS FILED.

THE COURT:  YOU HAVE GOT TO BRING IT HERE.

MR. KIFLE:  THEY HAVE IT AND I THINK YOU HAVE IT ALSO.

THE COURT:  MS. GATELY SAYS SHE DOESN'T HAVE IT.

MS. GATELY:  YOUR HONOR, I DON'T HAVE ANY EXHIBITS.

MR. KIFLE:  IT WAS EMAILED, EMAILED TO THEM.

THE COURT:  WHAT YOU HAVE TO DO, SIR, YOU HAVE TO BRING IT HERE AND IN OPEN COURT OFFER IT.

MR. KIFLE:  OKAY.  WELL, THAT EXHIBIT WOULD SHOW --

THE COURT:  WELL, YOU CAN'T TELL ME WHAT THE EXHIBIT WOULD SHOW BECAUSE MS. GATELY HAS A RIGHT TO LOOK AT IT AND OBJECT TO IT.

MR. KIFLE:  SHE --

THE COURT:  HOLD ON.  AND MS. WRIGHT JUST CHECKED AND THERE IS NOTHING ON THE DOCKET BEING FILED IN THE CLERK'S OFFICE HERE, ANY EXHIBITS.

WHEN DID YOU FILE IT?

MR. KIFLE:  THE SAME WAY I FILED IT, I FILED IT ALREADY.  I EMAILED IT TO THE CLERK'S OFFICE AND THEY SEND ME ALL THE PAPERS BY EMAIL.  TO MAKE IT CONVENIENT FOR EVERYBODY, I DON'T DEMAND THAT I RECEIVE EVERYTHING BY MAIL.

THE COURT:  WHAT YOU HAVE TO DO, AND AGAIN -- AND I

UNDERSTAND YOU ARE NOT AN ATTORNEY.  MS. GATELY HAD EXHIBITS 1, 4, 5, 6, 7, 8, 9, 10 AND 13, BUT THE FIRST 1, 4, 5, 6, 7, 8, 9, 10 ARE EXHIBITS THAT SHE BROUGHT TO COURT.  AND BEFORE -- SHE ASKED TO OFFER THEM INTO EVIDENCE AND BEFORE I WOULD ACCEPT THEM YOU HAD A RIGHT TO LOOK AT THEM AND TO OBJECT.

YOU HAVE TWO PROBLEMS HERE.  ONE, WE ARE LOOKING AT THE CLERK'S OFFICE FILES ONLINE AND THERE ARE NO EXHIBITS THAT HAVE BEEN FILED WITH THE CLERK'S OFFICE.

SECOND OF ALL, IF YOU DON'T HAVE AN EXHIBIT HERE, JUST BECAUSE -- MS. GATELY CAN LOOK AT IT AND SHE CAN OBJECT, BUT IF I DISAGREED, I COULD STILL LET IT INTO EVIDENCE.  BUT I DON'T HAVE IT HERE TO LOOK AT.  I DON'T HAVE IT.  YOU DID NOT HAND IT TO ME.  AND EVEN IF WE COULD SEND DOWNSTAIRS TO GET THEM OR UPSTAIRS TO GET THEM, THEY ARE NOT FILED UPSTAIRS.  SO I CAN'T CONSIDER IT, ALLOW IT INTO EVIDENCE ONE WAY OR THE OTHER.  BUT YOU ATTACHED EXHIBITS TO YOUR MOTIONS OR BRIEFS?

MR. KIFLE:  YES, I DID.  THAT'S WHAT --

THE COURT:  DO YOU HAVE -- ARE THEY ATTACHED TO THE MOTIONS, THE BRIEF YOU'VE GOT RIGHT THERE?

MR. KIFLE:  THIS IS MY COPY BUT BASICALLY EVERYTHING IS SUBMITTED TO THE CLERK'S OFFICE AND TO THEM ALSO BY MAIL.

MS. GATELY:  YOUR HONOR, THE DEFENDANTS' TRIAL BRIEF DOES NOT HAVE ANY ATTACHMENTS TO IT.

THE COURT:  OKAY.  WELL, WE DON'T HAVE IT.  AND I WOULD DEFINITELY CONSIDER IT.  I WILL LISTEN TO WHAT MS. GATELY

HAS TO SAY IF I AGREE WHETHER I WILL KEEP IT OUT OR KEEP IT OR LET IT COME IN OR IF I DISAGREED WITH HER AND I THOUGHT IT NEEDED TO COME IN, BUT I DON'T HAVE ANYTHING TO RULE ON.

MR. KIFLE:  OKAY.  SO CAN I CONTINUE?

THE COURT:  YOU CAN CONTINUE WITH YOUR QUESTIONS, YES, SIR.

BY MR. KIFLE:

Q.   YES, SIR.

YOU SAID, MR. AHMED, HUMAN TRAFFICKING IS ILLEGAL IN ETHIOPIA.  WHAT DO YOU MEAN BY THAT?  CAN YOU EXPLAIN WHAT YOU MEAN BY THAT?

A.   WHAT I MEANT WAS HUMAN TRAFFICKING IS A CRIME AS IN ANY COUNTRY AND IT'S ALSO A CRIME IN ETHIOPIA.

Q.   DID YOU SAY IN THE ARTICLE I PUBLISHED FOR YOU THAT THERE ARE 200 COMPANIES THAT TRAFFICK OR THAT EXPORT PEOPLE, ESPECIALLY WOMEN, TO SAUDI ARABIA?  DID YOU, DID YOU WRITE THAT?

MS. GATELY:  OBJECTION TO THE CHARACTERIZATION, YOUR HONOR.  I MEAN THAT'S NOT WHAT THE EXHIBIT SAYS.

THE COURT:  I DON'T THINK IT SAYS THAT, MR. KIFLE.

MR. KIFLE:  IT SAYS THAT -- HE SAID THERE ARE 200 AGENCIES IN ETHIOPIA WHO DO, WHO EXPORT PEOPLE TO SAUDI ARABIA. THAT'S WHAT IT SAYS.

MS. GATELY:  NOTE MY OBJECTION, YOUR HONOR.

THE COURT:  I DON'T THINK IT SAYS THAT.  DO YOU WANT

TO LOOK AT THE EXHIBIT AGAIN?  I DON'T THINK THE EXHIBIT SAYS THAT.

MR. KIFLE:  WELL, I CAN -- I CAN READ IT.

THE COURT:  IF YOU CAN SHOW ME ON THE EXHIBIT WHERE IT SAYS IT, I WILL CONSIDER IT, BUT AS MS. GATELY WAS PUTTING THEM IN, I WAS LOOKING AT THEM.

MR. KIFLE:  ALL HE CAN EXPLAIN IS WHERE HE SAID, YOU SAID --

THE COURT:  HOLD ON, HOLD ON, HOLD ON.  DON'T ANSWER THE QUESTION UNTIL I RULE ON THIS.

(PAUSE IN PROCEEDINGS)

LET ME SAY THIS TO YOU, MR. KIFLE.

MR. KIFLE:  I'M SORRY, SIR.

THE COURT:  EACH SIDE HAS ONE HOUR TO PRESENT WHAT THEY WANT TO PRESENT.  AND I KNOW YOU ARE LOOKING FOR THAT DOCUMENT, BUT IF YOU TELL US WHICH ONE IT IS, I CAN LOOK IT UP AND PULL IT OUT FOR YOU.

MR. KIFLE:  YEAH.  IT'S THE ARTICLE HE PUBLISHED ON MY BLOG.

MS. GATELY:  YOUR HONOR, TO SAVE TIME, THAT'S EXHIBIT 1.

THE COURT:  EXHIBIT 1.  ALL RIGHT.

MS. GATELY:  COMMENT 41.

THE COURT:  EXHIBIT 1, PAGE 41.

MS. GATELY:  COMMENT 41.  PAGE 21 AND 22 OF 31 IN

EXHIBIT 1, YOUR HONOR.

MR. KIFLE:  CAN I READ IT?

THE COURT:  PAGE 21 AND 22 OF EXHIBIT 1.  IT'S IN EVIDENCE.  IF YOU WANT TO READ IT TO HIM, YOU CAN.

MR. KIFLE:  I'D LIKE TO READ IT TO SEE IF HE AGREES.

THE COURT:  GO AHEAD.

MR. KIFLE:  OKAY.  IT SAYS:  BY THE WAY -- THAT'S WHAT HE SAID.  BY THE WAY, THERE ARE 200 COMPANIES WHO ARE DOING --

THE COURT:  NOW, ARE YOU ON THE SAME PAGE I AM ON?  I AM LOOKING AT EXHIBIT 1, PAGE 21.

MS. GATELY:  PAGE 22 NOW.  ONTO THE NEXT PAGE.

THE COURT:  22, OKAY.

ALL RIGHT.  GO AHEAD.

BY MR. KIFLE:

Q.  OKAY. HE WROTE:  BY THE WAY, THERE ARE 200 COMPANIES WHO ARE DOING THAT, WHO ARE DOING THAT.  NONE OF THEM, NONE OF THEM BELONG NEITHER TO ME NOR TO THE SHEIK.

SO IF YOU SAID HUMAN TRAFFICKING IS SUCH A TERRIBLE CRIME, HOW IS IT THAT THE GOVERNMENT ALLOWS 200 COMPANIES TO DO HUMAN TRAFFICKING?

MS. GATELY:  OBJECTION TO THAT QUESTION, YOUR HONOR.

THE COURT:  GO AHEAD AND STATE YOUR OBJECTION FOR THE RECORD AND I WILL GIVE MR. KIFLE A CHANCE TO RESPOND.

MS. GATELY:  YOUR HONOR, THAT'S NOT WHAT THE EXHIBIT

SAYS.

THE COURT:  YOU'VE GOT TO READ THE WHOLE PART, MR. KIFLE.  IF YOU LOOK UP ABOVE THERE, IT SAYS:  I RUN LEGITIMATE COMPANIES THAT I OWN.  MY COMPANIES ARE ENGAGED IN HEAVY INDUSTRIES AND LARGE-SCALE COMMERCIAL FARMS.  NONE OF MY COMPANIES MADE ANY FORCEFUL RESETTLEMENT.  GETTING INTO FOREIGN EMPLOYMENT IS NOT MY KIND OF BUSINESS.  BY THE WAY, THERE ARE AROUND 200 COMPANIES WHO ARE DOING, WHO ARE DOING THAT.  NONE OF THEM BELONG TO ME.

SO HE IS TALKING ABOUT RESETTLEMENT.  HE IS NOT TALKING ABOUT HUMAN TRAFFICKING.  HE IS TALKING ABOUT -- IT'S A DIFFERENT MATTER.

MR. KIFLE:  ACTUALLY, IF YOU'LL READ IT AGAIN, IT SAYS FOREIGN, FOREIGN EMPLOYMENT, WHICH IS ANOTHER WORD FOR HUMAN TRAFFICKING.  THEY DON'T WANT TO CALL IT HUMAN TRAFFICKING.

THE COURT:  WHAT IS ANOTHER WORD FOR HUMAN TRAFFICKING?

MR. KIFLE:  THEY CALL IT FOREIGN EMPLOYMENT.  THEY CALL IT FOREIGN EMPLOYMENT BECAUSE THE HUMAN TRAFFICKING IS A BAD WORD INTERNATIONALLY, SO THEY DON'T WANT TO BE --

THE COURT:  WELL, LET'S ASK THIS QUESTION, LET'S ASK THIS QUESTION.

MR. KIFLE:  YES, SIR.

THE COURT:  MR. AHMED, WHEN YOU TALK ABOUT FOREIGN

EMPLOYMENT, WHAT ARE YOU TALKING ABOUT?

THE WITNESS:  YOUR HONOR, THERE ARE EMPLOYMENT AGENCIES IN THE UNITED STATES AND EUROPE AND AFRICA AND ETHIOPIA AS WELL.  EMPLOYMENT AGENCY AND HUMAN TRAFFICKING IS TOTALLY DIFFERENT THINGS.  I NEVER SAID HUMAN TRAFFICKING.

THE COURT:  SO WHEN YOU ARE TALKING ABOUT FOREIGN EMPLOYMENT, ARE YOU TALKING ABOUT HUMAN TRAFFICKING?

THE WITNESS:  NOT AT ALL, SIR.

THE COURT:  AND WHEN YOU REFERRED TO 200 COMPANIES, WHAT 200 COMPANIES ARE YOU TALKING ABOUT?

THE WITNESS:  EMPLOYMENT AGENCIES.  THOSE ARE EMPLOYMENT AGENCIES, LEGALLY OPERATIONAL.  AND I SAY EVEN WITH THEM, I HAVE NO -- THEY ARE NOT -- I AM NOT IN BUSINESS EVEN WITH THAT KIND OF BUSINESS.

THE COURT:  I DON'T THINK, MR. KIFLE, THAT WE ARE TALKING ABOUT THE SAME THING HERE.  I THINK -- I UNDERSTAND WHAT YOU MAY ASSUME IT TO MEAN, BUT BASED ON THE QUESTIONS I DON'T THINK WE ARE TALKING ABOUT THE SAME THING.

MR. KIFLE:  YOUR HONOR, I DON'T WANT TO BE ARGUMENTATIVE, BUT SINCE YOU DO NOT FOLLOW ETHIOPIAN POLITICS, YOU --

THE COURT:  WELL, HOW DO YOU KNOW I DON'T?

MR. KIFLE:  MAYBE YOU DO.  BUT IF YOU DO FOLLOW ETHIOPIAN POLITICS, YOU WOULD NOT HAVE SAID WHAT YOU JUST SAID RIGHT NOW, BECAUSE THE GOVERNMENT --

THE COURT:  WELL, AGAIN --

MS. GATELY:  OBJECTION, YOUR HONOR.  WE ARE TRYING TO GET EVIDENCE OUT HERE.

THE COURT:  -- YOU CAN'T ARGUE THE POINT.

YOU WILL BE ALLOWED TO PRESENT EVIDENCE, AND IF YOU CAN PRESENT EVIDENCE THAT SHOWS THAT FOREIGN EMPLOYMENT MEANS HUMAN TRAFFICKING, THEN YOU WILL BE ALLOWED TO DO THAT.

THE QUESTION HAS BEEN ASKED AS FAR AS THIS WITNESS IS FOREIGN EMPLOYMENT HUMAN TRAFFICKING.  HE SAID NO.  NOW, WHEN YOU GET READY TO PRESENT YOUR PART OF THE EVIDENCE IF YOU CAN PUT UP EVIDENCE THAT SHOWS -- YOU ARE EVEN ALLOWED TO TESTIFY.  YOU WILL BE ALLOWED TO TAKE THIS STAND AND TESTIFY.  IF YOU WANT TO TESTIFY THAT YOUR INTERPRETATION OF FOREIGN EMPLOYMENT IS HUMAN TRAFFICKING, THEN YOU WILL BE ALLOWED TO DO THAT.  BUT WE CAN'T GET INTO AN ARGUMENT WITH THIS WITNESS ABOUT HIS INTERPRETATION OF FOREIGN EMPLOYMENT.  BUT YOU WILL BE ALLOWED TO PRESENT EVIDENCE, EVEN THROUGH YOUR OWN TESTIMONY, WHAT FOREIGN EMPLOYMENT MEANS.

MR. KIFLE:  YES, SIR.

MS. GATELY:  YOUR HONOR, I JUST WOULD NOTE AN OBJECTION IN THAT THIS HEARING IS REALLY SOLELY FOCUSED ON THE DAMAGES ISSUE AND NOT ON ANY UNDERLYING LIABILITY.  THERE HAS ALREADY BEEN A DEFAULT JUDGMENT ENTERED AGAINST MR. KIFLE AND THE ETHIOPIAN REVIEW.

THE COURT:  I AM QUITE FAMILIAR WITH THAT,

MS. GATELY.  I AM QUITE FAMILIAR WITH THAT.  BUT, MS. GATELY, I AM DEALING WITH A PRO SE PERSON AND I AM TRYING TO BE AS FAIR AS POSSIBLE.

MS. GATELY:  I UNDERSTAND.

THE COURT:  HE DOES NOT HAVE THE TRAINING THAT YOU HAVE.

MS. GATELY:  I UNDERSTAND.

THE COURT:  AND WE HAVE GOT TO BE A LITTLE MORE PATIENT.  BUT I AM NOT SAYING DON'T OBJECT.

MS. GATELY:  NO.  I UNDERSTAND.  I'VE GOT TO DO A JOB FOR MY CLIENT AND I AM TRYING TO DO THAT.

THE COURT:  EXACTLY.

GO AHEAD.

BY MR. KIFLE:

Q.   OKAY, MR. AHMED.  SO WHAT'S YOUR INTENTION IN -- THE ARTICLE TALKS ABOUT HUMAN TRAFFICKING, MY ARTICLE.  SO WHY, WHY DID YOU HAVE 200 COMPANIES WHO ARE DOING FOREIGN EMPLOYMENT IF YOU -- WHAT'S THE CONNECTION?  WHAT'S THE CONNECTION YOU ARE TRYING TO MAKE?

A.   IT SAYS I HAVE NO CONNECTION.

Q.   WHY DID YOU MENTION FOREIGN EMPLOYMENT, THEN, IN THE ARTICLE?

MS. GATELY:  OBJECTION, ASKED AND ANSWERED.

THE COURT:  HOLD ON, HOLD ON, HOLD ON.

HE DID ANSWER THAT.  I HAVE TO SUSTAIN THAT

UNITED STATES DISTRICT COURT

OBJECTION.

GO TO ANOTHER QUESTION.

MR. KIFLE:  I DIDN'T ANSWER -- I DIDN'T HEAR THE ANSWER.

THE COURT:  SAY THE ANSWER AGAIN.

THE WITNESS:  I SAY -- COME AGAIN?  I'M SORRY.  I GOT DISTRACTED.

BY MR. KIFLE:

Q.   WELL, MY ARTICLE TALKS ABOUT THE EXPORTING OF ETHIOPIAN WOMEN, INCLUDING UNDERAGE --

A.   I SAY THAT I HAVE NO CONNECTION.

Q.   LET ME FINISH.  INCLUDING UNDERAGE GIRLS TO --

MS. GATELY:  YOUR HONOR --

THE COURT:  HOLD ON.  DON'T ANSWER UNTIL YOUR ATTORNEY HAS A CHANCE TO OBJECT.  YOUR ATTORNEY WILL OBJECT AS SOON AS HE FINISHES THE QUESTION.

MS. GATELY:  THE POINT IS HE JUST ANSWERED IT AGAIN AND HE SAID NO CONNECTION.

MR. KIFLE:  NO.  I DIDN'T HEAR THE ANSWER.

THE COURT:  HE SAID NO CONNECTION.

MS. GATELY:  WELL, HE SAID IT AGAIN.

THE COURT:  HE SAID NO CONNECTION.

BY MR. KIFLE:

Q.   OKAY.  THESE COMPANIES, YOU ARE TALKING ABOUT TWO HUNDRED COMPANIES.  I'M TRYING TO ESTABLISH THAT IN ETHIOPIA HUMAN

TRAFFICKING IS NOT ILLEGAL.  ACTUALLY, THE GOVERNMENT, HE CLAIMS THAT --

THE COURT:  LET ME EXPLAIN SOMETHING TO YOU AGAIN, NOW.  WE ARE NOT HERE TO DETERMINE THAT.  WHAT WE ARE HERE ABOUT THIS AFTERNOON, THIS WITNESS BY AND THROUGH THEIR ATTORNEYS ARE ASKING THIS COURT TO AWARD DAMAGES AGAINST YOU PERSONALLY AND AT SOME POINT IN TIME THEY ARE GOING TO TELL ME AN AMOUNT.  THEY ARE ALSO ASKING THAT I ENTER A DEFAULT JUDGMENT AGAINST THE ETHIOPIAN REVIEW AND AWARD DAMAGES AGAINST THEM.  YOU KNOW, THAT IS WHAT WE OUGHT TO BE ASKING QUESTIONS ABOUT IS THAT IT HAS ALREADY BEEN DETERMINED THROUGH THE DEFAULT JUDGMENT THAT YOU WERE WRONG --

MR. KIFLE:  I UNDERSTAND, SIR.

THE COURT:  -- ON A PERSONAL BASIS.  AND HOW MUCH DAMAGES SHOULD BE AWARDED AGAINST YOU IS WHAT I AM TRYING TO DETERMINE.  AND NOW THEY ARE TRYING TO SAY I SHOULD ALSO ENTER A DEFAULT JUDGMENT AGAINST THE ETHIOPIAN REVIEW.  AND IN A DEFAULT JUDGMENT -- HOW CAN I EXPLAIN THIS?  YOU NEED TO TRY TO GIVE ME A REASON WHY I SHOULD NOT ENTER THE MOTION FOR DEFAULT JUDGMENT AGAINST THE ETHIOPIAN REVIEW.  WAS IT THAT YOU JUST DIDN'T HAVE ENOUGH TIME TO FILE AN ANSWER OR THAT SOMETHING CAME UP THAT MIGHT FALL UNDER WHAT WE CALL EXCUSABLE NEGLECT?  WHY SHOULD I NOT GRANT THIS DEFAULT JUDGMENT?

MR. KIFLE:  WELL, I WOULD JUST SAY I AM NOT --

THE COURT:  WELL, DON'T ARGUE BUT ASK QUESTIONS OF

THIS PERSON ALONG THOSE LINES.

MR. KIFLE:  OKAY.  CAN I EXPLAIN OR ANSWER WHAT YOU SAID?

THE COURT:  WELL, I AM JUST TELLING YOU WHAT YOU NEED TO BE ASKING QUESTIONS ON, BECAUSE IF YOU DON'T ASK QUESTIONS ALONG THOSE LINES, EVERY QUESTION YOU ASK, MS. GATELY, WHICH IS HER RESPONSIBILITY AS AN ATTORNEY, SHE IS GOING TO OBJECT AND I'VE GOT TO RULE ON IT.

MR. KIFLE:  OKAY.  THE POINT I AM TRYING TO MAKE IS THAT HE SAID --

MS. GATELY:  OBJECTION, YOUR HONOR.

MR. KIFLE:  -- THAT THE --

THE COURT:  LISTEN, LISTEN, LISTEN, LISTEN.

MS. GATELY:  THIS IS ARGUMENT.

THE COURT:  YOU CAN'T ARGUE.  YOU HAVE TO ASK QUESTIONS.

MR. KIFLE:  OKAY.  LET ME GO TO THE NEXT QUESTION.  I FEEL LIKE MY HANDS ARE TIED, YOU KNOW.  I DON'T KNOW HOW I CAN DEFEND MYSELF.  ANYWAY, I WILL GO TO MY NEXT QUESTION.

THE COURT:  OKAY.

BY MR. KIFLE:

Q.   DO YOU KNOW, DO YOU KNOW A JOURNALIST ZAWEWISH APIEYAY (PHONETIC)?

A.   I DON'T KNOW.

Q.   DO YOU KNOW A JOURNALIST ZYRIO TALIMO (PHONETIC)?

A.   I DON'T KNOW.

MS. GATELY:  YOUR HONOR, I AM GOING TO OBJECT.

THE COURT:  HOLD ON.

MS. GATELY:  EXCUSE ME.

THE COURT:  WELL, HE HAS ALREADY ANSWERED.  HE DIDN'T KNOW.

MS. GATELY:  WELL, I HAVE A FEELING THERE IS GOING TO BE ANOTHER NAME COMING AND I AM GOING TO REGISTER MY OBJECTION TO THIS LINE OF QUESTIONING.  IT HAS NOTHING TO DO WITH DAMAGES.

THE COURT:  WELL, YOU CAN REGISTER AN OBJECTION AND I WILL GIVE HIM A CHANCE TO TELL ME WHY IT'S RELEVANT.

MS. GATELY:  ALL RIGHT.

MR. KIFLE:  CAN I EXPLAIN WHY IT'S RELEVANT?

THE COURT:  WELL, NO.  THAT QUESTION HAS BEEN ANSWERED.

ASK THE NEXT QUESTION.

BY MR. KIFLE:

Q.   OKAY.  YOU ARGUED THAT IN PUBLISHING THE ARTICLE I ACTED IN A RECKLESS MANNER.  HAVE YOU BEEN CONTACTED BY MUBY SHATIEYAY (PHONETIC)?  HAVE YOU OR SHEIK AL AMOUDI BEEN CONTACTED BY MUBY SHATIEYAY (PHONETIC) FOR INTERVIEW?

MS. GATELY:  OBJECTION.  YOU KNOW, IF THERE IS ANY RELEVANCE TO THIS, IT MIGHT BE RELEVANT TO UNDERLYING LIABILITY BUT NOT TO DAMAGES.

UNITED STATES DISTRICT COURT

THE COURT:  WHY IS THAT QUESTION RELEVANT?

MR. KIFLE:  THE QUESTION IS RELEVANT BECAUSE THEY CLAIM THAT I HAVE TRIED TO INTENTIONALLY DAMAGE THE CLIENT, MR. AHMED, BUT IT SHOWS THAT ME AND MY SOURCES IN TURKEY, I WENT --

THE COURT:  SEE, HERE'S -- OKAY.  I THINK I SEE. IT'S ALREADY BEEN DETERMINED THAT YOU -- DEFAMATION AGAINST YOU.  THAT'S ALREADY BEEN DETERMINED.  THAT'S ALREADY BEEN DECIDED.  WHEN YOU DID NOT FOLLOW THE CORRECT CIVIL PROCEDURES IN RESPONDING, THEN IT'S ALREADY BEEN DECIDED THAT THERE HAS BEEN A DEFAULT ENTERED AGAINST YOU AND THERE HAS ALSO BEEN GRANTED A MOTION FOR DEFAULT JUDGMENT AGAINST YOU.  SO I AM NOT HERE TO DECIDE WHETHER OR NOT WHAT YOU DID WAS RIGHT OR WRONG. IT'S ALREADY BEEN DECIDED THAT YOU WERE WRONG.

MR. KIFLE:  WRONG?

THE COURT:  WRONG.  THAT'S ALREADY BEEN DECIDED BY THE PREVIOUS -- THIS CASE STARTED OFF WITH ANOTHER JUDGE.  THAT JUDGE IS NOW IN A HIGHER COURT.  AND SO I HAVE ALREADY LOOKED AT THE RECORD IN THIS CASE AND IT'S ALREADY BEEN DECIDED THERE IS A DEFAULT THAT HAS BEEN ENTERED AGAINST YOU, A DEFAULT JUDGMENT, A DEFAULT HAS BEEN ENTERED AGAINST THE ETHIOPIAN REVIEW.  A DEFAULT JUDGMENT HAS BEEN ENTERED AGAINST YOU AND RIGHT NOW I AM GOING TO DETERMINE WHETHER I SHOULD ENTER A DEFAULT JUDGMENT AGAINST THE ETHIOPIAN REVIEW.  BUT WE ARE NOT HERE TO DETERMINE WHETHER OR NOT -- ON THE DEFAMATION WHETHER

UNITED STATES DISTRICT COURT

YOU WERE RIGHT OR WRONG.  THAT HAS BEEN DECIDED --

MR. KIFLE:  I DON'T GET A HEARING?

THE COURT:  -- AGAINST YOU.

MR. KIFLE:  I DON'T GET A HEARING?

THE COURT:  WELL, YOU DIDN'T FOLLOW THE RIGHT PROCEDURES IN BEING ABLE TO DEFEND YOURSELF ON THAT MATTER.

MR. KIFLE:  THIS IS THE FIRST TIME I APPEARED IN COURT, SIR.

THE COURT:  WELL, I HATE TO KEEP CUTTING INTO YOUR TIME, BECAUSE YOUR HOUR IS RUNNING OUT, BUT IN THE PROCEDURE, THE CIVIL PROCEDURE, A COMPLAINT WAS FILED BY DLA PIPER ON BEHALF OF THIS WITNESS, MR. AHMED, AND THEY MADE ALLEGATIONS THAT YOU, BY WRITING THIS ARTICLE OR PUTTING THIS BLOG OUT THERE, YOU DEFAMED HIM.  YOU HAD A RIGHT TO RESPOND BY SAYING THAT IS INCORRECT, THAT IS WRONG, AND HERE ARE MY DEFENSES. YOU DIDN'T DO THAT IN THE TIME SET OUT UNDER THE LAW IN THE FEDERAL COURTS OF THE UNITED STATES.

SO A DEFAULT, THEY FILED A MOTION FOR DEFAULT.  A DEFAULT WAS ENTERED AGAINST YOU, A MOTION WAS FILED FOR DEFAULT AGAINST THE ETHIOPIAN REVIEW AND DEFAULT ENTERED AGAINST THEM. SO THE QUESTION OF WHETHER OR NOT YOU ARE IN THE RIGHT OR WRONG HAS BEEN DECIDED.  IT'S JUST DETERMINE HOW MUCH MONEY SHOULD THE COURT MAKE YOU PAY FOR THIS.  THAT'S WHAT WE ARE HERE ABOUT.  OR WHETHER OR NOT, YOU KNOW, OR WHETHER OR NOT I SHOULD NOT GRANT THE MOTION FOR DEFAULT JUDGMENT AGAINST THE ETHIOPIAN

REVIEW.

MR. KIFLE:  I UNDERSTAND, SIR.  I AM TRYING TO MAKE A POINT, BUT UNLESS I GO INTO DETAILS, HOW CAN I EXPLAIN THAT YOU SHOULD NOT ENTER A DEFAULT JUDGMENT?

THE COURT:  MS. GATELY, IF YOU WILL GIVE ME A LITTLE LEEWAY HERE.

MS. GATELY:  YES, SIR.

MR. KIFLE:  I AM LOST, SIR.

THE COURT:  I NEED TO EXPLAIN SOMETHING TO YOU.

YOU NEED TO BE TRYING TO CONVINCE ME THAT EVEN THOUGH THE COURT HAS FOUND THAT YOU WRONGED THIS WITNESS IN WHAT YOU WROTE THAT HE WAS NOT HURT THAT BAD, THAT I SHOULD NOT BE AWARDING HIM ANY LARGE SUMS OF MONEY OR ANY MONEY AT ALL.  YOUR QUESTIONS SHOULD BE TRYING TO SHOW THAT, YEAH, THE ARTICLE IS THERE BUT IT DIDN'T COST HIM ANYTHING REGARDING HIS BUSINESS, IT DIDN'T COST HIM ANYTHING PERSONALLY, THAT, YOU KNOW, THERE'S NO REAL DAMAGES HERE, AND IF THERE IS DAMAGES, JUDGE, IT'S AT MOST NOMINAL OR SMALL.

YOU NEED TO BE TRYING TO ASK QUESTIONS TO SHOW ME THAT.  YOU ALSO, AS FAR AS THE ETHIOPIAN REVIEW, YOU SHOULD BE TRYING TO ASK QUESTIONS IN THE PRESENTATION OF YOUR CASE SHOWING THAT A DEFAULT JUDGMENT SHOULD NOT BE ENTERED AGAINST THE ETHIOPIAN REVIEW.  YOU SHOULDN'T BE TRYING TO CONVINCE ME THAT YOU DIDN'T DEFAME THIS MAN.  THAT TRAIN HAS ALREADY LEFT THE STATION.  SO THE MAIN THING YOU SHOULD BE TRYING TO DO IS

SHOW ME THAT HE WAS NOT -- WE ARE CALLING IT DAMAGES.  I WILL SIMPLIFY IT -- THAT HE WAS NOT HURT ECONOMICALLY, PERSONALLY, OR PROFESSIONALLY OR BUSINESS-WISE BECAUSE OF THAT ARTICLE OR BLOG.

NOW, I HAVE GONE PROBABLY FARTHER THAN I SHOULD BE ALLOWED TO GO, BUT MS. GATELY SAID SHE WOULD GIVE ME SOME LEEWAY AND I THINK IT WOULD HELP WITH WHAT I AM TRYING TO DO.

NOW, I AM ALSO GOING TO TELL YOU ANOTHER THING.  EACH SIDE HAS ONE HOUR TO PRESENT WHAT THEY HAVE TO PRESENT.  YOU MIGHT NOT WANT TO TAKE YOUR WHOLE HOUR QUESTIONING THIS WITNESS.  I AM SURE AT SOME POINT IN TIME YOU WANT TO TELL ME, EITHER THROUGH ARGUMENT OR TESTIMONY, YOUR SIDE.  YOU HAVE PROBABLY ALREADY TAKEN ABOUT 35 TO 40 MINUTES OF YOUR TIME WITH THIS WITNESS.

MR. KIFLE:  CAN I TALK, SIR?  CAN I SPEAK?

THE COURT:  YES.

MR. KIFLE:  I AM TRYING TO -- I UNDERSTAND WHAT YOU ARE TRYING TO DO, SIR.  I KNOW I --

THE COURT:  PLUS, LET ME ALSO ADD THIS:  THAT THERE IS ANOTHER THIRD JUDGE INVOLVED IN THIS CASE, A MAGISTRATE JUDGE BY THE NAME OF JUDGE SCOFIELD, AND YOU DIDN'T FOLLOW JUDGE SCOFIELD'S DISCOVERY ORDERS ON WHAT YOU WERE SUPPOSED TO HAVE GIVEN TO THE OTHER SIDE.  YOU DIDN'T FOLLOW THOSE THINGS.

SO YOU SEEM LIKE A HIGHLY INTELLIGENT PERSON, BUT THE LAW IS NOT AS SIMPLE WITH ALL THE DIFFERENT THINGS YOU'VE GOT

TO KNOW AND UNDERSTAND.  IT'S GETTING KIND OF COMPLICATED. THAT'S WHY THEY HAVE APPELLATE COURTS AND THE SUPREME COURT TO HELP PEOPLE LIKE ME OUT.

SO GO AHEAD.  YOU WERE GOING TO TELL ME SOMETHING.

LET HIM TELL ME WHAT HE WANTS TO TELL ME.

MR. KIFLE:  I'LL MAKE IT SHORT.

THE COURT:  GO AHEAD.

MR. KIFLE:  BUT I AM TRYING TO SAY SOMETHING.

THIS IS A VERY IMPORTANT CASE FOR ME.

THE COURT:  I AGREE.

MR. KIFLE:  MORE THAN IT IS FOR HIM, BECAUSE I AM TRYING TO PROTECT MY FUNDAMENTAL RIGHT TO, YOU KNOW, SPEECH. AND, OF COURSE, BECAUSE OF MY SITUATION, I CANNOT AFFORD MULTIMILLION-DOLLAR LAW FIRMS LIKE DLA PIPER BECAUSE I DON'T HAVE MONEY.  I'M EXILED.  MY PARENTS ARE EXILED.  EVERYBODY IS EXILED AND I CANNOT EVEN COVER MY PARENTS' MEDICAL BILLS.

BUT BECAUSE IT'S MY PASSION TO TALK ABOUT THE PROBLEMS IN ETHIOPIA DESPITE ALL THE SACRIFICES I HAVE BEEN PAYING FOR THE PAST 20 YEARS AND MY PARENTS HAVE BEEN PAYING - THEY WERE KICKED OUT OF ETHIOPIA BECAUSE OF ME - BUT STILL, AFTER ALL, AFTER ALL THE SACRIFICES I AM CONTINUING TO EXPOSE THE TERRIBLE SITUATION IN ETHIOPIA.  ETHIOPIA IS A VERY RICH COUNTRY BUT ALSO THE POOREST COUNTRY IN THE WORLD.

THE BUSINESS, THE GOVERNMENT IN ETHIOPIA IS THE MOST CORRUPT GOVERNMENT, THE MOST BARBARIC GOVERNMENT -- AND JUST

GIVE ME 30 SECONDS, 30 MORE SECONDS.  30 SECONDS.

THE COURT:  ONE MINUTE.

MR. KIFLE:  ONE MINUTE, OKAY.

AND WHEN FOR THE PAST SIX YEARS DLA PIPER HAS BEEN AFTER ME, I'M TRYING TO DEFEND MYSELF.  THIS IS THE FIFTH LAWSUIT AGAINST ME.  TWICE I HAVE BEEN SENTENCED TO LIFE IN PRISON AND TOLD TWICE -- I HAVE A HUNDRED-THOUSAND-DOLLAR FINE AGAINST ME IN LONDON AND THIS IS THE FIFTH ONE.  AND WHEN I -- WHEN THIS COURT, WHEN THIS CASE CAME TO THIS COURT, I THOUGHT I WAS GOING TO GET A CHANCE TO AT LEAST, YOU KNOW, DEFEND MYSELF.

THIS IS THE UNITED STATES COURT, NOT THE ETHIOPIAN COURT, AND I THOUGHT I WAS GOING TO BE GIVEN A CHANCE TO, YOU KNOW, PRESENT MY WITNESSES AND GIVEN TIME TO -- EQUAL TIME TO TALK.  BUT SO FAR FOR THE PAST TWO YEARS I MEAN I REQUESTED DIFFERENT HEARINGS, DIFFERENT THINGS AND I SUBMITTED DIFFERENT MOTIONS AND NONE OF MY REQUESTS HAVE BEEN GRANTED.

OF COURSE, I AM NOT A LAWYER AND I CANNOT FOLLOW ALL THE -- I DON'T KNOW ALL THE PROCEDURES AND I CANNOT AFFORD TO HIRE A LAWYER, BUT I TRIED MY BEST.  THIS, THIS BRIEF TOOK ME TWO WEEKS TO PREPARE.  I HAD TO STOP ALL MY OTHER WORK AND SPENT TWO WEEKS WORKING ON THIS AND -- BUT NOW I JUST -- I FEEL LIKE HELPLESS.  I'M -- IT'S LIKE, YOU KNOW, MY HANDS ARE TIED. I HAVE THE CASE.  THIS IS ON MY PART.  PEOPLE WHO PROVIDED ME WITH EVIDENCE, THEY ARE IN JAIL IN ETHIOPIA, I ACKNOWLEDGE, BUT I KNOW --

MS. GATELY:  YOUR HONOR, I AM JUST GOING TO HAVE TO -- I HAVE GOT TO OBJECT, OBJECT HERE, YOUR HONOR.  THIS IS WAY FAR AFIELD OF THE ISSUE THAT IS BEFORE US AND I DO HAVE ANOTHER WITNESS THAT I WOULD LIKE TO PRESENT.

THE COURT:  YES.  ANY OTHER QUESTIONS YOU HAVE FOR THIS WITNESS?  I WILL ADDRESS WHAT YOU SAID AT THE APPROPRIATE TIME IN THIS HEARING, BUT RIGHT NOW WE NEED TO -- I HAVE ALLOWED YOU TO GO FAR AFIELD OF WHAT IS REALLY APPROPRIATE IN THIS TYPE OF HEARING, BUT I FELT THAT YOU -- COMING FROM ETHIOPIA AND AGAIN NOT BEING A LAWYER, I FELT THAT I NEEDED TO LET YOU HAVE SOME LEEWAY.  BUT ANY OTHER QUESTIONS FOR THIS WITNESS?

MR. KIFLE:  WELL, IT SEEMS THAT I CANNOT CONTINUE MY QUESTIONING BECAUSE OF WHAT I AM TRYING TO GET AT, CONTINUOUSLY INTERRUPTED BY THE OPPOSING COUNSEL, AND --

THE COURT:  OKAY.  SO NO OTHER QUESTIONS?

MR. KIFLE:  SO I CANNOT -- I DO NOT HAVE ANY MORE QUESTIONS FOR HIM.

THE COURT:  OKAY.

MR. KIFLE:  BUT I HAVE A QUESTION FOR THE LAWYER.

THE COURT:  YOU CAN'T ASK THE LAWYER QUESTIONS.

MR. KIFLE:  BECAUSE THEY ARE VERY PRO -- BECAUSE THEY HAVE VERY ESSENTIAL FACTS.

THE COURT:  YOU CANNOT ASK THE LAWYERS QUESTIONS. YOU CANNOT ASK THIS LAWYER A QUESTION UNLESS THIS LAWYER TAKES

THE WITNESS STAND TO TESTIFY.

MR. KIFLE:  EVEN IF IT IS ESSENTIAL TO MY CASE?

THE COURT:  YOU CANNOT ASK HER ANY QUESTIONS UNLESS SHE TAKES THE STAND.  YOU CAN CALL HER AS A WITNESS.

MR. KIFLE:  YEAH, I AM CALLING, I AM CALLING HER NOW.

THE COURT:  WELL, YOU CAN'T DO IT RIGHT NOW.  SHE IS PRESENTING HER CASE.  AND I CAN TELL YOU RIGHT WHEN YOU CALL HER AS A WITNESS YOU ARE GOING TO HAVE TO BE PREPARED TO BE ABLE TO SHOW WHY YOU ARE CALLING THIS ATTORNEY AS A WITNESS, BECAUSE I CAN TELL YOU I KNOW WHAT IS GOING TO HAPPEN.  SHE IS GOING TO OBJECT AND THEY ARE GOING TO ARGUE THAT YOU CAN'T, BUT WE WILL CROSS THAT BRIDGE.

ANY OTHER QUESTION OF THIS WITNESS THAT IS NOT --

MR. KIFLE:  NO, NOT TO HIM.

THE COURT:  OKAY.

MR. KIFLE:  BUT TO HER.

THE COURT:  THANK YOU.  YOU CAN BE SEATED.

I FEEL LIKE I AM CUTTING YOU OFF, BUT I HAVE TO FOLLOW THE LAW AS SET OUT IN AMERICA IN DOING THIS.

MR. KIFLE:  SAY AGAIN.

THE COURT:  I HAVE TO FOLLOW THE RIGHT PROCEDURE AS SET FORTH IN THE FEDERAL RULES OF CIVIL PROCEDURE.

MR. KIFLE:  CAN YOU TELL ME WHY I CANNOT CALL THEM?

THE COURT:  BECAUSE (A), FIRST OF ALL, SHE IS NOT ON THE STAND TESTIFYING.  IF YOU WANT TO CALL HER AS A WITNESS

WITH YOUR TIME LEFT WHEN IT GETS TIME TO PRESENT YOUR CASE, YOU CAN CALL THIS ATTORNEY AS A WITNESS, AND WHETHER OR NOT SHE GETS TO TESTIFY OR NOT, WE WILL CROSS THAT BRIDGE THEN.

MR. KIFLE: OKAY.

THE COURT: FOR RIGHT NOW THE CASE IS BEING PRESENTED BY --

MR. KIFLE: FOR THE RECORD I SUBMITTED THEM AS A LIST, IN MY LIST OF WITNESSES.

THE COURT: ALL RIGHT. THANK YOU.

YOU CAN BE SEATED.

DO YOU HAVE ANY ANYTHING ELSE FOR THIS WITNESS?

MS. GATELY: ONE QUESTION, YOUR HONOR.

THE COURT: OKAY. THANK YOU, MR. KIFLE.

MR. KIFLE: AM I DONE HERE?

THE COURT: YES, SIR. THANK YOU. YOU CAN HAVE A SEAT.

MR. KIFLE: MY TIME IS UP?

THE COURT: SIR?

MR. KIFLE: MY TIME IS UP?

THE COURT: YOUR TIME IS NOT UP UNLESS YOU WANT TO ASK SOME MORE QUESTIONS.

HOW MUCH TIME DOES MR. KIFLE HAVE LEFT?

OH, OKAY. FINE.

MR. KIFLE: HOW MUCH TIME DO I HAVE?

THE COURT: LET'S SEE. DO YOU HAVE ANY OTHER

UNITED STATES DISTRICT COURT

QUESTIONS?

MR. KIFLE:  YES.  IF I HAVE TIME, I HAVE MORE QUESTIONS.  IF I CANNOT --

THE COURT:  YOU CAN'T CALL THIS ATTORNEY.

MR. KIFLE:  THEN I HAVE MORE QUESTIONS FOR HIM.

THE COURT:  ALL RIGHT.  GO AHEAD, GO AHEAD.

BY MR. KIFLE:

Q.  OKAY.  SO THIS IS IN REGARDS TO YOUR BEING DAMAGED BY MY REPORT.

CAN YOU TELL ME AGAIN, HOW WERE YOU AFFECTED BY MY REPORT?  HOW WAS YOUR BUSINESS AFFECTED BY MY REPORT?  TO BE MORE SPECIFIC.

A.  AS I EXPLAINED IT TO MS. GATELY, WHOEVER DEALS BUSINESS WITH ME GOOGLES MY NAME AND IT COMES OUT THAT WRONGFULLY ACCUSED HUMAN TRAFFICKER, I'M A HUMAN TRAFFICKER, AND THIS AFFECTS MY CREDIBILITY AND MORALLY AS WELL, BECAUSE AS YOU SEE IN THE COMMENTS, HUNDREDS OF COMMENTS OF THREATS AND INSULTS THAT AFFECTED ME PERSONALLY AND --

Q.  YOU DON'T THINK --

THE COURT:  WELL, NO, NO.  LET HIM FINISH HIS ANSWER.

A.  (CONTINUING)  AND MY FRIENDS AND MY FAMILY AS WELL.

BY MR. KIFLE:

Q.  SO ARE YOU SAYING YOU LOST INCOME BECAUSE OF MY -- MY REPORT?

A.  YES.

UNITED STATES DISTRICT COURT

Q.   YOU LOST INCOME?  HOW MUCH INCOME HAVE YOU LOST?

A.   I WOULDN'T KNOW.

Q.   SO IF YOU DON'T KNOW, HOW DO YOU CLAIM THAT YOU ARE DAMAGED BY MY REPORT?

A.   I BELIEVE I EXPLAINED.

Q.   BUT YOU SAID YOU DON'T KNOW HOW MUCH INCOME YOU LOST.

     MS. GATELY:  OBJECTION, YOUR HONOR, ARGUMENTATIVE NOW.

     THE COURT:  THAT IS ARGUMENTATIVE.  SUSTAINED.

     ASK ANOTHER QUESTION.

BY MR. KIFLE:

Q.   HAVE YOU LOST ANY LAND BECAUSE OF, BECAUSE OF THIS, MY REPORT?

A.   I DON'T KNOW WHERE THIS LAND IS COMING FROM, SIR.  LET ME TRY TO EXPLAIN BECAUSE --

     THE COURT:  WELL, HAVE YOU LOST, HAVE YOU LOST ANY LAND?

     THE WITNESS:  I NEVER OWNED THE LAND.  LET ME EXPLAIN.

     THE COURT:  HAVE YOU LOST ANYTHING AS A RESULT OF THIS?

     THE WITNESS:  NOT -- LAND IN ETHIOPIA IS LEASED.

     THE COURT:  OKAY.

     THE WITNESS:  NOBODY OWNS.  THEY HAVE A LEASE FROM THE PUBLIC LAND FOR CERTAIN YEARS AND BY ETHIOPIAN CONCESSION

LAND OWNERSHIP IS NOT ALLOWED.  THAT IS TO EXPLAIN.

BY MR. KIFLE:

Q.   IS IT TRUE THAT SINCE -- IS IT TRUE THAT SINCE THIS LAWSUIT, THIS CASE WAS FILED, YOUR COMPANY HAS RECEIVED 10,000 HECTARES OF LAND IN ETHIOPIA, 10,000?

MS. GATELY:  OBJECTION, YOUR HONOR.  AGAIN, WE ARE WAY FAR AFIELD HERE.

THE COURT:  WELL, IF HE IS ASKING HAS HE GOTTEN ADDITIONAL LAND SINCE THIS LAWSUIT WAS FILED, I THINK THAT WOULD BE RELEVANT.

THE WITNESS:  IT'S NOT TRUE, SIR.  I HAVE NOT GOTTEN NEW LAND, EVEN NOT LEASED NEW LAND.

THE COURT:  THAT'S THE ANSWER TO THAT QUESTION.

BY MR. KIFLE:

Q.   BECAUSE OF THE LAND YOU ACQUIRED, WAS THERE PEOPLE WHO WERE EVICTED FROM THE LAND?

MS. GATELY:  OBJECTION, YOUR HONOR.

THE COURT:  SUSTAINED.  DON'T ANSWER THAT QUESTION.

NEXT QUESTION.

BY MR. KIFLE:

Q.   AND DID YOU OWN LAND IN THE GAMBELLA REGION IN ETHIOPIA?

MS. GATELY:  OBJECTION, YOUR HONOR.

THE COURT:  SUSTAINED, SUSTAINED.

NEXT QUESTION.

MR. KIFLE:  HOW CAN I PROVE THAT HE HAS NOT BEEN

DAMAGED BY MY -- IF I CANNOT ASK HIM ABOUT HIS BUSINESS, SIR?

THE COURT:  YOU CAN BUT THAT QUESTION DOES NOT RELATE TO IT.

MR. KIFLE:  IT RELATES TO IT.

THE COURT:  NEXT QUESTION, PLEASE.

MR. KIFLE:  YOUR HONOR, I CANNOT CONTINUE LIKE THIS BECAUSE I AM TRYING TO DEMONSTRATE THAT HE HAS BEEN -- HE HAS PROFITED FROM THE NOTORIETY HE HAS RECEIVED BECAUSE OF MY ARTICLE, BUT I CANNOT DEMONSTRATE THAT BECAUSE OF -- BECAUSE I CANNOT ASK HIM ANY QUESTIONS.  I DON'T UNDERSTAND WHAT TO ASK HIM, YOU KNOW?  I AM TRYING TO --

THE COURT:  WELL, YOU HAVE BEEN ASKING HIM QUESTIONS FOR ABOUT AN HOUR NOW.  SO TO SAY YOU CAN'T ASK HIM ANY QUESTIONS, I DON'T KNOW IF I AGREE WITH THAT.  YOU HAVE TO ASK HIM QUESTIONS THAT ARE RELEVANT.  MS. GATELY HAS A RIGHT TO OBJECT AND I HAVE TO RULE.  SO IF YOU DON'T HAVE ANY OTHER QUESTIONS, THEN YOU CAN BE SEATED AND WE WILL CALL -- AND THEN YOU CAN COME BACK UP.

MS. GATELY?

MR. KIFLE:  I HAVE SOME MORE QUESTIONS, BUT I MEAN ALL OF MY QUESTIONS ARE NOT ALLOWED, SO THERE IS NO WAY FOR ME TO DEMONSTRATE THAT HE IN FACT HAS BENEFITED FROM MY ARTICLE AND HE WAS NOT IN ANY WAY DAMAGED.  BUT I --

THE COURT:  WELL, AGAIN, ONE MORE TIME.  YOU CAN ASK HIM QUESTIONS ALONG THOSE LINES.  IF YOU HAVE ANY QUESTIONS

ALONG THOSE LINES, I WILL ALLOW THEM.  IF YOU DON'T THINK YOU CAN ASK ANY OTHER QUESTIONS, THEN YOU CAN BE SEATED.  AGAIN, I AM TRYING MY BEST TO ALLOW YOU TO ASK WHATEVER YOU CAN, BUT YOU HAVE TO ASK QUESTIONS THAT ARE RELEVANT AND I HAVE TO RULE BASED ON THE OBJECTIONS.  THAT'S ALL I CAN SAY.

MR. KIFLE:  YEAH.  I'M TRYING TO ASK HIM QUESTIONS ABOUT HIS BUSINESS AND THE LAND IS A VERY IMPORTANT PART OF HIS BUSINESS.

THE COURT:  WHY DON'T WE DO THIS, WHY DON'T WE DO THIS:  WHY DON'T YOU KIND OF SIT DOWN AND THINK ABOUT SOME OF THE OTHER QUESTIONS YOU MIGHT WANT TO ASK THIS WITNESS WHILE MS. GATELY COMES BACK UP ON REDIRECT, IF YOU HAVE ANY MORE QUESTIONS.

MS. GATELY:  YOUR HONOR, ACTUALLY, I AM NOT GOING TO REDIRECT, YOUR HONOR.

THE COURT:  OKAY.

MS. GATELY:  BECAUSE WE WANT TO MOVE ON AND GET THIS HEARING DONE TODAY.

THE COURT:  ALL RIGHT.  ANY OTHER QUESTIONS?

MR. KIFLE:  WELL, ALL MY QUESTIONS ARE RELATED TO HIS BUSINESS.  SO IF I CANNOT ASK HIM --

THE COURT:  WHAT IS THE NEXT QUESTION YOU HAVE RELATING TO HIS BUSINESS?  WHAT IS THE NEXT QUESTION YOU HAVE?

MR. KIFLE:  I WAS GOING TO, I WAS GOING TO GO TO HIS COFFEE BUSINESS AND HIS FRUIT BUSINESS.

UNITED STATES DISTRICT COURT

76

THE COURT: WHAT QUESTION DO YOU WANT TO ASK HIM ABOUT HIS COFFEE BUSINESS?

MR. KIFLE: FOR EXAMPLE, HOW MUCH PROFIT HE MADE OVER THE PAST THREE YEARS SINCE THIS WAS --

THE COURT: ASK HIM THAT QUESTION.

MR. KIFLE: BUT THE LAND IS --

THE COURT: THAT'S A QUESTION YOU CAN ASK HIM, THAT COFFEE, THAT QUESTION YOU JUST SAID. THAT'S A LEGITIMATE QUESTION TO ASK. YOU CAN ASK HIM THAT QUESTION.

BY MR. KIFLE:

Q. OKAY. YOU SAID YOU OWN OR YOU EXPORT COFFEE?

A. YES.

Q. SINCE THIS LAWSUIT WAS FILED HAS YOUR COFFEE EXPORTING BUSINESS EXPANDED OR DECLINED?

A. IN TERMS OF REVENUE?

Q. EXPORTING.

A. IN TERMS OF --

Q. YOU KNOW WHAT I MEAN.

A. WHAT ARE YOU TALKING ABOUT?

THE COURT: DON'T ARGUE WITH HIM.

BY MR. KIFLE:

Q. HAS YOUR BUSINESS EXPANDED OR --

A. I AM TRYING TO UNDERSTAND YOUR QUESTION.

ARE YOU ASKING ME IF MY PROFIT INCREASED IN THE LAST TWO YEARS?


UNITED STATES DISTRICT COURT

Q.   YES.

A.   NO.  WE ARE NOT MAKING A PROFIT ON OUR COFFEE.

Q.   BECAUSE OF --

THE COURT:  ALL RIGHT.  NEXT QUESTION.  HE HAS ANSWERED THAT QUESTION.  HE SAID NO.

BY MR. KIFLE:

Q.   OKAY.  ARE YOU, ARE YOU EXPORTING MORE COFFEE TO SAUDI ARABIA NOW OR BEFORE TWO THOUSAND -- BEFORE MY ARTICLE?

A.   I DO NOT EXPORT TO SAUDI ARABIA.

Q.   WHERE DO YOU EXPORT, SIR, YOUR COFFEE?

A.   I THINK I ANSWERED THAT IN MS. GATELY'S QUESTION.

THE COURT:  WHERE DO YOU EXPORT IT TO?

THE WITNESS:  TO THE EUROPEAN UNION AND TO THE UNITED STATES.

THE COURT:  OKAY.

BY MR. KIFLE:

Q.   WELL, WHAT DID YOU EXPORT TO SAUDI ARABIA?

A.   SO FAR I DO NOT EXPORT ANYTHING.

Q.   YOU DO NOT EXPORT ANYTHING TO --

THE COURT:  DON'T ARGUE WITH HIM.  WHAT IS YOUR NEXT QUESTION?

BY MR. KIFLE:

Q.   IS SAUDI, SAUDI STAR YOUR COMPANY?

A.   NO, SIR, SAUDI STAR IS NOT MY COMPANY.

Q.   ONLY HORIZON IS YOUR COMPANY?

MS. GATELY:  OBJECTION, YOUR HONOR.

THE COURT:  SUSTAINED.

MS. GATELY:  ONCE AGAIN, WE ARE WAY AFIELD OF THE ISSUES HERE.

THE COURT:  NEXT QUESTION, NEXT QUESTION.

BY MR. KIFLE:

Q.   SO YOU DO NOT EXPORT ANYTHING TO SAUDI ARABIA?

MS. GATELY:  OBJECTION.

THE COURT:  SUSTAINED.  I THINK WE HAVE KIND OF GOTTEN AN AMOUNT OF QUESTIONS IN HERE AND WE ARE NOT -- WE ARE KIND OF RUNNING AROUND IN CIRCLES AND YOU ARE REALLY NOT LISTENING TO WHAT I AM SAYING TO YOU, MR. KIFLE.  AGAIN, I THINK I HAVE TRIED MY BEST, BUT YOU ARE NOT LISTENING TO WHAT I AM SAYING.  I HAVE TRIED MY BEST, SO I THINK THAT'S ENOUGH QUESTIONS FOR THIS WITNESS.

YOU CAN STEP DOWN.

THE WITNESS:  THANK YOU, SIR.

THANK YOU, YOUR HONOR.

THE COURT:  CALL YOUR NEXT WITNESS.

MS. GATELY:  THANK YOU, YOUR HONOR.

IT'S AN EXPERT, CRAIG KRONENBERGER, AND MY COLLEAGUE, MR. LEHMAN, IS GOING TO DIRECT HIM.

THE COURT:  OKAY.

THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

- - -

CRAIG KRONENBERGER,

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, BEING FIRST

DULY SWORN, TESTIFIED AS FOLLOWS:

- - -

THE CLERK:  THANK YOU.

HAVE A SEAT, PLEASE.

DIRECT EXAMINATION

BY MR. LEHMAN:

Q.   GOOD AFTERNOON.  COULD YOU PLEASE STATE YOUR NAME FOR THE RECORD?

A.   CRAIG KRONENBERGER.

Q.   BY WHOM ARE YOU EMPLOYED?

A.   EDELMAN.

Q.   AND WHAT IS YOUR POSITION WITH EDELMAN?

A.   GLOBAL MANAGING DIRECTOR OF STRATEGIC GROWTH.

Q.   AND GENERALLY WHAT IS EDELMAN'S BUSINESS?

A.   WE ARE IN THE BUSINESS OF PUBLIC RELATIONS AND IN THE BUSINESS OF REPUTATIONAL MANAGEMENT AND CRISIS.

Q.   OKAY.  AND HAVE YOU COME TO COURT TODAY TO GIVE EXPERT OPINIONS CONCERNING DAMAGES SUFFERED BY THE PLAINTIFF, JEMAL AHMED, AS A RESULT OF DEFENDANTS' DEFAMATION?

A.   YES.

Q.   OKAY.  I WOULD LIKE TO DIRECT THE COURT'S ATTENTION AND YOUR ATTENTION TO EXHIBIT 11, WHICH IS YOUR EXPERT REPORT AND YOUR RESUME.

UNITED STATES DISTRICT COURT

A.   YES.

Q.   DO YOU RECOGNIZE THOSE DOCUMENTS?

A.   YES.

Q.   AND IS THAT A TRUE AND CORRECT COPY OF YOUR CURRENT RESUME THAT IS ATTACHED TO THE REPORT?

A.   YES.

Q.   AND IS THE REPORT THE REPORT THAT WAS FILED WITH THIS COURT AS THE SUMMARY OF YOUR OPINIONS IN THIS CASE?

A.   YES.

Q.   AND DID YOU PREPARE THAT OR HAVE IT PREPARED FOR YOU UNDER YOUR DIRECTION?

A.   YES.

MR. LEHMAN:  OKAY.  I WOULD ASK THAT EXHIBIT 11 BE MOVED INTO EVIDENCE, YOUR HONOR.

THE COURT:  ANY OBJECTION, MR. KIFLE?

MR. KIFLE:  NO OBJECTION.

THE COURT:  OKAY.  IT'S ADMITTED WITHOUT OBJECTION.

BY MR. LEHMAN:

Q.   OKAY.  LOOKING AT YOUR RESUME BRIEFLY, WHERE DID YOU GO TO COLLEGE?

A.   UNIVERSITY OF CINCINNATI.

Q.   AND WHAT DEGREE DID YOU OBTAIN?

A.   A BACHELOR OF FINE ARTS IN ELECTRONIC MEDIA.

Q.   OKAY.  AND SINCE GRADUATION FROM COLLEGE WHAT HAS BEEN YOUR GENERAL BUSINESS?

UNITED STATES DISTRICT COURT

A.   PREDOMINANTLY FOCUSED IN THE AREA OF DIGITAL MEDIA AND REPUTATIONAL MANAGEMENT.

Q.   AND WITH EDELMAN DO YOU WORK IN THAT AREA?

A.   YES.   THE GROUP WITH CRISIS AND REPUTATION MANAGEMENT FOR DIGITAL RESIDES UNDERNEATH ME AND I AM THE LEAD STRATEGIST.

Q.   OKAY.   AND PRIOR TO COMING TO EDELMAN DID YOU WORK IN THE SAME AREA OF REPUTATION MANAGEMENT, DIGITAL REPUTATION MANAGEMENT?

A.   YES.

Q.   ABOUT HOW MANY YEARS IN TOTAL HAVE YOU WORKED IN THAT AREA?

A.   ROUGHLY AROUND 15 YEARS.

Q.   OKAY.   AND HAVE YOU ALSO TAUGHT IN THAT AREA?

A.   YES.

Q.   AND WHAT KIND OF TEACHING HAVE YOU DONE?

A.   I DO A LOT OF TRAINING WITH CORPORATIONS, EXECUTIVES AND INDIVIDUALS AROUND REPUTATION MANAGEMENT.

Q.   AND IN THE COURSE OF YOUR WORK IN REPUTATION MANAGEMENT HAVE YOU BEEN INVOLVED IN ESTIMATING HOW MUCH IT WILL COST TO REPAIR SOMEONE'S REPUTATION THAT HAS BEEN DAMAGED?

A.   YES.

Q.   AND ABOUT HOW MANY TIMES HAVE YOU DONE THAT?

A.   HUNDREDS.   I HAVE BEEN DOING IT FOR A LONG TIME.

Q.   AND HAVE YOU DEVELOPED TOOLS TO ASSESS SEARCH ENGINE RESULTS AS PART OF YOUR WORK?

A.   YES, USING INDUSTRY-WIDE TOOLS AND TECHNOLOGY AS WELL AS SOME OF OUR OWN METHODOLOGIES.

MR. LEHMAN:  OKAY.  AND WE WOULD LIKE TO TENDER MR. KRONENBERGER AS AN EXPERT IN THE AREA OF DIGITAL REPUTATION MANAGEMENT AT THIS TIME.

THE COURT:  MR. KIFLE, YOU HAVE A RIGHT TO DO ONE OF THREE THINGS:  YOU CAN ASK QUESTIONS OF THIS WITNESS TO DETERMINE WHETHER OR NOT THIS WITNESS CAN TESTIFY AS AN EXPERT, OR YOU CAN AGREE THAT THIS PERSON CAN TESTIFY AS AN EXPERT, OR YOU CAN JUST SAY I OBJECT, AND THEN I WILL HAVE TO MAKE A DECISION BASED ON WHAT I HAVE HEARD.

MR. KIFLE:  CAN I TALK?  CAN I SPEAK?

THE COURT:  YES, SIR.

MR. KIFLE:  OKAY.  AFTER HEARING WHAT --

THE COURT:  PLEASE STAND.

MR. KIFLE:  YES, SIR.

AFTER HEARING WHAT HE SAID SO FAR, HE HAS NO EXPERIENCE ABOUT ETHIOPIA SO HE CANNOT BE EXPERT ABOUT PEOPLE WHO LIVE IN ETHIOPIA.  THAT'S MY OBJECTION.

THE COURT:  OKAY.  I AM GOING TO OVERRULE YOUR OBJECTION AND I WILL ALLOW THIS WITNESS TO TESTIFY AS AN EXPERT.

MR. LEHMAN:  THANK YOU, YOUR HONOR.

BY MR. LEHMAN:

Q.   OKAY.  MR. KRONENBERGER, ARE YOU BEING COMPENSATED FOR THE

UNITED STATES DISTRICT COURT

TIME YOU SPENT IN RESEARCHING YOUR CONCLUSIONS AND IN TESTIFYING?

A.    YES, I AM.

Q.    AND HOW ARE YOU COMPENSATED?

A.    ON AN HOURLY BASIS.

Q.    HOW MUCH IS YOUR HOURLY RATE?

A.    $450 FOR THIS PART OF THE WORK.  THE ANALYSIS WORK WAS $280.

Q.    OKAY.  ARE ALL OF THE OPINIONS AND CONCLUSIONS YOU HOLD WHICH ARE IN YOUR REPORT, ARE THESE OPINIONS THAT YOU HOLD TO A REASONABLE DEGREE OF CERTAINTY IN YOUR FIELD OF EXPERTISE?

A.    YES.

Q.    HAVE YOU REACHED A CONCLUSION ABOUT WHETHER MR. AHMED'S REPUTATION HAS BEEN DAMAGED BY THE PUBLICATION OF THE ETHIOPIAN REVIEW ARTICLES IN THIS CASE?

A.    YES.  BASED UPON THE PUBLISHING OF THE ARTICLES THEMSELVES AND THE REPUBLISHING OF THE ARTICLES AND THE IMPACT THAT IT CAUSED I BELIEVE THAT IT HAD SIGNIFICANT REPUTATIONAL HARM ON MR. AHMED AND I WOULD SAY ARGUABLY SOME OF THAT REPUTATION IS UNREPAIRABLE.

Q.    OKAY.  AND HAVE YOU REACHED A CONCLUSION ABOUT WHETHER MR. KIFLE USED TACTICS TO INCREASE THE VISIBILITY OF THE DEFAMATORY CONTENT?

A.    PRIMARILY THERE WERE TWO THINGS:  ONE, MR. KIFLE OWNS SEVERAL OTHER WEBSITES WHICH WERE LINKING BACK TO THE ETHIOPIAN

REVIEW.  THAT HAS AN IMPACT ON ACTUALLY DRIVING RANKINGS AND SEARCH ENGINES.

IN ADDITION TO THAT, THE REPUBLISHING OF THE ARTICLES, YOU KNOW, THE MORE YOU ARE PUBLISHING THESE ARTICLES, THE MORE YOU ARE PUTTING IT OUT THERE, THE MORE PEOPLE START TO SHARE THEM SOCIALLY, THE MORE IT STARTS TO SPREAD.

Q.   OKAY.  AND WE WILL TALK ABOUT THAT A LITTLE MORE IN DETAIL IN A FEW MINUTES.

AND WHAT HAVE YOU CONCLUDED, IF ANYTHING, ABOUT HOW MUCH IT WILL COST MR. AHMED TO TAKE STEPS TO REPAIR HIS ONLINE REPUTATION AND REPUTATION GENERALLY?

A.   WE HAVE REALLY LOOKED INTO THIS AND RESEARCHED IT AND THERE ARE AROUND 13,380 ENGAGEMENTS WITH THE ACTUAL PHYSICAL CONTENT.

Q.   AND DID YOU COME TO A CONCLUSION AS TO HOW MUCH THAT WILL COST TO UNDO?

A.   AROUND $125,000 TO $145,000.

Q.   OKAY.  LET'S TALK ABOUT YOUR OPINION FOR DAMAGES BASED FIRST ABOUT HOW YOU ASSESSED THE DAMAGE TO HIS REPUTATION.

CAN YOU DESCRIBE GENERALLY YOUR METHODOLOGY FOR ASSESSING THE DAMAGE STEMMING FROM THE ETHIOPIAN REVIEW ARTICLES?

A.   THE FIRST THING IS UNDERSTANDING THE AUTHORITY OF THE ETHIOPIAN REVIEW WEBSITE.  I'LL GIVE YOU AN EXAMPLE, AN AUTHORITY.  THE NEW YORK TIMES IS AN EXAMPLE.  IT'S A MAJOR

UNITED STATES DISTRICT COURT

NEWS PUBLICATION.  PEOPLE COME TO THAT SITE.  THEY LIKE THE NEWS ARTICLES ON IT.  THEY SHARE THE ARTICLES.  OTHER SITES LINK BACK TO THE NEW YORK TIMES.  AND SO WHAT HAPPENS, BECAUSE THEY ARE DOING IT, IT SENDS SIGNALS TO THE SEARCH ENGINES TO SAY, HEY, THIS IS HIGH AUTHORITY CONTENT THAT PEOPLE REALLY TRUST AND THEY BELIEVE IN AND THEY LIKE THIS CONTENT.

ANOTHER EXAMPLE WOULD BE ATLANTA PARENT MAGAZINE.  IT HAS AN AUTHORITY SCORE OF 34, SO IT ALSO HAS SOME AUTHORITY, NOT AS HIGH AS THE NEW YORK TIMES BY ANY MEANS, BUT PEOPLE DO IN FACT TRUST THAT CONTENT AS WELL.

IN THIS CASE WITH THE ETHIOPIAN REVIEW IT HAS AN AUTHORITY SCORE OF 54, OR I BELIEVE 53, ACTUALLY.

Q.   WELL, LET ME ASK YOU, WAS IT POSSIBLE TO DETERMINE EXACTLY HOW MANY PEOPLE ACTUALLY VIEWED THE ETHIOPIAN REVIEW ARTICLES IN THIS CASE?

A.   NO, WE CANNOT, BECAUSE WE DO NOT HAVE ACCESS TO THE ANALYTICS AND THE DATA BEHIND THE WEBSITE ITSELF.

Q.   THAT IS INFORMATION YOU NORMALLY WOULD OBTAIN THROUGH DISCOVERY, CORRECT?

A.   CORRECT.

Q.   ARE THE METHODOLOGY AND TOOLS OR DATA THAT YOU USE TO DETERMINE HOW MANY PEOPLE READ THE NEGATIVE ARTICLES AND THE TOOLS, ARE THOSE TOOLS AND DATA SOURCES CUSTOMARILY RELIED UPON IN YOUR PROFESSION?

A.   YEAH.  THEY ARE PRETTY MUCH THE INDUSTRY STANDARD IN THE

AREA OF REPUTATIONAL MANAGEMENT AND MONITORING, BOTH SOCIAL AND SEARCH.

Q. OKAY. AND HAVE YOU PREPARED AN EXHIBIT TO ASSIST YOU IN EXPLAINING YOUR FINDINGS AND OPINIONS?

A. YES, I HAVE.

MR. LEHMAN: IF I MAY APPROACH, YOUR HONOR?

THE COURT: YES, SIR.

DO YOU HAVE THIS, MR. KIFLE?

MR. LEHMAN: I AM SHOWING YOU WHAT HAS BEEN MARKED AS EXHIBIT 12 AND THIS IS A COPY FOR THE JUDGE.

THE COURT: THANK YOU.

BY MR. LEHMAN:

Q. WHAT IS EXHIBIT 12 INTENDED TO SHOW GENERALLY?

A. IT IS INTENDED TO SHOW THE IMPACT THAT THE ARTICLES HAD IN THE ONLINE SPACE, DEMONSTRATING THE AMOUNT OF AUTHORITY AND THE AMOUNT OF PEOPLE AND THE AMOUNT OF ENGAGEMENTS THAT OCCURRED WHEN THE ARTICLES WERE PUT OUT THERE.

Q. OKAY. IN LOOKING AT THE CENTER OF PAGE ONE OF THIS CHART, WE SEE THE ETHIOPIAN REVIEW WITH ITS AUTHORITY SCORE MENTIONED AT 54 THERE.

DO YOU SEE THIS?

A. YES.

Q. OKAY. WHAT IS THIS CHART GENERALLY, THIS FIRST CHART ON PAGE ONE, INTENDED TO SHOW?

A. WELL, IT SHOWS FIRST THE ETHIOPIAN REVIEW AND THEN YOU

HAVE THE AUTHORITY SCORE OF 54.  AROUND IT, BELOW IT ARE THE ARTICLES AND THE DATES OF WHICH THE ARTICLES WERE ACTUALLY PUBLISHED.  SO IT GOES FROM MARCH 2012 TO OCTOBER 2012.

ABOVE IT ARE -- REPRESENTS BOTH.  ONE, MR. KIFLE'S FACEBOOK AND TWITTER ACCOUNTS.  WHEN HE PUBLISHES CONTENT, HE ALSO PUBLISHES THEM THROUGH HIS SOCIAL MEDIA CHANNELS THAT HE OWNS AS WELL.  AND IN ADDITION TO THAT, HE OWNS SEVERAL OTHER WEBSITES WHERE THEY LINK BACK TO THE ARTICLES AS WELL.  AND SO THIS IS TYPICALLY, WHEN THOSE ARTICLES WERE PUBLISHED, THEY STARTED TO KIND OF GROW AND AMPLIFY THROUGH THESE DIFFERENT SOCIAL CHANNELS AND THROUGH THE WEBSITES, SO THIS IS HOW IT STARTED TO GET OUT INTO THE INTERNET.

Q.   OKAY.  WE HAVE TALKED ABOUT THIS AUTHORITY SCORE OF 54 A COUPLE OF TIMES.  HOW IS THAT DETERMINED?  FROM WHAT SOURCE OR WHAT INFORMATION DO YOU DETERMINE THAT?

A.   WE USE A TECHNOLOGY TOOL CALLED MOZ, WHICH IS A STANDARD TECHNOLOGY PRODUCT FOR LOOKING AT THESE TYPES OF SITUATIONS.

Q.   AND THAT'S M-O-Z?

A.   M-O-Z.

Q.   OKAY.  AND IS THAT CONSIDERED AUTHORITATIVE IN THE AREA OF DIGITAL REPUTATION MANAGEMENT?

A.   YES.  IT'S ONE OF THE MOST WIDELY-USED TOOLS FOR S.E.O., FOR SEARCH ENGINE OPTIMIZATION, IF YOU ARE LOOKING AT SEARCH ENGINES.

Q.   OKAY.  COULD YOU TURN TO PAGE TWO OF EXHIBIT 12, PLEASE?

A.   (COMPLIES).

Q.   CAN YOU SHOW OR COULD YOU INFORM THE COURT AS TO WHAT EXHIBIT OR PAGE TWO OF THIS CHART SHOWS?

A.   SO PAGE TWO SHOWS THAT ONCE THE CONTENT WAS INITIALLY OUT THERE OTHER TYPES OF MEDIA CHANNELS STARTED TO PICK THIS UP. SO THIS REPRESENTS AROUND 21 DIFFERENT SITES STARTED TO PICK UP THE CONTENT.  SO NOW ALL OF A SUDDEN IT'S KIND OF GIVEN BIRTH TO THIS AND ALL OF A SUDDEN IT'S BEING AMPLIFIED.  A LOT OF OTHER SITES ARE PICKING IT UP AND THEY ARE STARTING TO SHARE IT WITH ALL THE PEOPLE THAT COME TO THEIR SITES.

Q.   AND BY LOOKING AT THE TOP -- OR LET ME ASK YOU FIRST, HOW DID YOU DETERMINE THESE WEBSITES, WHO PICKED UP THE STORIES?

A.   SO WE DO TWO THINGS.  ONE IS WE USE THE TOOL MOZ, WHICH WILL ACTUALLY TRACK DOWN ALL THE PUBLIC DATA ON THE INTERNET TO FIND ALL THOSE SITES THAT ARE ACTUALLY LINKING BACK TO THE ARTICLES.  AND WE ALSO USE A TOOL CALLED RADIAN6, WHICH IS AN INDUSTRY WELL-KNOWN AND RECOGNIZED TOOL FOR LOOKING AT ALL THE SOCIAL MEDIA THAT LINKS TO THE ARTICLES AS WELL.

Q.   OKAY.  AND IS THAT SOMETHING THAT IS COMMONLY USED IN THE DIGITAL RIGHTS?

A.   YES, VERY MUCH SO.

Q.   DIGITAL REPUTATION?

A.   YES.

Q.   OKAY.  LET'S LOOK BACK AT THE CHART AND AT THE VERY TOP OF THE CHART WE SEE TWO BOXES, ONE LABELED YOUTUBE BILISUMMAA TV,

SEVEN POSTS, AND ETHIOTUBE, SIX POSTS.  CAN YOU EXPLAIN WHAT THE BOX ON BILISUMMAA TV REFERS TO?

A.   YES.  SO BILISUMMAA TV PICKED UP THE ARTICLES AND AS YOU SAW FROM THE PREVIOUS DOCUMENTS THAT WERE SHOWN IS THAT THEY WERE TURNED INTO VIDEO CONTENT AND THEY WERE POSTED UP ON YOUTUBE.  AND BILISUMMAA TV HAS ITS OWN YOUTUBE CHANNEL WHERE PEOPLE CAN COME TO AND LOOK AT CONTENT THAT BILISUMMAA PUBLISHES AND IN THIS CASE THERE WERE SEVEN DIFFERENT VIDEOS THAT WERE PUT ON YOUTUBE.

Q.   OKAY.  AND ETHIOTUBE, WHAT IS THAT?

A.   ETHIOTUBE IS EQUIVALENT OF A YOUTUBE VERSION FOR ETHIOPIA. AND BILISUMMAA TV THEN TOOK THE VIDEOS AND PUBLISHED THOSE ON ETHIOTUBE AND ETHIOTUBE IS CONSIDERABLY BIGGER AND ACTUALLY GOT A SIGNIFICANT AMOUNT OF TRACTION AND A LOT OF VIEWS OFF OF THAT SITE AS WELL.

Q.   NOW, THE RADIAN6 TOOL YOU MENTIONED PROVIDES YOU WITH DETAILS ABOUT HOW MANY TIMES THE VIDEO IS REVIEWED ON ETHIOTUBE?

A.   YES.

Q.   AND WHAT WAS THAT NUMBER?

A.   IN TOTAL THE VIEWS WERE 11,974 VIDEO VIEWS ACROSS YOUTUBE, ETHIOTUBE AND A FEW OTHER SITES THAT HAD VIDEOS ON THEM.

Q.   NOW, IN YOUR REPORT DO YOU MENTION THAT I BELIEVE ETHIOTUBE HAD NEARLY ABOUT 8400 VIEWS FROM YOUR TOOL?  IS THAT RIGHT?

UNITED STATES DISTRICT COURT

A.   FROM OUR TOOL, YES.

Q.   OKAY.  AND DOES THAT ETHIOTUBE SITE SHOW THAT SAME NUMBER OF VIEWS FOR THESE?

A.   NO.  THE ETHIOTUBE SITE HAS NUMBERS CALCULATING PROBABLY CLOSE TO 200,000 VIEWS IS WHAT THE ETHIOTUBE SITE SAYS, BUT IN THIS CASE WE GO WITH OUR TECHNOLOGY AND WHAT IS ACTUALLY ACCURATE BECAUSE WE ARE UNSURE WHETHER THAT IS ACTUALLY TRUE OR NOT.

Q.   YOU ARE UNABLE TO VERIFY THE ACCURACY?

A.   CAN'T VERIFY IT.

Q.   OKAY.  NOW IF YOU WOULD TURN TO PAGE THREE, THE FINAL PAGE OF THIS CHART, WILL YOU EXPLAIN TO THE COURT WHAT THIS DEPICTS?

A.   SO THIS GIVES YOU KIND OF A LARGER VIEW OF EVERYTHING THAT ULTIMATELY HAPPENED.  STARTING AT THE TOP, YOU WILL SEE 13,380 TOTAL ENGAGEMENTS.  THIS IS PROBABLY THE MOST IMPORTANT NUMBER, BECAUSE THESE ARE PEOPLE THAT EITHER CLICKED ON THE CONTENT THROUGH A SEARCH ENGINE AND ACTUALLY FOUND THE ARTICLES OR IT IS PEOPLE WHO HAVE FOUND THE VIDEO CONTENT AND VIEWED THE CONTENT OR IS PEOPLE THAT SAW THE CONTENT, LIKED IT AND DECIDED TO SHARE THE CONTENT.

SO ENGAGEMENTS IS VERY IMPORTANT BECAUSE IN SOME CASES YOU MAY SAY THINGS SUCH AS SOMEONE MIGHT HAVE SEEN A TV COMMERCIAL.  MAYBE THEY DID IT AND MAYBE THEY DID NOT.  WHO KNOWS?  IN THIS CASE THESE ARE PEOPLE THAT ACTUALLY SAW THE CONTENT AND IN SOME WAY, SHAPE, OR FORM ENGAGED WITH THE

CONTENT.  AND THAT'S VERY POWERFUL BECAUSE THESE ARE PEOPLE THAT ARE CLEARLY READING THE CONTENT AND WATCHING THE VIDEOS AND INVESTED IN THE CONTENT ITSELF.

Q.    AND THESE NUMBERS, ARE THESE ALL NUMBERS THAT YOU GENERATED THROUGH THE USE OF RADIAN6 AND MOZ?

A.    RADIAN6, MOZ, AND ALSO GOOGLE AD PLANNER.

Q.    OKAY.  THERE IS MENTION HERE OF 90 PERCENT NEGATIVE SEARCH RESULTS.  TO WHAT DOES THAT REFER?

A.    SO WHEN YOU SEARCH FOR JEMAL AHMED'S NAME OR IF YOU PUT IN JEMAL AHMED ETHIOPIA, IN THE RESULTS ITSELF FROM THE TIME FROM MARCH 2012 ALL THE WAY TO NOW IT RANGED FROM 30 TO 50 PERCENT OF THE CONTENT THAT SHOWED UP WAS NEGATIVE.  IF YOU TAKE OUT THE CONTENT THAT WAS NOT RELATED TO JEMAL AHMED, THEN YOU ARE LOOKING AT 90 PERCENT OF THE CONTENT WAS NEGATIVE.

Q.    OKAY.  AND WERE THOSE NEGATIVE SEARCH RESULTS RELATED TO ANYTHING OTHER THAN THE HUMAN TRAFFICKING ARTICLES THAT APPEARED ON ETHIOPIAN REVIEW?

A.    THE ONLY NEGATIVE THING THAT WE FOUND THROUGH THE SEARCH ENGINES AND THROUGH OUR SOCIAL DISCOVERY WERE ALL RELATED TO THAT PARTICULAR CASE, NOTHING ELSE WE FOUND THAT WAS NEGATIVE AROUND JEMAL AHMED.

Q.    OKAY.  IS IT FAIR TO SAY THAT THESE OTHER NUMBERS AROUND THE CIRCLE HERE ALL ARE WRAPPED UP INTO THE 13,380 TOTAL ENGAGEMENTS?

A.    YES.

Q.    OKAY.  HOW CONFIDENT ARE YOU IN THE ACCURACY OF THAT NUMBER?

A.    HIGHLY CONFIDENT.  THIS IS ALL PUBLIC DATA.  THIS, IN MY OPINION, WOULD BE WHAT WOULD BE CONSIDERED A BARE MINIMUM OF ACTUALLY WHAT OCCURRED.  WE CANNOT HAVE AN UNDERSTANDING OF HOW, EXACTLY HOW MANY PEOPLE WENT TO THE SITE, BECAUSE WE DON'T HAVE THE SITE DATA.

WHEN YOU ARE ON FACEBOOK IF YOU SHARE AN ARTICLE WITH A FRIEND, THAT IS ACTUALLY CONSIDERED PRIVATE WITHIN YOUR OWN NETWORK OF FRIENDS, SO WE DON'T HAVE ACCESS TO THAT.  SO THERE ARE A LOT OF THINGS THAT WE CANNOT TRACK ON HERE, BUT THESE ARE ALL THINGS THAT WE CAN TRACK SO WE FEEL VERY CONFIDENT ABOUT THESE NUMBERS THAT YOU SEE HERE TODAY.

Q.    OKAY.  CAN YOU GIVE A FRAME OF REFERENCE?  IS THAT A LOT OF ENGAGEMENTS OR JUST A COUPLE OF ENGAGEMENTS, SOMEWHERE IN BETWEEN?

A.    THAT IS A LOT OF ENGAGEMENTS AROUND AN EXECUTIVE OR AN OWNER OF A COMPANY.  YOU KNOW, IF YOU LOOK AT EVEN A TYPICAL CEO IN THE CITY OF ATLANTA RUNNING A COMPANY, OVER THAT PERIOD OF TIME TO GET OVER 13,380 PEOPLE ENGAGING WITH YOUR CONTENT IS A SIGNIFICANT AMOUNT OF ENGAGEMENTS.

Q.    OKAY.  HOW DOES THAT NUMBER IMPACT YOUR OPINION ON DAMAGES?

A.    IT'S A BIG FACTOR IN IT, BECAUSE, ONCE AGAIN, IT DETERMINES THE AMOUNT OF PEOPLE THAT ACTUALLY ENGAGED WITH THE

CONTENT.  THESE ARE OBVIOUSLY PEOPLE WHO CARED AND WERE INTERESTED ENOUGH TO LEARN MORE AND TO SEEK OUT MORE INFORMATION ABOUT IT.  SO THEREFORE I THINK IT BECOMES VERY POWERFUL.  BECAUSE, AS YOU KNOW, WHEN YOU SEE A VIDEO ABOUT SOMEBODY AND YOU SEE THE TYPE OF MESSAGE YOU SAW IN THESE VIDEOS, IT BECOMES VERY POWERFUL CONTENT.

Q.   YOU MENTIONED EARLIER THAT YOU HAD THE OPINION THAT MR. KIFLE USED TACTICS TO KEEP HIS NEGATIVE CONTENT HIGHER RATED ON SEARCH ENGINES.  IS THAT ACCURATE?

A.   YES.

Q.   OKAY.  AND WHAT TACTICS DID HE USE, IF ANY, THAT YOU COULD DETERMINE?

A.   YOU KNOW, ONE OF THEM WAS SOMETHING CALLED CROSS-LINKING, SO WITH THE OTHER WEBSITES THAT HE OWNED HE LINKED BACK TO THE ARTICLES FROM THOSE OTHER WEBSITES.  THAT SENDS A SIGNAL TO THE SEARCH ENGINES LIKE GOOGLE AND IT SAYS TO THEM THAT, OH, OTHER WEBSITES ARE LINKING BACK TO MY ARTICLES AND CONTENT. THEREFORE, THIS CONTENT MUST BE IMPORTANT.  AND THEN, OF COURSE, ONCE AGAIN, THE REPUBLISHING OF THE ARTICLES AND CONTINUING TO REPUBLISH IT AND LINK BACK.

SO IF YOU WENT IN AUGUST AND YOU SAW THE LAST ARTICLE, YOU WOULD HAVE READ IT AND THEN IT WOULD HAVE LINKED TO ALL THE PREVIOUS ARTICLES.  SO PEOPLE WOULD HAVE THEN GONE BACK THROUGH ALL THE DIFFERENT ARTICLES THAT WERE THERE.  AND THAT'S IMPORTANT FROM A SEARCH ENGINE STANDPOINT BECAUSE THEY

SEE THAT THIS ARTICLE, THIS POPULAR ARTICLE, IS NOW LINKED TO OTHER ARTICLES.  SO THAT NOW MAKES ALL OF THE ARTICLES VERY POWERFUL.

Q.  OKAY.  AND, FINALLY, DO YOU HAVE AN OPINION ABOUT HOW MUCH IT WILL COST TO REPAIR MR. AHMED'S ONLINE REPUTATION?

A.  YEAH.  IT'S ROUGHLY BETWEEN $125,000 AND $145,000.

Q.  HOW DO YOU ARRIVE AT THAT FIGURE?

A.  WELL, THERE'S REALLY TWO FACTORS.  THE FIRST FACTOR IS THAT YOU'VE GOT 13,380 ENGAGEMENTS THAT OCCURRED OUT THERE.  SO YOU HAVE THIS GROUP OF PEOPLE OUT THERE THAT HAS SEEN THIS NEGATIVE CONTENT.

SO THE FIRST THING IS WE HAVE TO TRY TO CHANGE THAT PERCEPTION BECAUSE THEY HAVE AN UNFAIR PERCEPTION OF MR. AHMED. SO WE HAVE TO PUT ADVERTISING OUT THERE AROUND POSITIVE THINGS IN HOPES THAT WE MIGHT REACH THOSE SAME PEOPLE THAT SAW THE CONTENT PREVIOUSLY.  SO THAT IS THE FIRST FACTOR.  AND IT'S IMPORTANT TO NOTE THAT WE WOULD TRY TO REACH THEM BUT IT DOES NOT MEAN WE WILL REACH THEM.

Q.  IN YOUR OPINION, THEN, IS IT POSSIBLE TO FULLY RESTORE HIS REPUTATION?

A.  NO, IT'S NOT.  IT'S NOT POSSIBLE.

Q.  AND WHY IS THAT?

A.  WELL, ONE, THERE IS NO WAY TO EVEN GUARANTEE THAT WE COULD EVER GET IN FRONT OF THE PEOPLE WHO SAW THIS CONTENT PREVIOUS. THAT'S THE FIRST THING.

THE SECOND THING IS THAT THE NEGATIVE CONTENT THAT IS THERE HAS SPREAD AND IT'S LIKE A VIRUS.  IT IS EVERYWHERE.  IT'S IN A LOT OF DIFFERENT WEBSITES.  AND SO THE ONLY WAY TO STOP THAT IS TO HAVE IT ALL REMOVED.  AND IT'S REALLY ACROSS A LOT OF DIFFERENT SITES GLOBALLY AND THE CHANCES OF GETTING THOSE REMOVED IN OTHER COUNTRIES IS NOT LIKELY.  SO IT IS GOING TO BE A VERY DIFFICULT PROCESS.

MR. LEHMAN:  TENDER THE WITNESS TO MR. KIFLE.

THE COURT:  DO YOU HAVE ANY QUESTIONS FOR THIS WITNESS BASED ON WHAT HE TESTIFIED TO?

MR. KIFLE:  I HAVE TWO QUESTIONS.

THE COURT:  ALL RIGHT.  YOU MAY COME FORWARD AND ASK THOSE TWO QUESTIONS.

DID YOU ALL OFFER NUMBER 12 INTO EVIDENCE?

MR. LEHMAN:  OH, I'M SORRY.  I WOULD LIKE TO OFFER THAT INTO EVIDENCE AS EXHIBIT 12, YOUR HONOR.

THE COURT:  ANY OBJECTION?

MR. KIFLE:  NO OBJECTION, SIR.

THE COURT:  ADMITTED WITHOUT OBJECTION.

CROSS-EXAMINATION

BY MR. KIFLE:

Q.   SO YOU ARE AN EXPERT ON INTERNET AND SEARCH ENGINES AND ALL OF THAT.

HAVE YOU TRIED TO -- HAVE YOU TRIED TO FIND OUT IF THESE WEBSITES ARE BEING ACCESSED IN ETHIOPIA?

A.    YOUR QUESTION IS IF ANY OF THESE SITES ON HERE --

Q.    YES.

A.    -- ARE BEING ACCESSED IN ETHIOPIA?

Q.    YES.

A.    WE CANNOT TELL FOR SURE HOW MANY PEOPLE IN ETHIOPIA ARE ACCESSING THOSE SITES, NO.

Q.    MY QUESTION IS:  HAVE YOU TRIED TO FIND OUT IF THESE WEBSITES ARE BEING ACCESSED BY THE PEOPLE IN ETHIOPIA?

A.    THERE IS NO WAY OF KNOWING.

Q.    HAVE YOU COME UP WITH ANY REPORT FROM DIFFERENT INTERNATIONAL PRESS SITE GROUPS ABOUT ALL THIS OR MOST OF THESE WEBSITES ARE BLOCKED IN ETHIOPIA AND NOBODY IN ETHIOPIA IS ABLE TO READ?  FOR EXAMPLE, MY WEBSITE IS BLOCKED IN ETHIOPIA.  HAVE YOU COME UP WITH ANY REPORT ABOUT THAT?

A.    SO MY ROLE IN THIS IS SPECIFICALLY TO LOOK AT AND DEFINE A NEUTRAL OPINION ON WHAT I ACTUALLY SAW AND SO LOOKING AT WHAT SITES ARE BLOCKED OR NOT BLOCKED IS NOT PART OF THE DEFINITION OF WHAT I AM TRYING TO DO HERE.

          THE COURT:  IS IT POSSIBLE, IS IT POSSIBLE BASED ON YOUR RESOURCES FOR YOU TO DETERMINE WHETHER OR NOT THESE WEBSITES CAN BE SEEN IN ETHIOPIA?

          THE WITNESS:  WITHOUT ME BEING IN ETHIOPIA AND LOOKING AT THEM, I DO NOT KNOW.

          THE COURT:  AND WOULD IT BE CORRECT TO SAY, THEN, THAT YOU CAN'T SAY WHETHER ONE PERSON OR A THOUSAND PEOPLE SAW

THIS IN ETHIOPIA?

THE WITNESS:  IN ETHIOPIA, NO.

BY MR. KIFLE:

Q.    HAVE YOU READ THE MULTIPLE REPORTS BY COMMITTEE TO PROTECT JOURNALISTS IN NEW YORK ABOUT THE ETHIOPIAN REVIEW AND MANY OF THESE WEBSITES HAVE TOTALLY BLOCKED IN ETHIOPIA?  HAVE YOU READ --

MR. LEHMAN:  OBJECTION.

THE COURT:  HOLD ON, HOLD ON.

MR. KIFLE:  HAVE YOU READ SUCH A THING?

THE COURT:  HOLD ON, HOLD ON.

WHAT IS THE OBJECTION?

MR. LEHMAN:  I AM GOING TO OBJECT ON A RELEVANCE BASIS THAT THIS IS NOT RELATED TO DAMAGES OR TO THE TESTIMONY THAT HAS BEEN GIVEN.

THE COURT:  I THINK I AM GOING TO HAVE TO SUSTAIN THAT OBJECTION BECAUSE MAINLY, THE FIRST QUESTION YOU ASKED HIM, HE SAYS HE DOESN'T KNOW WHETHER ANYBODY IN ETHIOPIA HAS SEEN THIS.  SO I CAN'T SEE HOW THE SECOND QUESTION WOULD BE RELEVANT, FIRST OF ALL.  BUT IF NOBODY -- HE CAN'T SAY WHETHER ANYBODY IN ETHIOPIA SAW THIS OR NOT, SO WHY IS IT IS RELEVANT WHAT -- THE QUESTION YOU WERE ASKING?  TELL ME.

MR. KIFLE:  I WOULD LIKE TO BE GIVEN A CHANCE TO INTRODUCE OR BRING MY OWN WITNESS ABOUT --

THE COURT:  MR. KIFLE, WHEN WE GET TO YOUR CASE, YOU

CAN PRESENT WHAT WITNESS YOU WANT TO PRESENT.

MR. KIFLE:  YEAH, BUT WHO WILL CONTRADICT HIS TESTIMONY?

THE COURT:  OKAY.  WELL, YOU ARE ALLOWED TO BRING YOUR WITNESS.

MR. KIFLE:  YES.

THE COURT:  BUT RIGHT NOW ASK THIS WITNESS QUESTIONS.

MR. KIFLE:  YEAH, I MEAN IN THE FUTURE.  I'M TALKING ABOUT, YOU KNOW, I WILL HAVE EXPERTS.

THE COURT:  WELL, DO YOU HAVE ANY QUESTIONS FOR THIS WITNESS?

MR. KIFLE:

Q.  OKAY.  SO IF -- NOW, YOU CLAIM THAT YOU ARE AN EXPERT IN THE INTERNET AND WHEN YOU DID A LOT OF RESEARCH, VERY IMPRESSIVE.  SO HOW -- IF YOU RESEARCH ABOUT THE NUMBER OF REACHES THAT MY ARTICLE HAS, HOW WERE YOU NOT ABLE TO COME UP WITH ANY OF THEM, HUNDREDS OF REPORTS ABOUT DIFFERENT INTERNET TYPE GROUPS AND PRESS FREEDOM GROUPS ABOUT VARIOUS WEBSITES ARE BEING BLOCKED IN ETHIOPIA AND THAT VERY FEW PEOPLE, A HANDFUL OF PEOPLE, HAVE ACCESS TO THESE WEBSITES?

THE COURT:  HOLD ON.  DON'T ANSWER THAT QUESTION.  THERE IS AN OBJECTION.

MR. LEHMAN:  OBJECT ON RELEVANCE AND OBJECT THAT IT'S ASKED AND ANSWERED.

THE COURT:  SUSTAINED.

YOU CAN ASK YOUR NEXT QUESTION.

BY MR. KIFLE:

Q.   OKAY, ONE MORE QUESTION.

HAVE YOU TRIED TO RUN A SIMULATION TO FIGURE OUT IF THE ETHIOPIAN REVIEW IS BEING ACCESSED BY PEOPLE IN ETHIOPIA AND ALSO ETHIOPIANS IN THE DIASPORA?

THE COURT:  HOLD ON.

MR. LEHMAN:  I AM GOING TO OBJECT THAT IT'S COMPOUND AND KIND OF ASKED AND ANSWERED AND IRRELEVANT.

THE COURT:  IT'S KIND OF BEEN ASKED AND ANSWERED, BECAUSE HE HAS ALREADY SAID HE CAN'T TELL WHETHER ONE PERSON OR A THOUSAND PEOPLE SAW THIS.

MR. KIFLE:  IF HE IS EXPERT, HE SHOULD BE ABLE TO DO THAT, SIR.

THE COURT:  BUT HE HAS ALREADY ANSWERED THE QUESTION HE COULDN'T.  SO HE HAS ALREADY SAID HE COULDN'T, SO THAT QUESTION HAS BEEN ANSWERED.

MR. KIFLE:  OKAY.  I WILL END.

THE COURT:  REDIRECT?

MR. LEHMAN:  NO QUESTIONS.

THE COURT:  MAY THIS WITNESS BE EXCUSED?

MR. LEHMAN:  HE MAY.

THE COURT:  THANK YOU, SIR.

CALL YOUR NEXT WITNESS.

THE WITNESS:  THANK YOU.

MS. GATELY:  YOUR HONOR, WE WILL REST AND SUBMIT THE ISSUE OF THE ETHIOPIAN REVIEW, INC. ON OUR PAPERS.

THE COURT:  THANK YOU, MS. GATELY.

MS. GATELY:  AND I AM PREPARED TO GIVE A CLOSING IF YOU WOULD LIKE.

THE COURT:  WHAT I WOULD LIKE TO DO IS THIS:  I AM GOING TO GIVE MR. -- I SAID AN HOUR EACH AND I AM GOING TO GIVE MR. -- MR. KIFLE IS PROBABLY JUST ABOUT OVER HIS HOUR, BUT I AM GOING TO GIVE HIM 20 MINUTES TO PRESENT HIS CASE AND THEN YOU WILL HAVE YOUR CLOSING.

MS. GATELY:  THANK YOU, SIR.

THE COURT:  NOW, MR. KIFLE.

MR. KIFLE:  YES, SIR.

THE COURT:  WHAT YOU NEED TO DO IS TRY TO TELL ME, EITHER THROUGH TESTIMONY, ARGUMENT, BUT RIGHT NOW TESTIMONY - I WILL GIVE YOU A CHANCE TO ARGUE LATER - THROUGH EVIDENCE WHY I SHOULD NOT GRANT THIS MOTION FOR DEFAULT JUDGMENT AND WHY I SHOULD NOT GRANT DAMAGES OR A SMALL AMOUNT OF DAMAGES OR ANY DAMAGES AT ALL AGAINST YOU.

MR. KIFLE:  YES, SIR.

THE COURT:  DAMAGES RIGHT NOW AGAINST YOU OR, IF I GRANT THE MOTION FOR DEFAULT JUDGMENT, DAMAGES AGAINST THE ETHIOPIAN REVIEW.

NOW, DON'T ARGUE AT THIS POINT.  I AM GOING TO GIVE YOU A CHANCE TO ARGUE.  DO YOU HAVE ANYBODY THAT YOU WANT TO

TAKE THE STAND AND TESTIFY?  DO YOU WANT TO TESTIFY?  DO YOU HAVE ANY WITNESSES ON THE OUTSIDE YOU WANT TO CALL IN TO TESTIFY?

MR. KIFLE:  SOMEBODY WILL ASK ME IF I GO OVER THERE?

THE COURT:  WELL, IF YOU GET UP THERE AND TESTIFY, EITHER ONE OF THE TWO LAWYERS ARE GOING TO GET TO ASK YOU QUESTIONS.

MR. KIFLE:  I CAN TESTIFY.

THE COURT:  ALL RIGHT.  SO YOU WANT TO TESTIFY?

MR. KIFLE:  YEAH, EITHER WAY.  I MEAN I CAN READ MY STATEMENT OR JUST TESTIFY, WHICHEVER IS GOOD FOR EVERYBODY.

THE COURT:  WELL, YOU CAN READ A STATEMENT IN YOUR CLOSING ARGUMENT.

MR. KIFLE:  I MEAN I --

THE COURT:  IF YOU WANT TO ARGUE THE POINT.

MR. KIFLE:  IS THERE A WAY TO ASK ME QUESTIONS?

THE COURT:  LET ME SAY THIS:  MS. GATELY IS PROBABLY GOING TO OBJECT, BUT YOU MIGHT BE BETTER OFF -- WELL, I CAN'T DO THAT.

HERE'S YOUR OPTIONS:  YOU CAN TAKE THE STAND AND TESTIFY, BUT IF YOU TAKE THE STAND AND TESTIFY, ONE OF THE TWO ATTORNEYS, YOU KNOW, EITHER MR. LEHMAN OR MS. GATELY GETS TO ASK YOU QUESTIONS.

I AM GOING TO GIVE YOU A CHANCE TO MAKE AN ARGUMENT OR A STATEMENT WHEN ALL THE EVIDENCE IS CLOSED.  I AM GOING TO

GIVE YOU A CHANCE TO MAKE AN ARGUMENT OR A STATEMENT WHEN ALL THE EVIDENCE IS CLOSED THAT THEY CAN'T ASK YOU QUESTIONS ABOUT, BUT IT'S UP TO YOU WHETHER YOU WANT TO TESTIFY UNDER OATH OR WHETHER OR NOT YOU WANT TO JUST WAIT AND GIVE ARGUMENT OR YOUR STATEMENT AT THE END.  I CAN'T TELL YOU WHAT TO DO.

MR. KIFLE:  YES, SIR.  AS LONG AS I AM GIVEN ENOUGH TIME TO MAKE MY ARGUMENT I CAN TESTIFY, BUT I WANT TO SAVE MY TIME.

THE COURT:  WELL, YOU'VE GOT 20 MINUTES LEFT AND THAT INCLUDES TESTIFYING AND THAT INCLUDES THE DIRECT.  THE CROSS I WON'T HOLD AGAINST YOU.

RAISE YOUR RIGHT HAND AND MS. WRIGHT IS GOING TO GIVE YOU AN OATH.

- - -

ELIAS KIFLE,

CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

- - -

THE CLERK:  THANK YOU.  HAVE A SEAT, PLEASE.

THE COURT:  YOU MAY PROCEED.

THE WITNESS:  I THOUGHT THEY WERE GOING TO ASK ME QUESTIONS.

THE COURT:  WELL, YOU GET -- USUALLY WHAT HAPPENS WHEN A PARTY TESTIFIES, THEY HAVE A LAWYER TO ASK THEM QUESTIONS, BUT SINCE YOU DON'T HAVE A LAWYER, THEN YOU CAN JUST

KIND OF TELL ME UNDER OATH WHAT YOU WANT TO TELL ME.

THE WITNESS:  YES, SIR.

THE COURT:  AND THEN THEY GET TO ASK YOU QUESTIONS.

THE WITNESS:  YES, SIR.

- - -

DIRECT EXAMINATION

THE WITNESS:  YOUR HONOR, THE PLAINTIFF, MR. AHMED, SAID THAT MY ARTICLE, MY REPORT, HAS BEEN EXTREMELY DAMAGING TO HIM BECAUSE I ACCUSED HIM OF CRIMINAL ACTS.  MY -- THE EVIDENCE I GATHERED AND MY TRIAL BRIEF AND ALL THE REPORTS ABOUT THE ETHIOPIAN SITUATION THAT CONTINUES IN ETHIOPIA WILL SHOW THAT EXPORTING PEOPLE TO THE MIDDLE EAST, TO SAUDI ARABIA --

MS. GATELY:  I AM GOING TO OBJECT, YOUR HONOR.

THE COURT:  SUSTAINED.

MS. GATELY:  THANK YOU.

THE COURT:  AGAIN, YOU HAVE TO TESTIFY ABOUT DAMAGES.

THE WITNESS:  YEAH.  THAT'S WHAT I'M TRYING TO DO, YOUR HONOR.

THE COURT:  ALL RIGHT.  GO AHEAD.

THE WITNESS:  IT'S NOT A CRIME IN ETHIOPIA.  THAT'S WHAT I'M TRYING TO -- IN FACT, MR. AHMED'S OWN FRIENDS FROM ATLANTA AND DIFFERENT UNITED STATES TRAVELED TO ETHIOPIA TO DO JUST THAT.

MS. GATELY:  OBJECTION.

THE WITNESS:  TO EXPORT PEOPLE.

MS. GATELY:  OBJECTION, YOUR HONOR.  THIS REALLY ISN'T EVIDENCE.

THE COURT:  SUSTAINED.  YOU CAN'T -- THERE IS NOTHING IN THE EVIDENCE THAT SAYS ANYBODY FROM -- WELL, I GUESS HE COULD GIVE HIS OWN OPINION WHY ANYBODY FROM ATLANTA TRAVELS TO ETHIOPIA.

MS. GATELY:  BUT --

THE COURT:  GO AHEAD.

MS. GATELY:  YOUR HONOR, AGAIN, THIS IS HERE ON A DEFAULT JUDGMENT HEARING FOR DAMAGES.  THERE HAS ALREADY BEEN A DEFAULT ENTERED AGAINST HIM PERSONALLY.

THE COURT:  TRUE.

MS. GATELY:  AND --

THE COURT:  MR. KIFLE, TELL ME WHY I SHOULD NOT AWARD $125,000 TO $145,000 IN MONEY AGAINST YOU IN THIS CASE.

THE WITNESS:  BECAUSE, FIRST OF ALL, IT'S NOT -- HE HAS NOT BEEN DAMAGED.  BECAUSE DESPITE, CONTRARY TO WHAT HE SAID, HUMAN TRAFFICKING IS NOT A CRIME IN ETHIOPIA.

MS. GATELY:  OBJECTION.

THE COURT:  OKAY.  BUT, AGAIN, THAT'S NOT THE ISSUE. THE ISSUE IS THAT THE DEFAMATION HAS ALREADY BEEN DECIDED.  THE QUESTION IS, IS THAT YOU SAID HE HASN'T BEEN DAMAGED, OKAY?

THE WITNESS:  YEAH.  HE HAS NOT BEEN DAMAGED.  AND, SECONDLY, SINCE HE HAS, SINCE HE HAS FILED THIS CASE, HE IN FACT HAS GAINED A NOTORIETY AMONG THE ETHIOPIAN -- IN ETHIOPIA

BY THE ETHIOPIAN GOVERNMENT, WHO APPRECIATED THE FACT THAT HE FILED THIS LAWSUIT AGAINST ME.

MS. GATELY:  OBJECTION.

THE WITNESS:  AND --

THE COURT:  HOLD ON, HOLD ON, HOLD ON.

LET ME HEAR YOUR OBJECTION.

MS. GATELY:  YOUR HONOR, AGAIN, THIS IS NOT EVIDENCE, THAT HE CLAIMS NOTORIETY FROM THE ETHIOPIAN GOVERNMENT.  THAT'S NOT EVIDENCE.  THAT'S NOT ADMISSIBLE EVIDENCE.

THE COURT:  I HAVE TO SUSTAIN THE OBJECTION ON THE FACT THAT YOU CAN'T REALLY SAY THE ETHIOPIA GOVERNMENT WANTED IT SO MUCH, BUT YOU CAN TESTIFY, I THINK HE CAN TESTIFY HIS OPINION THAT MR. AHMED HAS GAINED NOTORIETY.

THE WITNESS:  YOUR HONOR, IT'S VERY DIFFICULT TO ARGUE AND MAKE A STATEMENT IF SOMEBODY -- YOU KNOW, MY TRAIN OF THOUGHT, YOU KNOW, I CANNOT MAKE A STATEMENT WHEN I'M CONTINUOUSLY BEING INTERRUPTED.  I DON'T HOW, HOW I CAN --

THE COURT:  MS. GATELY HAS A RIGHT TO OBJECT AND I HAVE TO RULE ON HER OBJECTION.

MR. KIFLE:  BUT EVERY FEW MINUTES I'M TRYING TO --

THE COURT:  LISTEN, DON'T WORRY ABOUT MS. GATELY. YOU JUST TESTIFY AND I WILL RULE ON THE OBJECTIONS.

THE WITNESS:  OKAY.  SO I -- MY INTENTION WAS TO PRESENT WITNESSES WHO CAN TESTIFY, WHO CAN COME, AND IF GIVEN THE OPPORTUNITY TO TESTIFY --

THE COURT:  WE ARE DEALING WITH IT TODAY.  SO YOU NEED TO TELL ME OR PRESENT WITNESSES YOU HAVE TODAY.

THE WITNESS:  SO IF I -- UNLESS I PRESENT WITNESSES, HOW CAN I ARRIVE -- HOW CAN I DEMONSTRATE THAT, YOU KNOW, THAT HE HAS NOT BEEN DAMAGED?  THIS IS THE FIRST HEARING, YOUR HONOR.  AND FOR THE PAST THREE YEARS, TWO YEARS --

THE COURT:  HOLD ON ONE SECOND.  I NEED TO HEAR MS. GATELY'S OBJECTION.

MS. GATELY:  YOUR HONOR, I MEAN THE TIME, AS YOU SAID EARLIER, THE TRAIN HAS LEFT THE STATION.  WE HAVE TRIED, JUST EXTRAORDINARILY TRIED TO PROGRESS THIS CASE ALONG IN A TIMELY FASHION AND HAVE NOT BEEN ABLE TO GET ANY DISCOVERY OUT OF MR. KIFLE ALONG THE WAY, NECESSITATING, YOU KNOW, REPEATED MOTIONS AND THREE YEARS LATER THESE ARTICLES ARE STILL UP HERE ON THE WEBSITE HURTING MY CLIENT.

AND SO TO BE HERE TODAY AND HAVE TO HEAR THE SAME STUFF OVER AND OVER AGAIN, IT'S JUST, IT JUST -- IT SHOWS TO ME AN INDIVIDUAL WHO IS NOT WILLING TO CHANGE HIS BEHAVIOR DESPITE NUMEROUS COURT ORDERS TO THAT EXTENT.

SO WE ARE JUST GOING TO CONTINUE TO HAVE MORE TIME CLOCK BY HERE WITHOUT PROGRESSING THIS FURTHER UNTIL HE UNDERSTANDS THAT HE HAS DONE SOMETHING WRONG.  AND MY POINT HERE IS THAT WHAT HE IS TRYING TO TESTIFY ABOUT, IF IT HAD ANY RELEVANCE, HAD RELEVANCE A FEW YEARS AGO WHEN HE WAS ASKED DISCOVERY AS TO WHO HIS WITNESSES WERE AND WHAT HIS EVIDENCE

WAS.  HE FAILED TO DO THAT EVEN AFTER THE COURT ENTERED A PROTECTIVE ORDER THAT WOULD HAVE PROTECTED THE CONTENTS OF HIS WITNESSES' EVIDENCE.

SO WE ARE HERE TODAY FOR DAMAGES.  AND I HAVE BEEN TRYING TO BE VERY, VERY PATIENT IN ALLOWING HIM THE LATITUDE THAT THE COURT THINKS IS APPROPRIATE, BUT I AM GOING TO NOTE MY OBJECTION TO THIS CONTINUED COMING BACK TO THE SAME KINDS OF ISSUES THAT ARE NOT RELATED TO DAMAGES.

THE COURT:  THANK YOU, MS. GATELY.

ALL RIGHT.  NOW, HERE IS THE QUESTION I HAVE FOR YOU: DO YOU KNOW ANYTHING ABOUT MR. AHMED'S FINANCIAL SITUATION?

THE WITNESS:  FINANCIAL SITUATION?

THE COURT:  YES.

THE WITNESS:  YES, SIR.

THE COURT:  WHAT?

THE WITNESS:  HE HAS PROFITED SIGNIFICANTLY SINCE --

THE COURT:  HOW DO YOU KNOW THAT?

THE WITNESS:  I HAVE REPORTS, MULTIPLE REPORTS, AND --

THE COURT:  BUT DO YOU KNOW THAT PERSONALLY?  NOT FROM WHAT ANYBODY TOLD YOU.

THE WITNESS:  YEAH.

THE COURT:  OR WHAT YOU READ ANYWHERE.

THE WITNESS:  THROUGH PUBLISHED REPORTS.  AND ALSO I AM TRYING TO PROTECT MY WITNESSES FROM DLA PIPER, SIR.

THE COURT: LISTEN. HOLD ON. DON'T TALK ABOUT WITNESSES. IF YOU HAVE ANY WITNESSES, WE WILL DEAL WITH IT, IF YOU'VE GOT WITNESSES HERE, BUT DON'T TALK ABOUT WITNESSES.

TELL ME ABOUT HOW YOU KNOW ANYTHING ABOUT MR. AHMED'S FINANCIAL SITUATION, WHETHER OR NOT IT'S GOTTEN WORSE OR BAD SINCE THIS ARTICLE.

THE WITNESS: I HAVE MY WITNESSES READY TO TESTIFY.

THE COURT: ARE THEY HERE RIGHT NOW?

THE WITNESS: THEY ARE -- I CAN CALL THEM BY PHONE. THEY ARE IN ETHIOPIA, BUT THEY ARE WAITING, SIR. BUT --

THE COURT: WELL, THEY MIGHT HAVE TO WAIT A LITTLE WHILE LONGER. THEY WON'T BE TESTIFYING TODAY.

THE WITNESS: BUT THE PROBLEM IS THEY CANNOT COME HERE, SIR. THEY CANNOT GET A VISA.

THE COURT: BEFORE I HAVE MS. GATELY CROSS-EXAMINE YOU, DO YOU HAVE ANYTHING ELSE YOU WANT TO TELL ME?

THE WITNESS: CAN I TAKE TEN SECONDS TO SAY MORE ABOUT MY WITNESSES?

THE COURT: NO, NO.

ANY QUESTIONS?

THE WITNESS: CAN I ASK YOU A QUESTION, SIR?

THE COURT: WELL, ONE SECOND, ONE SECOND.

MS. GATELY: YOUR HONOR, I HAVE NO CROSS FOR THIS WITNESS.

THE COURT: OKAY. YOU HAVE ONE QUESTION FOR THE

COURT.  WHAT IS YOUR ONE QUESTION?

THE WITNESS:  OKAY.  MY -- JUST BECAUSE MY SOURCES, MY WITNESSES CANNOT GET A VISA TO COME TO -- THAT'S JUST LIKE HE CAN DO THAT EASILY.

THE COURT:  WHAT IS YOUR QUESTION?

THE WITNESS:  BUT MY -- CAN THE COURT ALLOW ME TO OTHER -- LIKE A PHONE OR VIDEO LINK?

THE COURT:  NO.

THE WITNESS:  THEY HAVE TO COME HERE?

THE COURT:  THEY HAVE TO BE HERE OR THEY HAVE TO BE HERE UNLESS THERE IS SOMETHING -- LET ME EXPLAIN THIS TO YOU.

THIS IS THE HEARING FOR TODAY.  AFTER THIS HEARING TODAY I AM GOING TO DECIDE WHETHER OR NOT TO GRANT DAMAGES AND WHETHER OR NOT TO GRANT THE MOTION FOR DEFAULT JUDGMENT.  THERE IS NOT GOING TO BE ANOTHER HEARING.  WHETHER THEY CAN COME TO AMERICA ON THEIR OWN OR WHETHER OR NOT YOU AND MS. GATELY CAN WORK OUT SOMETHING THROUGH VIDEO TESTIMONY OR VIDEO DEPOSITION, ALL OF THAT IS NOT GOING TO HAPPEN.  BECAUSE AS I INDICATED IN MY NOTICE TO YOU AND TO THE PLAINTIFFS, THIS IS THE DAY THAT I AM DECIDING DAMAGES.  AND I GAVE YOU ALL THAT NOTICE I THINK A MONTH AHEAD OF TIME, MORE THAN A MONTH.

SO, WITH THAT STATED, WHAT I WILL ALLOW YOU TO DO AT THE APPROPRIATE TIME IS GIVE YOUR STATEMENT AND ARGUMENT AND WE WILL GO FROM THERE, OKAY?  I THINK THAT WOULD BE A BETTER WAY OF HANDLING THIS.  YOU WILL BE ALLOWED TO GIVE YOUR OPPOSING

ARGUMENTS.  WE'LL HAVE IT AND THEN GO FROM THERE.

THE WITNESS:  CAN I HAVE MY CLOSING ARGUMENT WITHOUT INTERRUPTION?

THE COURT:  WELL, IT DEPENDS ON WHAT YOU SAY.  I CAN'T TELL MS. GATELY WHETHER SHE CAN OBJECT OR NOT.

OKAY?

THE WITNESS:  AM I DONE HERE?

THE COURT:  YOU ARE DONE HERE.

MS. GATELY:  YOUR HONOR, ACTUALLY, BEFORE HE LEAVES, I HAVE ONE QUESTION IF YOU DON'T MIND.

CROSS-EXAMINATION

BY MS. GATELY:

Q.  I JUST WANT TO CLARIFY MR. KIFLE DOES NOT LIVE IN ETHIOPIA NOW, DO YOU, SIR?

A.  NO, I DO NOT LIVE IN ETHIOPIA.

Q.  AND IS IT TRUE THAT YOU LIVE HERE IN ATLANTA?

A.  NO, I DON'T.

Q.  WHERE DO YOU LIVE?

A.  I CANNOT TELL YOU THAT.

THE COURT:  YOU HAVE TO ANSWER THAT QUESTION UNLESS YOU CAN GIVE ME A REASON.

THE WITNESS:  BECAUSE, BECAUSE AFTER MY FRIEND WAS KIDNAPPED IN JUNE, I AM AFRAID OF MY SAFETY AND I CANNOT REVEAL MY WHEREABOUTS.  I'M IN HIDING RIGHT NOW.

THE COURT:  LET ME ASK THIS QUESTION:  DO YOU LIVE IN

UNITED STATES DISTRICT COURT

GEORGIA?

THE WITNESS:  NO, I DON'T LIVE IN GEORGIA.

MS. GATELY:  YOUR HONOR --

THE COURT:  DO YOU WANT THAT QUESTION ANSWERED?

MS. GATELY:  I THINK I HAVE A RIGHT TO THAT, AN ANSWER TO THAT QUESTION.

THE COURT:  YOU HAVE TO ANSWER THAT QUESTION, WHERE YOU LIVE.

THE WITNESS:  IF THE COURT CAN TAKE RESPONSIBILITY FOR MY SAFETY, BECAUSE JUST THIS PAST JUNE MY FRIEND WAS KIDNAPPED FROM THE AIRPORT HERE.  I CAN'T TELL YOU HIS NAME. AND SINCE THEN IN CONSULTATION WITH THE STATE DEPARTMENT I AM -- I WAS TOLD TO HIDE MY WHEREABOUTS BECAUSE THE ETHIOPIAN GOVERNMENT IS TRYING TO -- HUNTING ME DOWN AND I WILL FACE CERTAIN DANGER IF THE GOVERNMENT, THE ETHIOPIAN GOVERNMENT, KNOWS WHERE I AM.  THIS IS A VERY SERIOUS MATTER.

THE COURT:  WHY DO YOU NEED TO KNOW WHERE HIS ADDRESS IS?

MS. GATELY:  YOUR HONOR, I THINK IT'S DIRECTLY RELEVANT TO SOME OF THE STATEMENTS HE HAS MADE IN HIS PLEADINGS AS TO WHY HE HAS NOT BEEN ABLE TO PARTICIPATE AND I THINK IT'S RELEVANT FOR ME TO BE ABLE TO SAY TO THE COURT --

THE COURT:  IT'S IRRELEVANT.  IN OTHER WORDS, THE MOTION TO COMPEL DISCOVERY AND ALL OF THOSE THINGS, AT THIS POINT IN TIME WE ARE TALKING ABOUT DAMAGES.

MS. GATELY:  WELL, I THINK I HAVE A RIGHT TO KNOW WHERE THE MAN IS.

THE COURT:  BUT IF IT'S RELEVANT.  IF IT'S RELEVANT YOU HAVE A RIGHT TO KNOW.  HOW IS IT RELEVANT THAT YOU KNOW WHERE HE LIVES RIGHT NOW?

MS. GATELY:  I THINK IT'S RELEVANT TO THE CLAIMS THAT HE IS MAKING FOR WHEN I MAKE MY ARGUMENTS ABOUT PUNITIVE DAMAGES AND OTHER THINGS.  I THINK HE IS RIGHT HERE IN ATLANTA AND HE DOESN'T WANT TO REVEAL WHERE HE IS.  HE'S HAD EVERY OPPORTUNITY TO PARTICIPATE IN THIS CASE.  AND TO SAY THAT HE'S OFF IN DISTANT LANDS AND THINGS --

THE COURT:  I HAVE SUSTAINED EVERY OBJECTION YOU HAVE MADE WHEN HE TRIED TO TALK ABOUT OTHER THINGS.  I MEAN I CAN MAKE HIM ANSWER THE QUESTION.

MS. GATELY:  IT'S HIS EXCUSE AND I AM NOT BEING ALLOWED TO CROSS-EXAMINE INTO HIS EXCUSE, I GUESS.

THE WITNESS:  THAT'S SHOWING --

THE COURT:  WAIT, WAIT.

IT'S HIS EXCUSE THAT HE COULD NOT PARTICIPATE?

MS. GATELY:  YES, BECAUSE HE'S TRAVELING AND HE DOESN'T HAVE -- HE REPEATEDLY HAS SAID HE HASN'T -- YOU KNOW, HE'S TRAVELED.  HE FILES NOTICES WITH THE COURT THAT HE IS AWAY FOR FOUR MONTHS AND ALL THIS KIND OF STUFF.

THE COURT:  BUT HOW IS THAT EXCUSE HE IS MAKING RELEVANT TO DAMAGES?

MS. GATELY:  THAT EXCUSE I THINK IS RELEVANT TO PUNITIVE DAMAGES.

THE WITNESS:  YOUR HONOR, I CAN -- IF YOU GUARANTEE MY SAFETY, I CAN PROVIDE YOU WITH EVIDENCE THAT I DO NOT LIVE HERE IN GEORGIA.  I CAN SHOW YOU A LEASE AGREEMENT AND THE PLANE TICKETS AND EVERYTHING AND ALSO I CAN BRING SOMEBODY TO TESTIFY FROM THE UNITED STATES DEPARTMENT OF STATE.

THE COURT:  I THINK, MS. GATELY --

THE WITNESS:  SOMEONE THAT --

MS. GATELY:  HOW ABOUT THE COUNTRY THAT HE RESIDES IN?

THE COURT:  HOLD ON.

MS. GATELY:  HOW ABOUT THE COUNTRY HE RESIDES IN?

THE COURT:  WAIT, WAIT.

THE WITNESS:  SOMEONE FROM THE DEPARTMENT.

THE COURT:  I SAID WAIT.

THE WITNESS:  YES, SIR; YES, SIR.

THE COURT:  AS FAR AS PUNITIVE DAMAGES I THINK HIS ACTIONS ARE THE THINGS THAT I TAKE INTO CONSIDERATION IN TERMS OF PUNITIVE DAMAGES.  IF HE DID NOT RESPOND TO DISCOVERY ORDERS ENTERED BY JUDGES IN THIS COURT, THOSE ARE THINGS WE ARE LOOKING AT.  I THINK YOU WANT TO SHOW PUNITIVE DAMAGES BY THE FACT OF SHOWING THAT HE WAS HERE AND HE JUST DIDN'T RESPOND.  I THINK THAT IS ALREADY ESTABLISHED.

MS. GATELY:  ALL RIGHT, YOUR HONOR.

NO FURTHER QUESTIONS.

THE COURT:  YOU MAY STEP DOWN.

YOU MAY PROCEED.

MS. GATELY:  PROCEED?

THE COURT:  YES.  YES, MA'AM; YES, MA'AM.

MS. GATELY:  YOUR HONOR, THANK YOU FOR YOUR PATIENCE TODAY.

IT IS MY PRIVILEGE TO REPRESENT JEMAL AHMED IN THIS CASE.

THE COURT:  I AM NOT LAUGHING AT YOU.  IT'S JUST THE FIRST STATEMENT YOU SAID.  I HAD TO SMILE.  I'M SORRY.

MS. GATELY:  WELL, I THINK YOU DID SHOW SOME PATIENCE TODAY AND I HOPE YOU THINK I DID AS WELL.

THE COURT:  YOU DID.

MS. GATELY:  IT'S MY PRIVILEGE TO REPRESENT JEMAL AHMED IN THIS CASE.  I THINK YOU HEARD THE TESTIMONY OF MR. AHMED THAT THERE IS PROBABLY FEW WORSE THINGS THAT YOU COULD ACCUSE SOMEBODY OF THAN TO BE ENGAGED IN HUMAN TRAFFICKING.

AND IN PARTICULAR IF YOU LOOK AT EXHIBIT 1, IT'S NOT JUST ENGAGED IN HUMAN TRAFFICKING BUT IT'S ENGAGED IN HUMAN TRAFFICKING OF UNDERAGE GIRLS FROM ETHIOPIA, THEN SENDING THEM TO THE MIDDLE EAST TO SLAVE-LIKE CONDITIONS.  AND SO IT'S HARD TO IMAGINE WHAT IS A WORSE KIND OF CRIME YOU COULD ACCUSE SOMEBODY OF.

UNITED STATES DISTRICT COURT

MR. KIFLE:  OBJECTION, YOUR HONOR.

THE COURT:  WHY IS THERE AN OBJECTION?

MR. KIFLE:  BECAUSE I ALREADY TRIED TO EXPLAIN THAT EXPORTING PEOPLE TO -- OUT OF ETHIOPIA IS NOT A CRIME.

THE COURT:  OKAY.  I AM GOING TO OVERRULE THE OBJECTION.

YOU MAY PROCEED.

MS. GATELY:  YOU HEARD THE TESTIMONY OF MR. AHMED THAT HE HAS BEEN HARMED PROFESSIONALLY AND PERSONALLY.

FROM A PERSONAL PERSPECTIVE HE SPOKE ABOUT THE ASSOCIATION OF AN ISSUE THAT OCCURRED IN MARCH OF 2012 RELATED TO A YOUNG ETHIOPIAN MAID THAT WAS WORKING IN LEBANON.  A VIDEO WAS TAKEN OF HER BEING ABUSED BY HER EMPLOYERS.  SHE WAS DRAGGED BY HER HAIR.  EVENTUALLY SHE COMMITTED SUICIDE.  AND THAT WAS OF NATIONAL INTEREST TO PEOPLE IN ETHIOPIA AS WELL AS IN THE DIASPORA COMMUNITY IN THE UNITED STATES.  IT GOT A LOT OF ATTENTION ON THE WEB.  THAT VIDEO WENT VIRAL.  AND THEN TWO WEEKS LATER MR. KIFLE --

MR. KIFLE:  OBJECTION.

MS. GATELY:  -- PUBLISHES THE ARTICLE.

THE COURT:  WHAT IS YOUR OBJECTION?

MR. KIFLE:  I HAVE NOTHING TO DO WITH THE VIDEO SO WHY IS SHE TALKING ABOUT THE VIDEO?  I HAVE NOTHING TO DO WITH A VIDEO.

THE COURT:  I ALLOWED THE EVIDENCE ABOUT THE VIDEO

INTO EVIDENCE, AS A MATTER OF FACT, SO I AM GOING TO OVERRULE YOUR OBJECTION.

MS. GATELY:  SO, AND TO CONTINUE, HE ASSOCIATED JEMAL AHMED WITH THAT SORT OF CONDUCT AT A TIME WHEN IT WAS A VERY HOT ISSUE HERE IN THE DIASPORA COMMUNITY IN ATLANTA AND IN THE LARGER COMMUNITY IN THE WORLD, FRANKLY.

YOU HEARD THE SINCERE TESTIMONY OF MR. AHMED THAT IT'S HURT HIS REPUTATION.  HE IS A REPUTABLE BUSINESSMAN.  YOU HEARD THE TESTIMONY OF OUR EXPERT WHO SAID THAT THERE WAS NO OTHER NEGATIVE MATERIAL ON THE WEB RELATED TO MR. AHMED EXCEPT FOR THIS NEGATIVE MATERIAL.  AND YOU HEARD HIM SAY THAT HE IS RESPONSIBLE FOR THE LIVELIHOOD OF A NUMBER OF PEOPLE THAT ARE WORKING FOR HIM IN ETHIOPIA AND IT UNDERMINES HIS REPRESENTATION TO BE PRESENTED IN THAT WAY.

IF YOU LOOK ALONE AT THE NUMBER OF TIMES IN WHICH MR. KIFLE REPUBLISHED THIS NEGATIVE CONTENT ON HIS WEBSITE EACH TIME, NOT JUST THE ORIGINAL PUBLICATION BUT EVERY TIME THAT HE COULD HE STUCK SOMETHING BACK UP ON HIS WEBSITE, AND IF YOU LOOK AT THE HUNDREDS OF COMMENTS, EVERY TIME THAT SORT OF THING WAS PUBLISHED, THE NEGATIVE, TERRIBLE THINGS THAT PEOPLE SAID ABOUT MR. JEMAL AHMED, IT JUST MAGNIFIED AND MADE IT WORSE.

YOU HEARD FROM OUR EXPERT WHO SAID THAT THIS IS A VIRUS.  SO BUT FOR MR. KIFLE PUBLISHING THIS NEGATIVE CONTENT ORIGINALLY ON MARCH 29TH AND THEN CONTINUING TO PUBLISH IT EVERY TIME THAT HE COULD AND AMP IT UP AND RECONNECT IT TO ALL

OF HIS WEBSITES, WE WOULDN'T BE IN THE POSITION WE ARE TODAY WHERE OVER 13,000 PEOPLE HAVE DIRECTLY ENGAGED WITH THAT CONTENT.  WE WOULDN'T BE IN THE POSITION OF HAVING THE BILISUMMAA TV VIDEOS WITH, YOU KNOW, THOUSANDS OF PEOPLE GETTING ON THOSE THINGS.

UNFORTUNATELY, WE ARE OPERATING IN A DIGITAL AGE NOW. IT'S NOT JUST WHEN WE HAD A NEWSPAPER AND YOU COULD SAY THE DAILY PUBLICATION IN THE NEWSPAPER AND THE NEXT DAY MAYBE ISSUE A RETRACTION.  WE ARE NOT IN THAT AGE ANYMORE.  WE ARE IN THIS DIGITAL AGE WHERE ONE ARTICLE LIKE THIS CAN SPAWN ALL KINDS OF NEGATIVE PUBLICITY AND SPREAD OUT INTO THE ETHERNET [SIC].  AND AS OUR EXPERT TESTIFIED, IT'S VERY HARD TO UNDUE THAT DAMAGE. IT MAY NEVER BE COMPLETELY UNDONE.  BUT HE NEEDS TO BE GIVEN THE MONEY TO TRY TO REPAIR HIS REPUTATION AND OUR EXPERT SAID THAT'S A MINIMUM OF A HUNDRED AND TWENTY-FIVE TO $145,000 AND I WOULD SUBMIT A LARGER AWARD IS IN ORDER IN THIS CASE.

BECAUSE YOU NOT ONLY HAVE THE FACT THAT HE HAS TO CREATE POSITIVE CONTENT ABOUT HIMSELF TO BUMP THE NEGATIVE STUFF OUT, WE HAVE 90 PERCENT OF GOOGLE SEARCH RESULTS BEING NEGATIVE ABOUT THIS MAN.  AND WHEN OUR EXPERT TESTIFIED THAT THE SMALLER NUMBER, THAT 30 TO 50 PERCENT, THAT INCLUDED WHEN YOU HAD -- WHEN RUN JEMAL AHMED'S NAME - IF YOU GOOGLE HIM YOURSELF, YOU'LL SEE THIS - THERE ARE SEVERAL PEOPLE WHOSE NAMES ARE JEMAL AHMED THAT ARE NOT THIS JEMAL AHMED.  AND SO WHEN YOU FACTOR OUT THE PEOPLE THAT ARE NOT HIM, IT'S

OVERWHELMINGLY NEGATIVE.

AND YOU HEARD THE TESTIMONY OF MR. AHMED THAT HE PERSONALLY WAS THE FRONT FOR HIS COFFEE COMPANY THAT GOES AROUND AND SOLICITS BUSINESS IN THE INTERNATIONAL BUSINESS COMMUNITY HERE IN THE UNITED STATES AND ELSEWHERE.  AND WHAT DOES SOMEBODY DO WHO DOESN'T KNOW SOMEONE ELSE IN THIS DIGITAL AGE?  THEY GOOGLE YOU.  AND HE BELIEVES THAT HE HAS LOST BUSINESS OPPORTUNITIES BECAUSE OF THAT.

SO NOTWITHSTANDING -- AND HE ALSO TESTIFIED UNDER CROSS-EXAMINATION THAT HIS NET, YOU KNOW, PROFIT FROM THE COFFEE BUSINESS HAS NOT GONE UP IN THE LAST TWO YEARS.  SO WHETHER YOU LOOK AT IT, WHETHER HE -- FRANKLY, WHETHER HE INCREASED HIS NET WORTH OR DIDN'T INCREASE HIS NET WORTH HE STILL BELIEVES THAT HE HAS BEEN HARMED BY THIS BOTH PERSONALLY AND PROFESSIONALLY BY THOSE LOST BUSINESS OPPORTUNITIES.  AND I THINK THAT OUR EXPERT EXPLAINED THE WAY THAT THIS SORT OF THING CAN GO VIRAL AND HARM SOMEBODY.

THERE IS SOMETHING ELSE HERE, THOUGH, THAT DESERVES MENTION AND THAT IS THAT IT'S TAKEN US ALMOST THREE YEARS TO GET TO THIS DAY.  AND IS IT ANY SURPRISE TO YOU THAT THOSE ARTICLES REMAIN ON THE WEB STILL TO THIS DAY AFTER BEING TOLD BY MR. JEMAL AHMED THE DAY AFTER IT WAS PUBLISHED THIS IS NOT TRUE, I AM NOT INVOLVED IN ANY FORM OF HUMAN TRAFFICKING, DOMESTIC WORKER AGENCY, NOTHING.  I AM NOT INVOLVED IN THIS. AFTER GETTING A LETTER FROM ME SAYING HE IS NOT INVOLVED IN

THIS, REMOVE AND RETRACT. THERE IS MANY PLACES ALONG THIS STAGE WHERE WE COULD HAVE STOPPED AND GOTTEN THE HARM UNDER CONTROL, BUT IT'S NOT STOPPED AND HE COMES BEFORE YOU TODAY AND YOU CAN SEE IT.

HE STILL THINKS HE IS RIGHT, THAT HE HAS DONE NOTHING WRONG, THAT HE WANTS TO PUT THE ETHIOPIAN GOVERNMENT ON TRIAL HERE. THIS HAS NOTHING TO DO WITH POLITICS. THIS HAS EVERYTHING TO DO WITH FREE SPEECH. CAN YOU GET UP AND SAY THAT SOMEBODY HAS DONE -- YOU KNOW, IS GUILTY OF HUMAN TRAFFICKING WHEN THEY HAVEN'T? THAT'S WHAT THIS CASE IS ABOUT. IT'S NOT ABOUT POLITICS. AND FOR THREE YEARS MR. KIFLE HAS TRIED TO MAKE IT ABOUT POLITICS. IT IS NOT ABOUT POLITICS HERE OR IN ETHIOPIA.

MR. KIFLE: OBJECTION, YOUR HONOR.

MS. GATELY: THEY ARE IRRELEVANT.

THE COURT: WHAT IS YOUR OBJECTION, SIR?

MR. KIFLE: SHE SAID I HAVE BEEN TRYING TO MAKE THIS ABOUT POLITICS. I DID NOT, I DID NOT DO THAT. I ESTIMATE THIS IS ABOUT --

THE COURT: I AM GOING TO OVERRULE YOUR OBJECTION.

MR. KIFLE: THIS IS ABOUT MY --

THE COURT: I AM GOING TO OVERRULE THE OBJECTION.

GO AHEAD, MS. GATELY.

MS. GATELY: YOUR HONOR, THIS CASE CRIES OUT FOR PUNITIVE DAMAGES. THIS MAN IS NOT GOING TO CHANGE HIS CONDUCT

WITHOUT A STRONG MESSAGE FROM THIS COURT AND AN AWARD OF A STIFF AMOUNT OF PUNITIVE DAMAGES.  AND THE CONDUCT THAT WE HAVE HAD TO GO THROUGH TO GET HERE TODAY HAS -- IF I COULD EXPLAIN TO YOU THE AMOUNT OF TIME AND EFFORT THAT IT HAS TAKEN US TO GET TO THIS DAY, IT'S AMAZING.  WE HAVE HAD TO FILE MORE THAN ONE MOTION.

MR. KIFLE:  OBJECTION.

THE COURT:  WHAT IS YOUR OBJECTION?

MR. KIFLE:  THE CASE IS DELAYED NOT BECAUSE OF ME. THE CASE WAS DELAYED BECAUSE OF THE ARGUMENT OVER MY WITNESSES AND ALSO THE AMOUNT OF TIME FOR THE COURT TO DECIDE THE CASE. FOR EXAMPLE, IT TOOK FOUR MONTHS --

THE COURT:  I AM GOING TO OVERRULE YOUR OBJECTION. SHE IS MAKING A CLOSING ARGUMENT.  IN A CLOSING ARGUMENT, SHE CAN MAKE THE ARGUMENT SHE IS MAKING.  SO I AM GOING TO OVERRULE YOUR OBJECTION.

MS. GATELY:  YOUR HONOR, IT'S THE VERY CONDUCT OF THIS CASE THAT HAS LED THIS ARTICLE TO BE UP THERE AND THE SUBSIDIARY ARTICLES TO BE UP THERE FOR THREE YEARS.  IT'S HIS CONDUCT.  AND IF YOU LOOK AT -- YOU KNOW, I BROUGHT SOME OF THE ORDERS UP HERE ALONG THE WAY THAT HAVE HAPPENED.  WE HAD MAGISTRATE JUDGE SCOFIELD WHERE WE HAD TO MOVE TO COMPEL ANSWERS TO DISCOVERY AFTER HE HAD REFUSED.  HE JUST WOULD MISS DEADLINES COMPLETELY.  WE WOULD KEEP SENDING HIM LETTERS, PLEASE FILE --

MR. KIFLE: OBJECTION, YOUR HONOR.

THE COURT: WHAT IS THE OBJECTION?

MR. KIFLE: I DID -- I DID NOT REFUSE. I DIDN'T, I DIDN'T REFUSE. THAT'S NOT --

THE COURT: OVERRULED.

MR. KIFLE: THAT'S NOT TRUE.

THE COURT: OVERRULED.

YOU MAY PROCEED.

MS. GATELY: WE HAVE -- IT'S ALL IN THE RECORD, YOUR HONOR, I MEAN NUMEROUS REQUESTS FOR HIM TO RESPOND TO DISCOVERY WHERE HE NEVER RESPONDED TO THE DISCOVERY. THEN WE HAD TO MOVE TO COMPEL. THEN WE HAVE THE MAGISTRATE JUDGE MAKING IT VERY CLEAR TO HIM, YOU KNOW, THAT -- AND TO MY POINT EARLIER ABOUT WHERE HE LIVES, THE COURT ADVISES DEFENDANT KIFLE, HOWEVER, THAT A FAILURE TO MAINTAIN A CURRENT MAILING ADDRESS WITH THE CLERK'S OFFICE OR A FAILURE TO COMPLY WITH A COURT ORDER MAY RESULT IN A RECOMMENDATION THAT SANCTIONS BE IMPOSED, INCLUDING ENTRY OF DEFAULT JUDGMENT. NOTWITHSTANDING THAT KIND OF, YOU KNOW, EXPLICIT ADVICE TO MR. KIFLE, HE CONTINUED NOT TO RESPOND OR OBEY THE COURT'S ORDERS, THEREBY DELAYING, DELAYING, DELAYING AND MAKING US FILE MORE AND MORE AND MORE MOTIONS.

AND SO THE REASON THAT WE ARE HERE TODAY AS NOTED IN THE REPORT AND RECOMMENDATION OF THE MAGISTRATE IS BECAUSE OF HIS PATTERN OF DELAY, FAILURE TO RESPOND AND DISREGARD FOR THIS COURT'S ORDERS. IT'S PERVASIVE AND CONSISTENT RELATING BACK TO

THE INCEPTION OF THIS ACTION.  THAT'S FROM THE MAGISTRATE JUDGE'S ORDER AND FINAL RECOMMENDATION.

SO THIS CASE CRIES OUT FOR PUNITIVE DAMAGES. MR. KIFLE, WHEN HE PUBLISHED IT, HE DIDN'T BOTHER TO DO ANY FACT CHECKING.  HE DIDN'T BOTHER TO ASK MY CLIENT WHETHER HE WAS ENGAGED IN THIS.  WHEN MY CLIENT TOLD HIM, WHEN I TOLD HIM WITHIN DAYS OF HIS PUBLICATION THAT IT WASN'T TRUE, HE DIDN'T WITHDRAW AND RETRACT IT.  HE JUST MADE IT WORSE.

THE COURT:  MS. GATELY, WHAT AMOUNT OF PUNITIVE DAMAGES ARE YOU ALL ASKING FOR?

MS. GATELY:  YOUR HONOR, I MEAN WE HAVEN'T SPECIFIED AN AMOUNT AND I WOULD RESPECTFULLY SUBMIT THAT, YOU KNOW, A HUNDRED THOUSAND OR MORE WOULD BE APPROPRIATE FOR THIS.  BUT I WOULD LEAVE IT TO THE JUDGE.  UNDER GEORGIA LAW IT'S TO THE IMPARTIAL FINDER'S, YOU KNOW, DISCRETION HOW MUCH TO DO.  I'M NOT -- YOU KNOW, I RECOGNIZE THAT MR. KIFLE IS AN INDIVIDUAL, BUT HE HAS THE POTENTIAL AND HAS DONE A GREAT DEAL OF DAMAGE TO THIS MAN AND FORCED HIM TO EXPEND TIME AND RESOURCES THAT HE SHOULDN'T HAVE HAD TO DO.

AND SO I THINK, YOU KNOW, WHATEVER THE COURT'S -- I THINK IT COULD RUN AS HIGH AS $500,000 TO SEND A MESSAGE TO THIS MAN THAT HE'S GOT TO CHANGE HIS BEHAVIOR.  YOU DON'T GET TO PUBLISH WHATEVER YOU WANT WITHOUT IMPUNITY.  IT HAS TO BE TRUE.  WE WOULDN'T BE HERE TODAY IF HE HAD PUBLISHED SOMETHING THAT WAS TRUE.  WE ARE HERE TODAY BECAUSE HE CHOSE TO ACCUSE

THIS PERSON AND PUBLISH SOMETHING SAYING THAT HE HAD COMMITTED A CRIME.  THAT'S DEFAMATION PER SE.

SO, YOUR HONOR, I RESPECTFULLY REQUEST THAT YOU AWARD COMPENSATORY DAMAGES IN THE AMOUNT THAT OUR EXPERT HAS TESTIFIED TO OF APPROXIMATELY $150,000, THAT YOU ENTER AN AWARD OF PUNITIVE DAMAGES, THAT YOU REQUEST, YOU KNOW, FILE AN ORDER ORDERING HIM TO TAKE DOWN THE DEFAMATORY PUBLICATION IN AN ORDER SAYING THAT IT'S DEFAMATORY SO THAT THAT CAN THEN BE USED BY OUR EXPERT AND OTHERS TO GET THIS TAKEN DOWN OFF OF THE WEB AND THAT HE ISSUE A RETRACTION AND AN APOLOGY FOR THIS.  AND ALSO WE HAVE ASKED FOR FEES AND COSTS AND I THINK THAT'S APPROPRIATE IN THIS CASE AS WELL.

THE COURT:  HOW SOON CAN YOU ALL GET ME A BREAKDOWN ON FEES AND COSTS?

MS. GATELY:  YES, SIR.

THE COURT:  HOW SOON?  CAN YOU DO IT BY NEXT WEEK?

MS. GATELY:  YES, SIR.

THANK YOU.

THE COURT:  ALL RIGHT.  IT IS EXACTLY 5:50. MS. GATELY STARTED AT 5:39 AND SHE STOPPED AT EXACTLY 5:50.  SO IF MY MATH IS CORRECT, SHE ARGUED 11 MINUTES AND I WILL GIVE YOU 11 MINUTES AS WELL TO ARGUE.

MR. KIFLE:  YOUR HONOR, I HAVE BEEN CRITICAL OF THE ETHIOPIAN GOVERNMENT FOR THE PAST 20 YEARS AND THE ETHIOPIAN GOVERNMENT HAS BEEN TRYING TO, HAS BEEN TRYING ALL IT COULD TO

QUASH MY BLOG AND SUPPRESS MY VOICE.

UNTIL 2010 THE GOVERNMENT EFFORTS TO SILENCE ME HAVE CONCENTRATED IN ETHIOPIA, BUT SINCE 2010, WITH THE HELP OF ITS POWERFUL FRIENDS AND OPERATIVES, BUSINESSMAN MOHAMMED AL AMOUDI, AND SINCE 2012, MR. JEMAL AHMED AND THE LAW AND PUBLIC RELATIONS FIRM DLA PIPER, THE REGIME HAS BEEN TRYING TO PROSECUTE ME WHILE I AM IN EXILE.  AL AMOUDI AND DLA PIPER THEMSELVES HAVE BEEN --

MS. GATELY:  YOUR HONOR?

THE COURT:  HOLD ON.  THERE IS AN OBJECTION.

MS. GATELY:  I AM GOING TO NOTE MY OBJECTION, BECAUSE I AM FOLLOWING ALONG HERE WITH MR. KIFLE'S TRIAL BRIEF AND ALL HE IS DOING IS READING IT.  AND SO IF THAT'S WHAT THIS IS GOING TO BE FOR THE NEXT -- IT'S GOING TO TAKE US A LOT LONGER THAN 11 MINUTES.

THE COURT:  IT'S NOT GOING TO TAKE MORE THAN 11 MINUTES.  I GAVE YOU 11 MINUTES TO ARGUE AND THAT'S ALL HE IS GOING TO GET.

MS. GATELY:  ALL RIGHT.  I AM JUST GOING TO NOTE THAT THAT'S WHAT IS --

MR. KIFLE:  SHE TOOK 30 SECONDS.

THE COURT:  WELL, SHE HAS A RIGHT TO OBJECT.  YOU OBJECTED WHEN SHE WAS DOING HER CLOSING SO YOU HAVE A RIGHT TO OBJECT -- SHE HAS A RIGHT TO OBJECT IN YOURS.

MR. KIFLE:  YES, SIR.

SINCE 2010 AL AMOUDI THROUGH DLA PIPER FILED TWO FRIVOLOUS LAWSUITS AGAINST ME IN THE UNITED KINGDOM WHICH I DID NOT CONTEST BECAUSE I HAVE NO CONTACT WHATSOEVER IN THE U.K. AND COULD NOT AFFORD TO DEFEND MYSELF.  THE STAR WITNESS IN THE UNITED KINGDOM LAWSUIT WAS THE ETHIOPIAN GOVERNMENT'S AMBASSADOR IN LONDON.

IN 2012, AL AMOUDI, MOHAMMED AL AMOUDI, DLA PIPER AND THE ETHIOPIAN GOVERNMENT SAW AN OPPORTUNITY TO DRAG ME TO COURT IN THE U.S. WHEN I MENTIONED IN MY BLOG AL AMOUDI'S PARTNER, JEMAL AHMED, WHO LIVED IN ATLANTA 20 YEARS AGO.  THEY JUMPED ON THE OPPORTUNITY AND WE ARE HERE NOW BEFORE THE COURT.

DLA PIPER HAVE INTIMATE KNOWLEDGE OF JEMAL'S AND AL AMOUDI'S BUSINESS PRACTICE IN ETHIOPIA AND SAUDI ARABIA.  DLA PIPER THEREFORE ARE ESSENTIAL WITNESS IN THIS CASE.  THREE OF MY PRIMARY WITNESSES ARE CURRENTLY IN ETHIOPIAN JAIL AND TWO ARE HIDING IN ETHIOPIA.  IF THE COURT CAN ENSURE THEIR SAFETY, THEY MAY BE WILLING TO TESTIFY VIA VIDEO LINK OR BY TRAVELING TO A NEIGHBORING COUNTRY.

MS. GATELY:  YOUR HONOR, I AM SORRY BUT I HAVE TO OBJECT AGAIN, BECAUSE THIS IS NOT ARGUMENT THAT RELATES TO THE DAMAGES OF MR. AHMED AND HIS REPUTATION, SO I THINK IT'S INAPPROPRIATE.

THE COURT:  MR. KIFLE, YOU HAVE TO ARGUE ABOUT WHAT THIS CASE HAS BEEN ABOUT OR THIS HEARING HAS BEEN ABOUT.  YOU HAVE TO KEEP IT TO THAT, SO I WILL SUSTAIN THAT OBJECTION.

MR. KIFLE:  THIS CASE CONSTITUTIONALLY IS IMPEDING MY CONSTITUTIONALLY PROTECTED WORK.  I HAVE BEEN WRITING ABOUT ETHIOPIA, PARTICULARLY ON HUMAN RIGHTS ISSUES --

MS. GATELY:  OBJECTION.

THE COURT:  HOLD ON.  I WILL SUSTAIN THAT OBJECTION.

MR. KIFLE, I WANT YOU TO HAVE YOUR FULL TIME TO ARGUE, BUT I THINK I HAVE BEEN PATIENT AND I HAVE GOT TO ADMIT I AM BEGINNING TO FEEL LIKE -- NOT FEEL LIKE -- THAT YOU ARE SHOWING TOTAL DISRESPECT FOR THIS COURT AND THAT IS SOMETHING I CAN'T TOLERATE.  I UNDERSTAND YOU ARE NOT A LAWYER AND YOU WANT SOMETHING TO TELL ME, BUT I DON'T KNOW HOW MANY DIFFERENT WAYS I CAN TELL YOU.  YOU HAVE TO ARGUE BASED ON WHETHER OR NOT I SHOULD GRANT DAMAGES IN THIS CASE.

PROCEED.

MR. KIFLE:  YOUR HONOR, I DON'T WANT TO DISRESPECT THE COURT FURTHER AND I CAME PREPARED TO MAKE A STATEMENT AND TO PRESENT MY CASE, BUT IT SEEMS THAT I AM UNABLE TO DO THAT. SO IF I CONTINUE, I WILL --

THE COURT:  YOU CAN PRESENT, YOU CAN MAKE YOUR ARGUMENT.  YOU CAN MAKE YOUR ARGUMENT AS LONG AS YOU -- YOU CAN'T ARGUE ABOUT WHETHER OR NOT YOU DEFAMED MR. AHMED.  THAT HAS BEEN DECIDED.  YOU NEED TO TELL ME.  IT'S VERY, VERY IMPORTANT THAT YOU TELL ME WHY -- THEY ARE ASKING FOR $145,000 AGAINST YOU PLUS A HUNDRED PLUS MORE THOUSAND DOLLARS IN PUNITIVE DAMAGES.  TELL ME WHY I SHOULDN'T DO THAT.

MR. KIFLE:  YOUR HONOR, I AM REALLY SORRY THAT YOU SAY THAT I AM NOW DISRESPECTING YOU, AND IF I CONTINUE, I AM GOING TO RISK DISRESPECTING YOU MORE AND I DON'T WANT TO DO THAT.

THE COURT:  DON'T WORRY SO MUCH ABOUT --

MR. KIFLE:  SO I'D BETTER STOP, THEN, BECAUSE --

THE COURT:  I'M MORE CONCERNED ABOUT YOU HAVING --

MR. KIFLE:  -- THAT'S THE LAST THING I WANT TO DO.

THE COURT:  I'M CONCERNED ABOUT YOU HAVING YOUR DAY IN COURT AND IN DEFENDING YOURSELF.  YOU ARE TELLING ME THESE THINGS.  THAT'S WHAT I'M CONCERNED ABOUT.  I'VE DONE ALL OF THIS BECAUSE I FEEL IT'S VERY IMPORTANT THAT A PERSON IN AMERICA HAVE THEIR DAY IN COURT AND I AM TRYING MY BEST TO MAKE SURE YOU HAVE THAT DAY, BUT I HAVE TO FOLLOW CERTAIN RULES. TELL ME WHY I SHOULDN'T -- YOU CAN'T SAY YOU DIDN'T DEFAME. YOU CAN'T ARGUE THAT.

LET ME ASK YOU THIS QUESTION:  YOU ARE SAYING THAT MR. AHMED WAS NOT DAMAGED.

MR. KIFLE:  YES, SIR.

THE COURT:  WHY DO YOU SAY THAT?  WHY DO YOU SAY HE WASN'T DAMAGED?

MR. KIFLE:  BECAUSE ALL THE INFORMATION I HAVE IS THAT HE IN FACT GAINED A NOTORIETY AMONG THE SUPPORTERS OF THE ETHIOPIAN GOVERNMENT AND HE HAS BEEN REWARDED FOR THAT.  HE HAS BEEN REWARDED FOR THAT.  AND I HAVE -- I CAN DEMONSTRATE THAT

UNITED STATES DISTRICT COURT

IF I AM GIVEN A CHANCE.  I CAN DEMONSTRATE THAT THROUGH --

THE COURT:  HOW DID HE GO OUT AND GET NOTORIETY FROM THIS?

MR. KIFLE:  BECAUSE THE ETHIOPIAN GOVERNMENT HAS BEEN TARGETING ME FOR A LONG TIME AND THE FACT THAT SUDDENLY JEMAL CAME HERE AND HE WAS -- HE SUCCEEDED IN STOPPING MY WORK.  FOR THE PAST TWO YEARS NOT ONLY I HAVE TO SPEND AN ENORMOUS AMOUNT OF TIME TRYING TO --

THE COURT:  SO ARE YOU SAYING HE MADE MORE MONEY BECAUSE OF YOUR ARTICLE?

MR. KIFLE:  NOT ONLY HE MADE MORE MONEY, HE BECAME MORE POPULAR AMONG SUPPORTERS OF THE ETHIOPIAN GOVERNMENT, BECAUSE --

THE COURT:  SO YOU ARE DISAGREEING THAT HIS CHARACTER WAS HURT; YOU ARE SAYING HIS CHARACTER BECAME BIGGER?

MR. KIFLE:  HE IN FACT IS VIEWED AMONG THE ETHIOPIAN GOVERNMENT SUPPORTERS AS A HERO AND THEY GO ON RADIO PROGRAMS IN ATLANTA AND OTHER PLACES PRAISING HIM AND GO TO FACEBOOK AND OTHER PLACES AND THE ETHIOPIAN SUPPORTS THIS.

THE COURT:  ALL RIGHT.  NOW --

MS. GATELY:  OBJECTION.

MR. KIFLE:  HE IS A HERO AMONG THEM.

THE COURT:  HOLD ON, HOLD ON, HOLD ON.

YOU CAN'T TESTIFY ABOUT WHAT SOMEBODY ELSE IS SAYING.

MR. KIFLE:  YES.

THE COURT: YOU KNOW, YOU CAN'T, I MEAN NOT TESTIFY. THERE WAS NO EVIDENCE PUT IN THAT THE RADIO STATIONS --

MR. KIFLE: YEAH, BUT THAT'S A PROBLEM. THE PROBLEM I HAVE IS BECAUSE OF THE -- BECAUSE OF HOW THE --

THE COURT: BUT YOU CAN TESTIFY IN YOUR OPINION HE GAINED NOTORIETY.

MR. KIFLE: YEAH. IT'S NOT ONLY OPINION. IF I AM GIVEN A CHANCE TO PRESENT WITNESSES, I CAN -- THERE ARE MANY PEOPLE WHO CAN TESTIFY THAT HE HAS BECOME MORE POPULAR BECAUSE OF THIS ARTICLE, BECAUSE NOW -- BEFORE, NOBODY KNOWS ABOUT JEMAL. NOW HE IS A POPULAR FIGURE IN ETHIOPIA AMONG THE ETHIOPIAN GOVERNMENT SUPPORTERS. AND THE ETHIOPIAN GOVERNMENT NOW DOMINATES EVERYTHING IN ETHIOPIA, THE MEDIA. MY BLOG IS BLOCKED IN ETHIOPIA. EVERYTHING IS BLOCKED. THE ONLY OUTLET --

THE COURT: BUT YOU HAVE GOT TO UNDERSTAND SOMETHING. IT'S THAT HE IS NOT SAYING IT JUST HURT HIM IN ETHIOPIA. HE IS SAYING IT'S HURTING HIM GLOBALLY, THAT HE SELLS TO COMPANIES IN AMERICA, HE SELLS TO COMPANIES OUTSIDE. SO IF IT'S IN AMERICA AND HE IS TRYING TO DEAL WITH A COMPANY IN AMERICA, MR. AHMED HAS TESTIFIED HE CAN'T EVEN DO IT HIMSELF ANYMORE BECAUSE PEOPLE GOOGLE HIS NAME AND SAY, OH, I'M PROBABLY NOT GOING TO DEAL WITH THAT PERSON. SO HE HAD TO HIRE SOMEBODY TO DO WHAT HE COULD DO HIMSELF.

MR. KIFLE: THAT'S NOT TRUE, YOUR HONOR, BECAUSE,

FIRST OF ALL --

THE COURT:  I JUST WANT TO TELL YOU IT'S 5:00 O'CLOCK EXACTLY AND YOU'VE GOT ONE MORE MINUTE, BECAUSE AT 5:01, THAT'S 11 MINUTES.

MR. KIFLE:  YES, SIR.  BECAUSE OF WHAT I WROTE ABOUT HIM AND EVERYTHING SURROUNDING THAT, NOW HE IS ABLE TO DO MORE BUSINESS NOT ONLY IN ETHIOPIA, ANYWHERE IN THE WORLD.  THE ETHIOPIAN EMBASSY IN WASHINGTON, D.C., IS AT HIS DISPOSAL.  THE ETHIOPIAN GOVERNMENT IS AT HIS DISPOSAL.  AND HE IS GETTING MORE LAND, MORE INVESTMENT OPPORTUNITIES AND MORE EMPLOYEES. HE'S GETTING EVERYTHING.  AND, TO THE CONTRARY, TO THE --

THE COURT:  GO AHEAD.  FINISH THAT SENTENCE AND I'VE GOT A QUICK QUESTION FOR YOU.

MR. KIFLE:  YEAH.  TO THE CONTRARY, TO THE CONTRARY, I HAVE BEEN SUBJECTED TO CONTINUOUS HARASSMENTS BY AN ARMY OF LAWYERS.

THE COURT:  BUT NOW YOU ARE GOING ASTRAY, NOW.

LET ME ASK YOU THIS QUESTION:  MS. GATELY HAS ASKED ME TO AWARD PUNITIVE DAMAGES.  PUNITIVE DAMAGES ARE THERE TO PUNISH AND SHE IS SAYING, JUDGE, YOU SHOULD AWARD THESE PUNITIVE DAMAGES BECAUSE HE HAS NOT FOLLOWED ANY OF THE COURT'S ORDERS.  SHE POINTED OUT SOME ORDERS THAT JUDGE SCOFIELD ENTERED THAT YOU DIDN'T FOLLOW, PLUS SHE SAYS FOR THREE YEARS HE HAS REFUSED TO TAKE DOWN THIS BLOG, WHICH CONTINUOUSLY HURT MY CLIENT, AND YOU SHOULD AWARD PUNITIVE DAMAGES AND PUNISH

HIM.

WHY SHOULD I NOT PUNISH YOU FOR NOT FOLLOWING THE COURT'S ORDERS AND FOR LEAVING UP A BLOG THAT IT HAS BEEN DECIDED YOU WERE WRONG IN?

MR. KIFLE:  BECAUSE -- I AM NOT REMOVING THE ARTICLE BECAUSE IT'S ABSOLUTELY TRUE.  IT'S THE TRUTH.  THAT'S WHY I'M NOT REMOVING IT.  AND A HUNDRED THOUSAND DOLLARS, $200,000, $500,000 IS PEANUTS FOR MR. AHMED.

THE COURT:  BUT HE IS NOT PAYING IT.  THAT'S WHAT THEY ARE ASKING YOU TO PAY.

MR. KIFLE:  YEAH, I KNOW.  I MEAN HE DOESN'T WANT MY MONEY.  TRUST ME.  AND HE'S NOT GOING TO GET THAT MONEY BECAUSE I DON'T HAVE THAT MUCH MONEY.  BUT THAT'S NOT THEIR INTENTION, YOUR HONOR.  THEIR INTENTION IS TO STOP ME, TO SILENCE ME.

THE COURT:  BUT YOU HAVE GOT TO UNDERSTAND SOMETHING. LET ME ASK YOU ONE LAST QUESTION AND THEN WE ARE GOING TO STOP.

THEY ARE ASKING ME TO ENTER AN ORDER TELLING YOU, ORDERING YOU TO TAKE THAT BLOG DOWN.  NOW, LET ME EXPLAIN TO YOU.  IF I DO THAT AND YOU DON'T TAKE THAT BLOG DOWN, THEN THEY CAN COME BACK AND FILE A MOTION FOR CONTEMPT AND ASK THAT I PUT YOU IN JAIL OR FINE YOU A CERTAIN AMOUNT OF MONEY UNTIL YOU TAKE THAT BLOG DOWN.  WHY SHOULD I NOT DO THAT?  TELL ME.

MR. KIFLE:  BECAUSE, FIRST OF ALL, IT'S THE TRUTH, AND, SECOND OF ALL, THEIR INTENTION IS NOT ONLY THE ARTICLE, IT'S TO SHUT DOWN THE WHOLE WEBSITE, MY BLOG.

THE COURT: NO, THEY ARE NOT ASKING ME TO DO THAT.

MR. KIFLE: YEAH. BUT YOUR HONOR --

THE COURT: THEY ARE NOT. I LISTENED VERY CLOSELY TO MS. GATELY.

MR. KIFLE: FIVE SECONDS.

THE COURT: SHE NEVER ONE TIME TOLD ME TO SHUT DOWN YOUR BLOG. SHE SAID TAKE DOWN THE DEFAMING STATEMENT AGAINST HER CLIENT. SHE DID NOT ONE TIME THIS WHOLE TWO AND A HALF HOURS ASK ME TO CLOSE DOWN YOUR BLOG OR QUIT YOU FROM RUNNING IT. THE ONLY THING THEY ARE ASKING ME TO DO IS HAVE YOU TAKE DOWN THAT BLOG AGAINST THEIR CLIENT.

MR. KIFLE: CAN I ANSWER, SIR?

THE COURT: YOU CAN ANSWER THAT AND THEN THAT'S IT.

MR. KIFLE: OKAY. OF COURSE, IF YOU ORDER ME TO BRING DOWN THE ARTICLE, I AM A LAW-ABIDING CITIZEN. I WILL DO IN IT IN A MINUTE. NOT ONLY THAT, HAD WE BEEN GIVEN A CHANCE, ME AND JEMAL ALONE TO SIT DOWN AND TALK, I WOULD HAVE DONE IT. BUT DLA PIPER'S PRESENTATION IS NOT THAT. THEY ARE AFTER ME TO BOG ME DOWN IN A LEGAL BATTLE. WE COULD HAVE SETTLED THIS PROBLEM TWO YEARS AGO OR, YOU KNOW, BEFORE THAT.

THE COURT: I WISH YOU ALL HAD.

MR. KIFLE: BUT MY FINAL ANSWER IS: ABSOLUTELY, IF THAT'S YOUR ORDER, I WILL ABIDE BY YOUR ORDER BECAUSE I AM A LAW-ABIDING PERSON.

THE COURT: AND I APPRECIATE THAT MORE THAN YOU

REALIZE.

OKAY.  THANK YOU FOR BEING HERE.  THANK YOU FOR EXERCISING YOUR RIGHTS.

OKAY.  YOU CAN BE SEATED AND LET ME TELL YOU ALL WHAT I AM GOING TO DO.

MR. KIFLE:  YES, SIR.

THE COURT:  THE COURT IS GOING TO GRANT THE DEFAULT JUDGMENT AGAINST ETHIOPIAN REVIEW.  THE COURT IS GOING TO ENTER AN ORDER AS OF TODAY.  YOU HAVE UNTIL 4:00 P.M. TOMORROW TO TAKE THIS BLOG DOWN, TAKE IT DOWN.

NOW, AT 4:01 -- NO.  AT 4:05 OR 4:01 I WANT MS. GATELY TO CHECK.

MS. GATELY:  YOUR HONOR, MAY I JUST CLARIFY THAT HE TAKES DOWN THE EXHIBITS THAT I TALKED ABOUT TODAY?

THE COURT:  THE EXHIBITS AS WELL.

MS. GATELY:  BECAUSE THEY ARE ALL RELATED TO THE SAME TOPIC.

THE COURT:  EVERYTHING RELATED TO THIS TOPIC HAS TO BE REMOVED.  YOU ARE GOING TO GET A WRITTEN ORDER, BUT I WANT TO JUMP ON IT RIGHT NOW.  IT HAS TO BE TAKEN DOWN BY 4:00 P.M. TOMORROW.  I AM DIRECTING MS. GATELY THEN TO CHECK.  IF IT'S NOT DOWN, THEN LET ME KNOW.

NOW, SECOND OF ALL, I AM GOING TO GRANT COMPENSATORY DAMAGES.  I WANT TO THINK ABOUT THE AMOUNT.  I AM GOING TO GRANT PUNITIVE DAMAGES.  AGAIN, I WANT TO THINK ABOUT THE

AMOUNT I WANT TO GRANT. THERE WILL HAVE TO BE A RETRACTION AND I WILL GIVE YOU THE WORDS THAT THE RETRACTION WILL SAY. IT WILL BE IN MY ORDER. I WILL DETERMINE WHAT THE WORDING WILL BE AND YOU WILL HAVE TO PUT THAT RETRACTION UP AT THE TIME DESIGNATED BY ME.

SO ONE MORE TIME. I AM GRANTING A DEFAULT JUDGMENT AGAINST ETHIOPIAN REVIEW. I AM GRANTING COMPENSATORY DAMAGES. I WILL GIVE YOU ALL THE AMOUNT. I AM GRANTING PUNITIVE DAMAGES. I WILL GIVE YOU ALL THE AMOUNT. YOU ARE TO TAKE DOWN THE BLOG AND ALL EXHIBITS AND ANYTHING ASSOCIATED WITH THAT BLOG BY 4:00 P.M. TOMORROW, JANUARY 30TH, 2015.

MS. GATELY: AND JUST TO CLARIFY, YOU HAVE ASKED US TO SUBMIT FEES AND COSTS?

THE COURT: YES.

MS. GATELY: SOMETIME NEXT WEEK?

THE COURT: I NEED YOU ALL TO DO THAT BY NOON MONDAY.

MR. KIFLE: CAN I?

THE COURT: YES, SIR.

MR. KIFLE: CAN YOU NOTE THAT I WILL -- I AM GOING TO APPEAL THIS CASE TO THE COURT OF APPEALS?

THE COURT: AND THAT IS A RIGHT YOU HAVE, YES.

MR. LEHMAN: YOUR HONOR, MY CLIENT HAS A QUESTION ABOUT THE RETRACTION. WILL THAT MEAN INCLUDING AN APOLOGY?

THE COURT: YES.

MR. LEHMAN: THANK YOU.


UNITED STATES DISTRICT COURT

MR. KIFLE:  YOUR HONOR, IF I AM GOING TO APPEAL THE CASE, CAN I WAIT UNTIL --

THE COURT:  YOU GET THE ORDER.  ONCE YOU GET THE ORDER FROM ME, THEN YOU HAVE 30 DAYS TO APPEAL.

MR. KIFLE:  OKAY.  SO CAN I WAIT 30 DAYS BEFORE I TAKE DOWN THE ARTICLE, I MEAN PENDING THE APPEAL?

THE COURT:  WELL, I AM GOING TO ENTER AN ORDER AND WHAT THE ORDER IS GOING TO INDICATE IS WHAT YOU ARE SUPPOSED TO DO.  NOW, WHETHER OR NOT THE ORDER CAN BE STOPPED, THAT PROCEDURE IS BETWEEN YOU AND YOUR APPEAL PROCESS.

MR. KIFLE:  BECAUSE I AM PLANNING TO APPEAL TOMORROW, SO --

THE COURT:  WHAT HE IS ASKING, MS. GATELY, HE IS ASKING THAT I NOT ORDER HIM TO TAKE DOWN THE BLOG UNTIL THE COURT OF APPEALS RULES ON MY RULING.

MS. GATELY:  AND I WOULD OF COURSE OBJECT TO THAT. IT NEEDS TO BE TAKEN DOWN IMMEDIATELY AS THE COURT HAS ORDERED.

THE COURT:  SO BASICALLY IN MY ORDER RIGHT NOW, I PLAN ON HAVING THE BLOG TAKEN DOWN BY 4:00 P.M. TOMORROW, AS I INDICATED, AND ALL THINGS, EXHIBITS WITH THE BLOG.

MR. KIFLE:  OKAY.  REGARDING MY OUTSTANDING MOTIONS, ARE YOU GOING TO BE DECIDING THOSE?

THE COURT:  I AM GOING TO RULE ON ALL OF THOSE.  YOU ARE GOING TO GET -- I AM GOING TO RULE ON EVERY ONE OF THE MOTIONS YOU HAVE OUT.

MR. KIFLE:  OKAY.  LAST QUESTION.  PENDING THE APPEAL, MAINLY THE APPEAL WILL BE FOCUSED MAINLY ON DISQUALIFYING DLA PIPER.

THE COURT:  LET ME JUST TELL YOU RIGHT NOW.  AS THE JUDGE, I DON'T LIKE TO PLAY GAMES.  I AM GOING TO DENY THAT MOTION DISQUALIFYING DLA PIPER BUT I AM GOING TO PUT IT IN WRITING.

THE FOLLOWING MOTION, HERE IS THE RULING THE COURT IS GOING TO MAKE.  IN THE MOTION FILED OPPOSITION OF PLAINTIFF'S MOTION FOR SANCTIONS -- WELL, LET ME BACK UP.

THE MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL, DLA PIPER, THE COURT IS DENYING THAT MOTION.  DLA PIPER WILL NOT BE DISQUALIFIED.  AND I AM SURE THAT IS THE ONE YOU WANT TO APPEAL, SO I AM TELLING YOU NOW.

MR. KIFLE:  ALSO, I WANT TO APPEAL THE COUNTERCLAIM.

THE COURT:  THE WHAT?

MR. KIFLE:  THE COUNTERCLAIM.  I WANT TO APPEAL THE COUNTERCLAIM ALSO.

THE COURT:  ALL RIGHT.  LET ME GIVE YOU THE NEXT RULING.

REQUEST FOR CLARIFICATION AND CONFIRMATION REGARDING PLAINTIFF'S NOTICE OF DEPOSITION.  I AM DENYING THAT MOTION.

DEFENDANT ELIAS KIFLE'S MOTION TO COMPEL PLAINTIFF JEMAL AHMED TO APPEAR FOR DEPOSITION.  I AM DENYING THAT MOTION.

MOTION FOR LEAVE TO FILE THIRD-PARTY COMPLAINT, COUNTERCLAIM AND PROPOSED THIRD-PARTY COMPLAINT, MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL.  I'M DENYING THAT MOTION.

THIS IS SET IN A FORMAL MOTION.  NOTICE OF CHANGE OF ADDRESS.  I AM DENYING THAT MOTION.

MR. LEHMAN:  YOUR HONOR, THAT WAS MY CHANGE OF ADDRESS.  I APOLOGIZE FOR PUTTING IT AS A MOTION.  IT SHOULD HAVE JUST BEEN FILED AS A NOTICE.

THE COURT:  THAT SHOULD HAVE BEEN.

I WILL DENY IT AS MOOT.

MR. LEHMAN:  THANK YOU.

THE COURT:  OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTION, MOTION TO VACATE JUDGE SCOFIELD'S ORDERS, MOTION TO DISQUALIFY COUNSEL.  I THINK THIS MOTION IS MOOT.

I THINK THAT'S ALL THE MOTIONS.  THAT WAS NUMBER OR DOCUMENT 81.

MR. KIFLE:  SO EVERYTHING IS DENIED?

THE COURT:  EVERYTHING IS DENIED BUT -- NOT EVERYTHING.

MS. GATELY:  IN FAIRNESS, YES, I HAD A MOTION FOR SANCTIONS THAT WAS FILED ON JANUARY 12TH THAT WOULD HAVE STOPPED HIM FROM PARTICIPATING IN THIS HEARING AND OBVIOUSLY THAT IS DENIED AS MOOT.

THE COURT:  EXACTLY.  THAT'S THE ONE I SAID IT'S DENIED AS MOOT.

SO NOW HERE IS WHAT I THINK YOU NEED TO DO.  WAIT UNTIL YOU GET MY WRITTEN ORDER.  YOUR APPEAL CLOCK DOESN'T REALLY START UNTIL I GET THE ORDER AND PUT IT IN WRITING AND FILE IT.  WE ARE NOT GOING TO BE ABLE TO HAVE IT TO YOU UNTIL AFTERNOON ON MONDAY, BECAUSE I NEED TO GET THE FEES AND EXPENSE REPORT FROM PLAINTIFF'S COUNSEL.  SO I AM PRETTY CONFIDENT WE WILL HAVE IT TO YOU -- I DON'T WANT TO OVERCOMMIT.  WE WILL HAVE IT TO YOU BY NO LATER THAN 9:00 O'CLOCK OR 9:30 TUESDAY MORNING.

MR. KIFLE:  SO THE CLOCK STARTS TUESDAY?

THE COURT:  YES.  NOW, HERE'S WHAT WE'VE GOT TO DO. YOU ARE NOT AN ATTORNEY SO YOU ARE NOT ON WHAT WE CALL THE ECF. SO YOU ARE GOING TO HAVE TO GIVE US SOMETHING WHERE WE KNOW WHERE TO MAIL IT TO YOU.

MR. LEHMAN:  I USUALLY FORWARD ALL THE ORDERS TO HIM BY EMAIL AS WELL, SO I WILL JUST MAKE SURE I DO THAT AS WELL.

THE COURT:  OKAY.  WELL, WE NEED AN EMAIL SO WE CAN -- OKAY.  WELL, DO YOU HAVE THE EMAIL?

MR. LEHMAN:  I DO.

THE COURT:  ALL RIGHT.  THEN YOU WILL FORWARD IT TO HIM.  YOU WILL GET ALL THESE ORDERS BY EMAIL.

MR. LEHMAN, WHAT I WOULD LIKE TO DO, I NEED YOU TO SEND ME SOMETHING INDICATING THE DATE AND THE TIME YOU FORWARDED THESE.

MR. LEHMAN:  DO YOU WANT ME TO COPY YOUR -- MAYBE

YOUR ASSISTANT OR SOMETHING ON IT?

THE COURT:  JUST FILE IT.  JUST FILE A CERTIFICATE OF SERVICE.

MR. LEHMAN:  OKAY.  THAT SOUNDS GOOD.

THE COURT:  THAT WILL TAKE CARE OF IT.

MR. LEHMAN:  THANK YOU, YOUR HONOR.

THE COURT:  YES, SIR?

MR. KIFLE:  SO THE CLOCK STARTS FOR APPEAL STARTING THE DAY YOU ENTER --

THE COURT:  WELL, WHAT I AM GOING TO TRY TO DO TO MAKE SURE YOU GET YOUR FULL TIME, MR. LEHMAN INDICATES TO ME THROUGH ECF WHAT DATE AND TIME HE FILED IT.  THAT WAY THE COURT OF APPEALS WILL KNOW EXACTLY WHEN YOU GOT IT AND THE CLOCK -- SO THEY CAN START THE CLOCK THEN.

MR. KIFLE:  SO I HAVE 30 DAYS AFTER THAT?

THE COURT:  YES.  THEN, YOU KNOW, YES.

I AM ALMOST AFRAID TO ASK BUT I WILL.  IS THERE ANYTHING ELSE FROM THE PLAINTIFFS?

MS. GATELY:  NO, YOUR HONOR.

MR. LEHMAN:  NO, YOUR HONOR.

THE COURT:  ANYTHING ELSE, MR. KIFLE?

IF NOT, THANK YOU ALL.  HAVE A GOOD DAY.

MS. GATELY:  THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

I, DAVID A. RITCHIE, OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, DO HEREBY CERTIFY THAT THE FOREGOING 139 PAGES CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE SAID COURT, HELD IN THE CITY OF ATLANTA, GEORGIA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS, THE 9TH DAY OF MARCH, 2015.

_____
DAVID A. RITCHIE
OFFICIAL COURT REPORTER
NORTHERN DISTRICT OF GEORGIA

UNITED STATES DISTRICT COURT